# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **DAVID CARL DUNCAN,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **No. 3:88-00992** |
| **v.** | ) | |
| | ) | **Judge Nixon** |
| **WAYNE CARPENTER, Warden,**[1] | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM

Petitioner David Carl Duncan, a prisoner in state custody confined under a sentence of death at Riverbend Maximum Security Institution, has filed a petition under 28 U.S.C. § 2254 for writ of habeas corpus (Doc. No. 3), as amended by two supplemental pleadings (Doc. Nos. 64; 118-1). Pending before the Court are the parties' cross motions for summary judgment (Doc. Nos. 177; 180), which have been fully briefed by the parties and are ripe for review. Moreover, because the Court reserved judgment on those motions until after holding a full evidentiary hearing into all of Petitioner's claims (*see* Doc. Nos. 205 at 3; 229), any claims not disposed of on the basis of either summary judgment motion are ripe for final judgment on the merits.

For the reasons set forth herein, Petitioner's motion for summary judgment will be **DENIED**; Respondent's motion for summary judgment will be **GRANTED IN PART** and **DENIED IN PART**; and the parties will be **ORDERED** to file amended briefs with respect to Petitioner's claim for ineffective assistance of counsel.

---

[1] See n.1 of contemporaneously entered Order.

# I. PROCEDURAL HISTORY

On April 1, 1983, Petitioner was convicted in the Criminal Court of Sumner County, Tennessee of first degree murder, armed robbery and aggravated rape, for which he was sentenced to death and two consecutive life sentences, respectively. The Tennessee Supreme Court affirmed his convictions and sentences on direct appeal. *State v. Duncan*, 698 S.W.2d 63 (Tenn. 1985), *cert. denied*, 475 U.S. 1031 (1986) (hereinafter "*Duncan 1*").

Petitioner filed his first petition for post-conviction relief on April 11, 1986,[2] which was denied after an evidentiary hearing. The denial was affirmed by the Tennessee Court of Criminal Appeals. The Tennessee Supreme Court denied permission to appeal, and the United States Supreme Court denied certiorari. *Duncan v. State*, No. C.C.A. 87-6-III, 1988 WL 10072 (Tenn. Ct. Crim. App. Feb. 9, 1988), *cert. denied*, 488 U.S. 934 (1988) (hereinafter "*Duncan Post-Conviction 1*"). Petitioner filed a second post-conviction petition on December 7, 1988, which was likewise dismissed after an evidentiary hearing. While his appeal from that dismissal was pending in the Tennessee Court of Criminal Appeals, Petitioner filed a third post-conviction petition, which was also denied after an evidentiary hearing. On consolidated appeal, the Tennessee Court of Criminal Appeals affirmed the denials of Petitioner's second and third post-conviction petitions. *See Duncan v. State*, Nos. 01C01-9311-CR-00412, 01C01-9510-CR-00347, 1997 WL 700043 (Tenn. Ct. Crim. App. Nov. 10, 1997) (hereinafter "*Duncan Post-Conviction 2/3*"). The Tennessee Supreme Court denied permission to appeal on December 28, 1998, and the United States Supreme Court denied certiorari. *Id.*, *cert. denied*, 528 U.S. 830 (1999). Petitioner's April 21, 1999 motion to reopen his third post-conviction proceeding was denied for

---

[2] The Tennessee Court of Criminal Appeals incorrectly recited the date of Petitioner's first post-conviction filing as December 23, 1986 in its later ruling. *See Duncan v. State*, Nos. 01C01-9311-CR-00412, 01C01-9510-CR-00347, 1997 WL 700043, at *1 (Tenn. Ct. Crim. App. Nov. 10, 1997).

failure to meet statutory requirements to reopen, and both the Tennessee Court of Criminal Appeals and the Tennessee Supreme Court denied permission to appeal. (Doc. No. 65, Addenda 48, 51, 54.)

While his second post-conviction petition was being litigated, Petitioner also filed a state petition for writ of habeas corpus, the dismissal of which was affirmed on appeal. *See Duncan v. State*, No. 01C01-9301-CR-00004, 1993 WL 331822 (Tenn. Ct. Crim. App. Aug. 26, 1993), *perm. app. denied* (Tenn. Dec. 28, 1993) (hereinafter "*Duncan Habeas 1*"). On October 27, 2009, Petitioner filed a second state petition for writ of habeas corpus, the dismissal of which was also affirmed on appeal. *See Duncan v. State*, No. M2009-02574-CCA-R3-HC, 2010 WL 4674268 (Tenn. Ct. Crim. App. Oct. 26, 2010) (hereinafter "*Duncan Habeas 2*").

Petitioner filed his original federal petition for writ of habeas corpus with this Court on November 28, 1988, before concluding his state proceedings. (Doc. No. 3.) Respondent filed an Answer along with a copy of the underlying record on March 23, 1989. (Doc. Nos. 9 and 10.) On Petitioner's motion, the Court ordered on June 12, 1990, that the petition would be held in abeyance with leave to reactivate following exhaustion in the state courts. (Doc. No. 30.) The Court reactivated the case on Petitioner's motion on December 10, 1999, and granted a stay of execution pursuant to 28 U.S.C. § 2251 to allow for consideration of the petition. (Doc. No. 35.) Petitioner filed an Amended Petition on October 2, 2000 (Doc. No. 64), and the Court allowed further amendment to that Amended Petition on November 27, 2007. (Doc. Nos. 118-1; 134.) Respondent filed an Answer to the Amended Petition on November 16, 2000. (Doc. No. 66.) The Court permitted Petitioner to conduct discovery (Doc. Nos. 87; 133), and held a full evidentiary hearing on Petitioner's claims in March 2012. (Doc. No. 229.) The parties have filed competing motions for summary judgment, including memoranda in support, responses, replies,

Petitioner's statement of fact and Respondent's response thereto[3] (Doc. Nos. 177; 178; 180; 181; 186; 187; 188; 191; 193; 195), as well as proposed findings of fact and conclusions of law regarding the hearing. (Doc. Nos. 232; 233.)  There is no dispute about the timeliness of the petition, and it is ripe for review.

## II.    FACTUAL BACKGROUND

The Tennessee Supreme Court summarized the evidence presented at Petitioner's trial as follows:

> Defendant was convicted of raping and killing Ruby Evelyn Burgess in the course of a robbery of the Short Stop Market in Gallatin, Tennessee. Ms. Burgess was employed at the market as the night-shift cashier, with her work assignment being from 10:00 p.m. to 6:00 a.m. On February 15, 1981, her relief reported to the market at approximately 5:40 a.m. She found the "still-warm," partially nude body of Ms. Burgess in the aisle near the cash register. Ms. Burgess's throat had been cut and she was lying in a pool of blood. Her pants and undergarments were pulled down around her lower right leg. A trail of blood led from the cooler at the back of the store to her body, indicating that the assault took place in the cooler. Time of death was fixed by the examining physician at approximately 5:30 a.m. According to the examining physician, Ms. Burgess's death resulted from three cuts to her neck of such force that they cut through her neck muscles, jugular vein, trachea, larynx and esophagus, and nicked the carotid artery. The immediate cause of death was an air embolus in the heart caused by the entry of air into the blood stream through the gaping wound in Ms. Burgess's neck.

> A subsequent examination of Ms. Burgess's body revealed mobile sperm in her vagina from a "type O secretor." The defendant is a "type O secretor," as are approximately thirty-five percent of the male population.

> The cash register drawer was closed when Ms. Burgess's body was found, but comparison of the cash register tape with the

---

[3] Respondent sought and obtained a waiver of the local requirement to support his motion for summary judgment with a statement of undisputed fact. (Doc. No. 194).

contents of the register showed that $246.00 was missing. The last item shown on the cash register tape was a 35¢ grocery item. (Prior to it, $3.00 worth of gas and a 25¢ grocery item had been sold.) A bottle of Tropicana fruit punch, which sold for 35¢, was sitting on the counter by the cash register. The bottle still had "frost" on it when the police arrived. Six fingerprints were lifted from the bottle. Four of the prints were later identified as being from defendant's left hand.

Linda Kelly, a local cab driver who had known the defendant three or four years, testified that she saw defendant pumping gas into a dark green Buick Electra at the market at approximately 4:50 a.m. on February 15, 1981. The defendant was wearing a toboggan and a dark jacket and had his hair in plaits.

At approximately 5:30 a.m., Harold Pryor, an employee of the Nashville Tennessean, was putting newspapers in a rack outside the Short Stop Market, when he saw a young black male, six foot one, approximately one hundred forty-five pounds, wearing a "tam" (or having short hair) and a dark "shawl," come from the direction of the market door and go towards a dark blue or black car parked at the store. The description generally matched that of the defendant, but Pryor did not identify the defendant as the man he had seen.

On the day after the murder, the defendant called the cab company and for the first time ever specifically requested that Ms. Kelly drive him to work in nearby Hendersonville, Tennessee. When the defendant mentioned to Kelly that he had seen her someplace the night before, Kelly reminded him that they had seen one another at the Short Stop Market. The defendant said he had trouble remembering this because "he'd been gettin' out and gettin' high ... that weekend." When Kelly said, "it's bad about that woman, you know, gettin' killed," the defendant's hands began to tremble and he changed the subject. For the next week and a half Kelly drove the defendant to and from work for $14.00 per day. The defendant then told Kelly he was leaving Gallatin to go to a vocational training center in Kentucky or Indiana. The proof showed defendant did join the Job Corps in Kentucky, where he remained until the fall of 1981.

After his return to Gallatin, the murder investigation zeroed in on the defendant. The defendant gave the police two statements to the effect that he had not been near the store at the time of the murder, that he seldom traded there, and that he did not know Ms.

5

Burgess. He said he had never purchased any juice at the store and was allergic to fruit punch. He further stated that he knew of no way he could have touched the bottle the police found on the counter by the cash register, and from which his fingerprints had been lifted.

The defendant's proof consisted of the testimony of friends and family. His girlfriend testified that he had spent the night of the killing at her house and that he had worked on her automobile the next day. She also testified that the defendant usually drove her orange and white automobile when he needed an automobile. Family members testified that while they owned two dark green automobiles, a Buick and a Nova, the Nova was not "street-worthy" in February, 1981, and the Buick was not purchased until sometime in 1982. The defendant's brother who owned the Nova testified that he had not permitted defendant to drive the car on the night of the murder, nor had he allowed defendant to drive his 1977 dark blue Grand Prix. The defendant did not testify.

From this evidence, the jury found the defendant guilty of first degree murder, aggravated rape, and armed robbery. Life sentences were given on the rape and robbery convictions and, in a separate hearing, the jury returned the sentence of death on the first degree murder conviction. In imposing the sentence of death, the jury found from the evidence introduced in the convicting phase of the trial that the murder of Ruby Evelyn Burgess was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind and that the murder was committed while the defendant was engaged in committing rape and robbery. See T.C.A. § 39-2-203(i)(5) and (7). No mitigating circumstances were found by the jury.

*Duncan 1*, 698 S.W.2d at 65–67.

## III.    CLAIMS PRESENTED

Petitioner has raised thirty-three claims, plus numerous sub-parts, which the Court summarizes as follows:

1.     Petitioner was denied the right to cross-examine witness Linda Kelly concerning bias and motive to lie, in violation of his right to a fair trial and a fair sentencing hearing.

2.      The prosecution offered false testimony by witness Kelly and withheld material exculpatory evidence demonstrating the falsity of that testimony.

3.      Petitioner's conviction and sentence were tainted by racially inflammatory argument by the prosecutor and by the visible presence of the Ku Klux Klan in the courtroom during his trial, in violation of his right to due process and equal protection.

4.      The grand jury that indicted Petitioner and the jury that convicted him were not a fair cross-section of the community and were tainted by invidious discrimination.

5.      The prosecution withheld exculpatory evidence that was material to both the guilt and sentencing verdicts in this case.

6.      Petitioner received ineffective assistance of counsel at both phases of trial and on direct appeal.

7.      Petitioner is actually innocent of the crimes for which he was convicted.

8.      The jury weighed unconstitutional aggravating circumstances in imposing the death sentence.

9.      The trial court improperly instructed the jury on the definition of "reasonable doubt" in a manner that lessened the prosecution's burden of proof at both the guilt and sentencing phases of the trial.

10.     Petitioner was denied necessary expert assistance at trial, in violation of his right to due process and to the effective assistance of counsel at both phases of the trial.

11.     The trial court improperly instructed the jury on the meanings of premeditation and deliberation in a manner that understated the prosecution's burden of proving essential elements of the crime.

12.     The jury was not required to find the element of "malice" as part of its deliberation on the murder charge.

13.     The trial court's instructions at the sentencing phase misled the jurors into believing that mitigating circumstances had to be found unanimously.

14.     The Tennessee death penalty statute is unconstitutional in violation of the Eighth and Fourteenth Amendments.

15.     The prosecution made inherently prejudicial and unfair statements regarding prosecutorial expertise to the jury.

16.     The prosecution misled the jury about the meaning of mitigating evidence and limited the consideration of mitigating circumstances by the sentencing jury.

17.     The prosecution made unconstitutionally improper arguments at the sentencing phase of trial.

18.     The trial court failed to inform the jury fully about the meaning of a life sentence.

19.     The Tennessee Supreme Court conducted a fatally flawed proportionality review of Petitioner's sentence.

20.     Tennessee's appellate review process in capital cases is inadequate and results in the arbitrary imposition of the death sentence.

21.     The trial court violated Petitioner's right to due process by instructing the jury on deliberate premeditated murder when the elements of that offense were not charged in his indictment.

22.     There was insufficient evidence to support the conviction.

23. The trial court improperly admitted evidence secured from Petitioner following his arrest without proper cause and without a proper showing of valid waiver by Petitioner of his right not to provide such evidence.

24. The trial court improperly admitted inflammatory crime scene photographs into evidence.

25. The trial court improperly admitted prejudicial and misleading serology testimony.

26. The trial court improperly excused a qualified prospective juror for cause.

27. Petitioner was unconstitutionally penalized with a death sentence for exercising his right to a jury trial.

28. Allowing the jury to deliberate on Petitioner's sentence until 11:40 p.m. improperly influenced jurors to impose the death penalty and violated Petitioner's right to due process.

29. There was insufficient evidence to establish that Petitioner perpetrated a robbery.

30. The lapse of time since the offense would render execution of the death sentence now cruel and unusual.

31. State officials destroyed potentially exculpatory evidence prior to trial.

32. Excessive courtroom security and the use of handcuffs on Petitioner while in the courtroom at trial deprived Petitioner of the presumption of innocence.

33. The cumulative effect of the errors at trial deprived Petitioner of a fair trial and sentencing hearing.

## IV.    STANDARD OF REVIEW

A state prisoner is entitled to a writ of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

Because Petitioner filed his original petition prior to the effective date of the Antiterrorism and Effective Death Penalty Act of 1996, the pre-AEDPA standard of review applies. *Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Under that standard the Court may "make its own independent determination of [Petitioner's] federal claim, without being bound by the determination on the merits of that claim reached in the state proceedings." *Buell v. Mitchell*, 274 F.3d 337, 344 (6th Cir. 2001) (quoting *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)). Although Respondent in his memorandum in support of summary judgment (Doc. No. 178) argues for the application of AEDPA to the Amended Petition, the Court rejects that argument for the reasons set forth in its Order of April 5, 2006. (Doc. No. 85.) In a case with similar relevant procedural background previously decided by this Court using pre-AEDPA standards, the United States Court of Appeals for the Sixth Circuit acknowledged that the petitioner had amended his petition in 1999 but still explained that "[b]ecause Harries filed his habeas corpus petition before the enactment of the Antiterrorism and Effective Death Penalty Act of 1996, we apply the pre-AEDPA standard of review." *Harries v. Bell*, 417 F.3d 631, 634 (6th Cir. 2005) (citing *Lindh v. Murphy*, 521 U.S. 320, 326 (1997)); *accord Thomas v. Chappell*, 678 F.3d 1086, 1100–01 (9th Cir. 2012).

State court findings of fact relevant to a district court's review of a habeas corpus petition are entitled to a presumption of correctness. 28 U.S.C. § 2254(d) (1966). However, under pre-AEDPA standards, that presumption can be overcome by any of eight statutory exceptions,

including the district court's independent finding that the state court's findings are not fairly supported by the record. *Id.*; *Bragan v. Morgan*, 791 F. Supp. 704, 717–18 (M.D. Tenn. 1992).

Summary judgment is only appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A "genuine issue of material fact" is a fact which, if proven at trial, could lead a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). In considering whether summary judgment is appropriate, the Court must "look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial." *Sowards v. Loudon Cnty*., 203 F.3d 426, 431 (6th Cir. 2000). In reviewing a motion for summary judgment, the Court must view the evidence and all inferences drawn from underlying facts "in the light most favorable to the party opposing the motion." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001).

The moving party has the burden of showing the absence of genuine factual disputes from which a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 249–50. However, "[t]he moving party need not support its motion with evidence disproving the non-moving party's claim, but need only show that 'there is an absence of evidence to support the non-moving party's case.'" *Hayes v. Equitable Energy Res. Co*., 266 F.3d 560, 566 (6th Cir. 2001) (quoting *Celotex Corp*., 477 U.S. at 325).

The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cnty. Bd. of Educ*., 330 F.3d 888, 892 (6th Cir. 2003). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a

well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ*., 351 F.3d 240, 247 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252).

V.    **ANALYSIS**

Due to the unwieldy number of claims and sub-claims at issue in this case, the Court has found it convenient to organize its analysis into the following categories: A) procedurally defaulted and/or abandoned claims; B) ineffective assistance of counsel claim; C) Petitioner's motion for summary judgment; and D) Respondent's motion for summary judgment.

*A. Procedurally Defaulted and/or Abandoned Claims*

Subsections (b) and (c) of pre-AEDPA § 2254 require a habeas corpus petitioner to exhaust the state remedies available to him before raising claims in federal court. Exhaustion requires that petitioners "fairly present" federal claims to the state courts to provide them with an opportunity to correct alleged violations of its prisoners' federal rights. *Picard v. Connor*, 404 U.S. 270, 275–76 (1971). A claim has been "fairly presented" if the petitioner identified the specific constitutional guarantee allegedly violated, as well as a statement of the facts which entitle the petitioner to relief. *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996). It is not enough to make a general reference to a constitutional guarantee as broad as due process to present the substance of such a claim to a state court. *Id*.

If the petitioner has no remedy currently available in state court, the exhaustion requirement is satisfied. *Id*. at 161–62; *Teague v. Lane*, 489 U.S. 288 (1989). Although a claim

may be deemed fully exhausted under these circumstances, the petitioner's failure to assert the claim in state court may constitute procedural default barring federal review. *Gray*, 518 U.S. at 162.

The procedural default doctrine is an extension of the comity policy that underscores the exhaustion doctrine. As explained by the Supreme Court, under this doctrine:

> [t]his Court will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment. This rule applies whether the state law ground is substantive or procedural. In the context of direct review of a state court judgment, the independent and adequate state ground doctrine is jurisdictional. Because this Court has no power to review a state law determination that is sufficient to support the judgment, resolution of any independent federal ground for the decision could not affect the judgment and would therefore be advisory . . . .
>
> * * *
>
> [T]he doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement. In these cases, the state judgment rests on an independent and adequate state procedural ground.

*Coleman v. Thompson*, 501 U.S. 722, 729–30 (1992) (citations omitted). Thus, when a claim is procedurally barred under state law, it is procedurally defaulted for the purpose of federal habeas review, and cannot be considered on its merits unless the petitioner establishes cause and prejudice for the default, or that failure to review the claim will result in a miscarriage of justice, *i.e.*, that he is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 318–21 (1995); *Alley v. Bell*, 307 F.3d 380, 385–86 (6th Cir. 2002).

Respondent has moved for summary judgment in this case, in part on the ground that a significant number of Petitioner's claims are procedurally defaulted. While Petitioner disputes

that contention for some claims, for others he either acknowledges the default or simply fails to respond on the issue of default. The latter claims are deemed abandoned. *See Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."). The Court has considered each of Petitioner's claims and concludes that the following claims are due to be dismissed either because they are defaulted or abandoned or both.

    1.   Claim 3-b and 3-c. Presence of the Ku Klux Klan at Trial

Petitioner asserts that the visible presence of the KKK in the courtroom during his trial, where the victim and jury were all white, denied him a fair trial and sentencing hearing. (Doc. No. 64 at 10–11, ¶¶ 10-b, 10-c.) Respondent correctly asserts that this claim was never raised in state court.[4] This is also true for Petitioner's recent contentions, presented in response to Respondent's motion for summary judgment (*see* Doc. No. 188 at 66–67) and at the evidentiary hearing in this matter (*see* Doc. No. 229 at 196–204), about the generally racially charged atmosphere of the courtroom during trial, including the presence of heightened security, and the suggestion that it may have influenced the jurors. Those claims were never raised in state court and are procedurally defaulted.

---

[4] In his response to motion for summary judgment on this point, Petitioner flatly states that "[t]here is no question that this issue was properly exhausted in the state courts" (Doc. No. 188 at 69 n.21), then cites pages of a state court brief in which he complained only of allegedly racial comments by the prosecutor and makes no mention of the courtroom atmosphere or presence of the KKK. (*See* Doc. No. 40, Addendum 27 at 60-61.)

2. Claim 4.  Race and Gender on the Grand and Petit Juries

Petitioner asserts that the grand jury that indicted him and the petit jury that convicted him were discriminatorily composed in violation of due process, equal protection and the right to a jury composed of a fair cross-section of the community pursuant to the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments.  (Doc. No. 64 at 11–14, ¶ 11.)

Specifically, he claims that the Sumner County grand jury had not had a female foreperson for at least 13 years before his indictment, and that the grand jury that indicted him was less than 40% female, although women constituted 51% of the county's population.  He also alleges that blacks were systematically excluded from the grand jury, underrepresented in the petit jury pool and excluded entirely from serving on his jury, leaving him to be tried by an all-white jury.

Respondent asserts that Petitioner's claims of exclusion of blacks from both the grand jury and petit jury are procedurally defaulted because he never raised them in any state court proceeding.  Petitioner acknowledges that these claims were not presented in state court[5] and that granting Respondent's motion with respect to these claims is appropriate. (Doc. No. 188 at 76–77.)  The Court agrees.

Respondent further argues that although Petitioner raised his claim about the exclusion of women from the role of grand jury foreperson in his motion to reopen his third post-conviction action, the Tennessee Court of Criminal Appeals held that the claim was barred on state procedural grounds, and it is therefore procedurally defaulted.  In affirming the trial court's

---

[5] To be precise, although Petitioner raised the exclusion of both blacks and women from both juries in his first post-conviction petition (Doc. No. 10, Addendum 11, ¶¶ 25, 36–39), he abandoned those claims by not appealing their denial in his appeal to the Tennessee Court of Criminal Appeals. (*See* Doc. No. 10, Addendum 15.) Waiver is an adequate and independent state ground that will support a finding of procedural default. *Cone v. Bell*, 492 F.3d 743,758 (6th Cir. 2007), *vacated on other grounds*, 556 U.S. 449 (2009).

denial of Petitioner's motion to reopen, the Tennessee Court of Criminal Appeals applied the state statute delineating the standard for reopening a post-conviction case, then codified at Tenn. Code Ann. § 40-30-217. (Doc. No. 65, Addendum 51.) It concluded that Petitioner's claim did not satisfy the applicable standard because it was premised upon a new right announced in *Campbell v. Louisiana*, 531 U.S. 392 (1998), which could not be applied retroactively under *Teague v. Lane*, 498 U.S. 288 (1989). In reaching this conclusion, the state court relied on the Sixth Circuit's holding that "*Teague* bars us from applying *Campbell* retroactively." (Doc. No. 65, Addendum 51, at 3 (citing *Coe v. Bell*, 161 F.3d 320, 352–55 (6th Cir. 1998)).) Tennessee's statutory restrictions on the ability to reopen a post-conviction proceeding, now codified at Tenn. Code Ann. § 40-30-117, constitute adequate independent grounds for rejection of a habeas claim. *See Guartos v. Colson*, No. 3:12-CV-0048, 2013 WL 247415, at *26 (M.D. Tenn. Jan. 23, 2013).

Because Petitioner's claim for the exclusion of women as grand jury foreperson was barred by an independent and adequate state ground, and because he has not alleged any cause or prejudice in connection with that finding, this claim is procedurally defaulted and cannot be considered on its merits.

### 3. Claim 7. Actual Innocence

The Amended Petition alleges, without elaboration or reference to any supporting evidence, that Petitioner is actually innocent of the crimes of first-degree murder, rape and robbery for which he has been convicted. (Doc. No. 64 at 21, ¶ 14.)

Respondent asserts that this freestanding and unsupported claim fails to state a claim for relief, and further that it is barred by the doctrine of procedural default due to Petitioner's failure to raise it in state court. (Doc. No. 178 at 14.) Petitioner makes no effort to dispute either

contention in response to summary judgment. The Court finds that this claim is both defaulted and abandoned.

### 4. Claim 8-a. Felony Aggravator

Petitioner asserts that it was a violation of his Eighth and Fourteenth Amendment rights for the jury to weigh the commission of a felony as an aggravating circumstance for the imposition of the death penalty for conviction of felony murder. (Doc. No. 64 at 21, ¶ 15-a.) As Respondent points out, however, Petitioner asserted this claim during his second post-conviction proceeding strictly as a state-law violation of *State v. Middlebrooks*, 840 S.W.2d 317 (Tenn. 1992) (Doc. No. 40, Addendum 27 at 26–30), and Petitioner does not disagree. (Doc. No. 188 at 100–01.) The Tennessee Court of Criminal Appeals relied solely on state law to analyze this claim, finding no prejudice from any error in light of the fact that the jury also found a second aggravating factor and would have imposed the same sentence without giving any weight to the felony aggravator. *Duncan Post-Conviction 2/3*, 1997 WL 700043, at *4. Accordingly, any federal constitutional claim arising from the prosecution's reliance on this aggravating factor at sentencing has not been fairly presented to the state courts and is therefore procedurally defaulted.

### 5. Claim 9. Reasonable Doubt Instruction

Petitioner asserts that the trial court improperly defined "reasonable doubt" in instructing the jury on both the guilt and sentencing deliberations, in a manner that lowered the prosecution's burden of proof in violation of the Eighth and Fourteenth Amendments. (Doc. No. 64 at 24, ¶ 16.)

Petitioner tacitly acknowledges that the claim was never raised below, but argues that it is nevertheless exhausted by virtue of the Tennessee Supreme Court's mandatory review of death penalty cases, citing *Cone v. Bell*, 359 F.3d 785, 790–93 (6th Cir. 2004), *rev'd on other grounds*, 543 U.S. 447 (2005). (Doc. No. 188 at 77 n.29.)

The argument that a claim is automatically exhausted because the Tennessee Supreme Court conducts a mandatory review for significant errors in capital cases is "too broad, as it would eliminate the entire doctrine of procedural bar in Tennessee in capital cases." *Coe*, 161 F.3d at 336. Since the *Cone* decision on which Petitioner relies was decided, the Sixth Circuit has expressly rejected the argument that an unasserted claim about an improper jury instruction was implicitly reviewed by the Tennessee Supreme Court. *See Zagorski v. Bell*, 326 F. App'x 336, 342 (6th Cir. 2009). As the Sixth Circuit explained:

> [the petitioner's argument] mischaracterizes the Tennessee Supreme Court's review; it examined the record pertaining to the issues Zagorski raised, but ***those claims he did not present remain defaulted***. *See Baldwin v. Reese*, 541 U.S. 27, 31 (2004) (a petitioner does not "fairly present" a federal claim to a state court for exhaustion purposes if the court must look beyond a petition or brief to find material alerting it to the claim).

*Id.* (emphasis added) (holding claim of improper "malice" instruction procedurally defaulted).

Petitioner also asserts that ineffective assistance of post-conviction counsel establishes cause for his failure to exhaust this and several other claims. (Doc. No. 188 at 77 n.29.) There is no foundation in the law for this proposition. To the contrary, "an attorney's negligence in a postconviction proceeding does not establish cause . . . except as to initial-review collateral proceedings for claims of ***ineffective assistance of counsel at trial***." *Martinez v. Ryan*, 132 S. Ct. 1309, 1319 (2012) (emphasis added). The Sixth Circuit has enforced this strict limitation on *Martinez*, explaining that "[w]e will assume that the Supreme Court meant exactly what it wrote"

18

with regard to the scope of the exception that *Martinez* created to *Coleman*'s procedural default rule. *See Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013) (holding that ineffective assistance of post-conviction counsel did not excuse default of substantive mental-competence claim or of ineffective-assistance-of-appellate-counsel claim); *see also Henderson v. Carpenter*, No. 06-2050-STA-TMP, 2014 WL 1847925, at *5–6 (W.D. Tenn. May 8, 2014) (refusing to apply *Martinez* where the claim at issue was not for ineffective assistance of counsel but a substantive claim of a constitutional violation).

Accordingly, Petitioner has not established any cause to excuse his procedural default of this claim, and it is barred from review.

### 6. Claim 10. Denial of Expert Assistance

Petitioner alleges that he was denied necessary expert assistance at trial, including the assistance of a forensic pathologist to challenge evidence at trial and a psychologist to testify to Petitioner's mental status. (Doc. No. 64 at 25–26, ¶ 17.)

In support of his motion for summary judgment, Respondent asserts that this claim is procedurally defaulted because Petitioner never raised it as a freestanding claim in state court. (Doc. No. 178 at 16.) Petitioner does not respond to Respondent's motion on this point, and apparently relies on the lack of expert assistance solely as one of the grounds for his claim of ineffective assistance of counsel at trial. (*See* Doc. No. 188 at 21, 41.) To the extent this claim was presented as a freestanding claim, it is both defaulted and abandoned.

7. <u>Claim 11.  Premeditation and Deliberation Instructions</u>

The Amended Petition alleges that the trial court's instructions on premeditation and deliberation unconstitutionally lowered the prosecution's burden of proof in violation of the Fourteenth Amendment. (Doc. No. 64 at 26, ¶ 18.)

Respondent asserts that Petitioner has procedurally defaulted this claim by failing to raise it as a federal claim in state court or to present it in any form to the Tennessee Court of Criminal Appeals. (Doc. No. 178 at 16–17.)  In response, Petitioner relies on the implicit review of the Tennessee Supreme Court, as discussed above. (Doc. No. 188 at 77 n.29.)  For the reasons set forth above in the Court's disposition of Petitioner's Claim 9, the Court finds that this claim is procedurally defaulted.

8. <u>Claim 14-e.  Scope of Tennessee's Death Penalty Statute</u>

Petitioner claims that Tennessee's death penalty statute violates the Due Process Clause of the Fourteenth Amendment because it embraces more than one subject in violation of Article II § 17 of the Tennessee Constitution.  (Doc. No. 64 at 29, ¶ 21-e.)

On appeal from the denial of his second post-conviction petition, Petitioner presented this claim solely as a matter of state law (Doc. No. 40, Addendum 27 at 113–15), and the Tennessee Court of Criminal Appeals rejected the claim solely on state law grounds. *Duncan 2*, 1997 WL 700043, at *13-14.  Petitioner has not fairly presented to the state courts any federal claim based on the caption or scope of the death penalty statute in effect at the time of his conviction, and this claim is therefore defaulted.

9.  Claim 15.  Prosecutorial Expertise

Petitioner claims that by telling jurors that it was his "duty" to seek the death penalty for Petitioner and that it was a "grave responsibility" for him, the prosecutor unfairly relieved jurors of the responsibility for imposing the death penalty and led them to defer to prosecutorial expertise in imposing the sentence. (Doc. No. 64 at 29–30, ¶ 22.)

Petitioner does not dispute that this claim was never raised in state court, but asserts that this claim is not defaulted by virtue of the Tennessee Supreme Court's automatic review and the ineffectiveness of post-conviction counsel. (Doc. No. 188 at 95 n.40, 105–06.)  For the reasons expressed in its disposition of Claim 9, the Court finds this claim to be procedurally defaulted.

10. Claim 16.  Prosecution's Mitigating Evidence Argument

Petitioner asserts that the prosecution gave the jury an unduly restrictive definition of "mitigating" as something "lessening" an offense, in violation of the Eighth and Fourteenth Amendments. (Doc. No. 64 at 30, ¶ 23.)

Again, Petitioner does not dispute that this claim was never raised in state court, but asserts that this claim is not defaulted by virtue of the Tennessee Supreme Court's automatic review and the ineffectiveness of post-conviction counsel. (Doc. No. 188 at 95 n.40, 103–04.) For the reasons expressed in its disposition of Claim 9, the Court finds this claim to be procedurally defaulted.

11. Claim 17.  Prosecution's Improper Sentencing Argument

Petitioner claims that the prosecutor violated his Eighth and Fourteenth Amendment rights by arguing at the sentencing phase that the victim had no one to speak for her, and that the

jury should impose the death sentence to give the death penalty meaning and so that it could be imposed in other cases. (Doc. No. 64 at 30, ¶ 24.)

On direct appeal, Petitioner quoted the prosecutor's argument at length, including the following lines relevant to his current claim:

> Mr. Duncan is here, at this point, asking not for justice, but he's asking for mercy. Ruby Evelyn Burgess is asking for nothing, because Mr. Duncan has deprived her of that opportunity, I ask again, please keep that in mind. . . . You, ladies and gentlemen, are the representatives of the conscience of this community. This community being Sumner County, Tennessee, because you all are from all over Sumner County. People, generally, I think, it's fair to say, favor the death penalty. You all have said that you are not against the death penalty, if you don't assess the death penalty in this case, what kind of cases are you going to assess the death penalty? When will the death statute ever have any meaning whatsoever?

(Doc. No. 10, Addendum 3 at 133–34.) These few sentences that form the basis of his current claim, however, were not among those sections of the prosecutor's argument that Petitioner emphasized or discussed in his appeal. (*Id*. at 133–36.) Instead, Petitioner's appeal complained about other aspects of the prosecutor's argument, including his reliance on the crime scene photographs and graphic descriptions of the victim's wounds, and comments he made about the facts of the case and about the nature of a life sentence. (*Id*.) Moreover, that appeal was based exclusively on alleged violations of state law. (*Id*. at 133-36.) Thus, Petitioner has failed to fairly present his current federal claim for state court review, and it is procedurally defaulted.

12. Claim 18. Instruction Regarding Life Sentence

Petitioner asserts that the trial court refused to instruct the jury about the meaning of a life sentence, and that in response to a request for clarification from the jury, the trial judge instructed them that it would be improper for them to consider the meaning of a life sentence.

He alleges that this violated his rights under the Eighth and Fourteenth Amendments. (Doc. No. 64 at 30, ¶ 25.)

On direct appeal, Petitioner complained that the trial court's instruction to the effect that it was improper for the jury to consider the meaning of a life sentence and that they must consider the instructions as read "and don't speculate about anything else," wrongly prohibited the jury from considering any non-statutory mitigating factors, such as mercy or sympathy for the defendant. (Doc. No. 10, Addendum 3 at 137–43.)  He did not assert any federal claim in connection with the trial court's failure to define a life sentence for the jury.

Given his failure to respond in support of this claim at all in response to Respondent's motion for summary judgment, Petitioner has abandoned this claim.  Alternatively, the Court finds that this claim was not fairly presented for review by the state courts and is procedurally defaulted.

### 13. Claim 23.  Improperly Obtained Evidence

Petitioner next asserts that admission of unconstitutionally obtained evidence violated his rights under the Fourth, Fifth and Sixth Amendments.  Specifically, he claims that the prosecution relied upon the statements, fingerprints, blood and saliva taken from Petitioner following his arrest without probable cause or knowing waiver. (Doc. No. 64 at 32, ¶ 30.)

In support of his motion for summary judgment, Respondent argues that to the extent Petitioner's claim rests on the Fourth Amendment, it fails to state a claim for habeas corpus relief.[6]  He further argues that Petitioner's exhausted claim concerning his own statements to police was properly rejected by the Tennessee Court of Criminal Appeals.  (Doc. No. 178 at 21.)

---

[6] Even if the Court were to reach the merits of this claim, it would fail.  A Fourth Amendment habeas claim may not proceed in the absence of an allegation of procedural dysfunction that precluded the petitioner from fully

Petitioner has failed to respond to Respondent's motion for summary judgment on this claim, and it is therefore abandoned.

### 14. Claim 24.  Inflammatory Evidence

The Amended Petition alleges that the trial court admitted unduly inflammatory photographs of the victim at the scene in violation of the Fourteenth Amendment. (Doc. No. 64 at 32, ¶ 31.)

Respondent asserts that Petitioner challenged admission of the photographs in state court solely on the basis of state law and did not raise a federal constitutional question. (Doc. No. 178 at 21.)

Once again, this claim is abandoned due to Petitioner's failure to respond to Respondent's motion for summary judgment on this point.  Moreover, Respondent is correct that Petitioner presented this claim to the Tennessee Supreme Court exclusively as a matter of state law (Doc. No. 10, Addendum 3 at 67–77), and any federal claim in connection with the photographs is accordingly defaulted.

### 15. Claim 25.  Serology Evidence

Petitioner next asserts that the trial court violated his rights under the Fourteenth Amendment by admitting misleading and prejudicial serology evidence at trial. (Doc. No. 64 at 32, ¶ 32.)

---

and fairly litigating the claim in state court.  *See Stone v. Powell*, 428 U.S. 465, 494–95 (1976); *Machacek v. Hofbauer*, 213 F.3d 947, 952 (6th Cir. 2000).

Respondent asserts that Petitioner challenged admission of the serology evidence in state court solely on the basis of state law and did not raise a federal constitutional question. (Doc. No. 178 at 21.)

This claim is abandoned due to Petitioner's failure to respond to Respondent's motion for summary judgment on this point. Moreover, Respondent is correct that this claim is defaulted because Petitioner did not raise any federal claim when he presented this issue to the Tennessee Supreme Court. (Doc. No. 10, Addendum 3 at 101–03.)

16. Claim 27. Penalty for Exercising Right to Jury Trial

Petitioner next asserts that because he would not have faced the death penalty if he had reached an agreement with the prosecution to plead guilty in exchange for a life sentence, the death penalty constitutes an unconstitutional penalty on his right to trial by jury. (Doc. No. 64 at 32–33, ¶ 34.)

Petitioner has failed to respond to the motion for summary judgment on this claim, and has therefore abandoned it. Moreover, it is apparent that the claim is defaulted, as Petitioner proceeded in state court on the (incorrect) theory that Tennessee law makes the death penalty unavailable following a guilty plea. (Doc. No. 10, Addendum 3 at 113–19); *Duncan 1*, 698 S.W.2d at 71. That is a different claim than the (equally meritless) one presented here, which is essentially that a penalty unconstitutionally burdens the right to jury trial when a lesser penalty could be imposed as part of a plea deal.

17. Claim 30. Delayed Execution

Petitioner alleges that his execution would constitute cruel and unusual punishment because of the passage of time between his conviction and execution. (Doc. No. 64 at 33, ¶ 37.)

As Respondent points out, Petitioner raised this claim for the first time in his 1999 motion to reopen his third post-conviction proceeding, and the state courts rejected it for failure to meet state statutory requirements to reopen a post-conviction proceeding. (Doc. No. 65, Addenda 48, 51.) Petitioner responds that this claim should be deemed exhausted based upon the Tennessee Supreme Court's automatic review and/or due to the ineffectiveness of post-conviction counsel. (Doc. No. 188 at 95 n.40.) For the reasons explained in its disposition of Claim 9 above, the Court rejects Petitioner's argument and finds this claim procedurally defaulted.

Even if Petitioner could establish that this claim was not ripe for presentation while it could have been raised in state court (*see Johnson v. Bredesen*, 558 U.S. 1067 (2009) (Stevens, J., statement respecting denial of certiorari)), the very case on which it is based makes clear that no federal appellate court has ever found that lengthy incarceration prior to execution constitutes cruel and unusual punishment. *See Lackey v. Texas*, 514 U.S. 1045, 1045 (1995) (Stevens, J. & Breyer, J., statement respecting denial of certiorari) (noting the issue has not been addressed); *see also Johnson*, 558 U.S. 1067 (Thomas, J., concurring in denial of certiorari) (same); *Black v. Bell*, 181 F. Supp. 2d 832, 882 (M.D. Tenn. 2001) (granting summary judgment to respondent on *Lackey* claim). To the contrary, federal appellate courts have consistently rejected *Lackey* claims. *See, e.g.*, *Thompson v. Sec'y for Dep't of Corr.*, 517 F.3d 1279, 1284 (11th Cir. 2008) ("[W]e conclude that execution following a 31-year term of imprisonment is not in itself a constitutional violation."), *cert. denied*, 556 U.S. 1114 (2009); *Shisinday v. Quarterman,* 511 F.3d 514, 526 (5th Cir. 2007), *cert. denied*, 555 U.S. 815 (2008); *Free v. Peters,* 50 F.3d 1362, 1362 (7th Cir. 1995) (per curiam) (explaining that the majority of the delay arose from

petitioner's pursuit of discretionary state and federal challenges), *cert. denied*, 514 U.S. 1034 (1995); *Stafford v. Ward*, 59 F.3d 1025, 1028 (10th Cir.), *cert. denied*, 515 U.S. 1173 (1995).

A single district court has recently held that gross systemic inefficiencies in California's appeal and post-conviction review process rendered it "so inordinately and unnecessarily delayed that only an arbitrarily selected few of those sentenced to death are executed," and that the state's death penalty system thus violates the Eighth Amendment. *See Jones v. Chappell*, No. 2:09-cv-02158-CJC, 2014 WL 3567365, at *13 (C.D. Cal. July 16, 2014). That opinion was based on an extensive record of facts specific to California's death penalty system, which distinguished Jones's case from precedent involving only claims of extraordinary delay in an individual petitioner's case. *Id.* at *11 n.19. Specifically, the Court relied on "the record before it," which contained evidence that – through no fault or dilatory tactics of their own – most California death row inmates wait three to five years just for appointment of counsel to handle their automatic direct appeal to the state supreme court and another two to three years waiting for oral argument to be set after the issues are briefed. *Id.* at *12. It takes at least eight to ten years for counsel to be appointed to handle an inmate's state habeas proceeding, and after those claims are finally investigated and briefed, another four years for the state supreme court to deliver a conclusory "lack of reasoned opinion" that further delays federal habeas adjudication. *Id.* The court found that in total "[t]hese delays – exceeding 25 years on average – are inherent to California's dysfunctional death penalty system, not the result of individual inmates' delay tactics, except perhaps in isolated cases." *Id.*

Petitioner has not offered any similar evidence about chronic, systemic delays in Tennessee's death penalty process, and relies solely on the delay in his individual case. Simple reference to the procedural history of Petitioner's case quickly dispels any hint of similarity

between the delay in his case and those at issue in *Jones*. As set forth above, Petitioner was convicted in April 1983, and the Tennessee Supreme Court ruled on his direct appeal in 1985. *See Duncan 1*, 698 S.W.2d at 63. The Tennessee Court of Criminal Appeals ruled on his first post-conviction petition less than three years later, in 1988, and both the Tennessee Supreme Court and United States Supreme Court denied discretionary appeal in a matter of months. *See Duncan Post-Conviction 1*, 1988 WL 10072, *cert. denied*, 488 U.S. 934 (1988). That Petitioner found it necessary to follow what might have been the conclusion of his state review process with two more post-conviction proceedings and a motion to reopen those proceedings, as well as two state habeas proceedings, cannot be blamed on any systemic failures in Tennessee's process. Accordingly, the delay between Petitioner's conviction and possible execution, admittedly occasioned in large part by his own voluntary pursuit of state and federal remedies (*see* Doc. No. 188 at 109), does not entitle him to relief.

18. Claim 31.  Destruction of Evidence

Petitioner complains that state officials destroyed the victim's clothing prior to trial, preventing him from examining or testing it for any exculpatory evidence. (Doc. No. 64 at 34, ¶ 38.)  Petitioner never raised this claim in state court and has now abandoned it by failing to respond to Petitioner's motion for summary judgment on this claim.

19. Claim 32.  Courtroom Security

The Amended Petition alleges that the presence of excessive security in the courtroom during his trial, including his being held in handcuffs, deprived him of the presumption of innocence in violation of his right to due process under the Fourteenth Amendment. (Doc. No. 64

at 34, ¶ 39.)  Once again, Petitioner never raised this claim in state court and has now abandoned it by failing to respond to Petitioner's motion for summary judgment on this claim.

For the foregoing reasons, Respondent's motion for summary judgment shall be **GRANTED** with respect to Petitioner's Claims 3-b, 3-c, 4, 7, 8-a, 9, 10, 11, 14-e, 15, 16, 17, 18, 23, 24, 25, 27, 30, 31 and 32.

### B.  Ineffective Assistance of Counsel Claim

The sixth claim presented in the Amended Petition asserts that Petitioner's previous counsel was ineffective in at least 35 ways throughout the guilt and sentencing phases of his trial and on appeal. (Doc. No. 64 at 16–21, ¶ 13.)  Respondent's primary defense to this claim is that most of its sub-claims are procedurally defaulted.  (*See* Doc. Nos. 66 at 24–28; 178 at 12–14.) Petitioner counters that his sub-claims were exhausted in state court, or alternatively, that ineffectiveness of post-conviction counsel constitutes cause for any default. (*See* Doc. No. 188 at 60–63 and n.18.)  Respondent disputes Petitioner's contention that his sub-claims were exhausted, and contests the argument that ineffectiveness of post-conviction counsel would provide cause for the alleged default. (*See* Doc. No. 193 at 7–8.)

An intervening change in the applicable law has turned this already complex dispute into a nearly indecipherable morass. Until recently, a prisoner could not demonstrate cause by claiming that he received ineffective assistance of counsel during state post-conviction proceedings. *See Coleman*, 501 U.S. at 752–53 (holding that attorney error is not cause to excuse a default).  That barrier was based on the premise that an individual does not have a constitutional right to counsel in post-conviction proceedings, so the prisoner "must bear the risk of attorney error that results in a procedural default." *Id.* (internal quotations omitted).

However, in *Martinez v. Ryan*, 566 U.S. ----, 132 S. Ct. 1309 (2012), the Supreme Court held that the ineffective assistance of post-conviction counsel can establish "cause" to excuse the procedural default of a defendant's substantial claim of ineffective assistance at trial, but only where state procedural law prohibits defendants from raising such claims on direct appeal and instead requires defendants to raise the claims for the first time in post-conviction proceedings. *Id*. at 1318–19. Less than a year after *Martinez*, the Supreme Court issued *Trevino v. Thaler*, 569 U.S. ----, 133 S. Ct. 1911 (2013). *Trevino* extended *Martinez* to apply to cases where, although state procedural law might permit defendants to raise ineffective-assistance claims on direct appeal, a state's "procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." *Id*. at 1921.

Applying *Trevino*, the Sixth Circuit has now recognized that "Tennessee defendants, too, are highly unlikely to have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." *Sutton v. Carpenter*, 745 F.3d 787, 792 (6th Cir. 2014). The court therefore held, based on *Martinez* and *Trevino*, that "ineffective assistance of post-conviction counsel can establish cause to excuse a Tennessee defendant's procedural default of a substantial claim of ineffective assistance at trial." *Id*. at 792 (citations omitted).

The *Martinez* Court's creation of a narrow exception to the procedural-default bar stemmed from its recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." *Martinez*, 132 S. Ct. at 1318. In other words, *Martinez* requires both that the ineffective assistance of post-conviction counsel occur during the "initial-review collateral proceeding," *see id*. at 1320 ("The

rule of *Coleman* governs in all but the limited circumstances recognized here. The holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts."), and that the claim be a substantial one, *see id*. at 1318–19 (noting that the prisoner must "demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit"). Importantly, *Martinez* did not dispense with the "actual prejudice" prong of the standard for overcoming procedural default first articulated by the Supreme Court in *Coleman*, 501 U.S. at 750.

Neither the Supreme Court nor the Sixth Circuit has yet provided guidance as to how district courts reviewing habeas petitions are to implement the rulings in *Martinez* and *Trevino*. In one of the first circuit court opinions to address the issue directly, the Ninth Circuit held that, to establish that his claim is "substantial," a habeas petitioner must "show that his post-conviction relief counsel was ineffective under *Strickland v. Washington*." *Clabourne v. Ryan*, 745 F.3d 362, 376 (9th Cir. 2014). That is, the petitioner must show both that his post-conviction counsel's performance was constitutionally deficient and that the petitioner was prejudiced by the deficiency. *Clabourne*, 745 F.3d at 376. Prejudice, under *Strickland*, requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the [post-conviction] proceeding would have been different." *Strickland*, 466 U.S. at 694. Further, according to the Ninth Circuit, "actual prejudice," for purposes of the *Coleman* analysis in the *Martinez* context, requires a showing that "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the claim has some merit." *Clabourne*, 745 F.3d at 377 (quoting *Martinez*, 132 S. Ct. at 1318).

Because *Sutton* was decided after the parties submitted their briefs, neither of them has had the opportunity to argue their respective views about its impact on the viability of Petitioner's ineffective assistance of counsel claim. While the Court regrets any additional delay in this case, a fair evaluation of Petitioner's claim requires it to hear from the parties about the extent to which the claim is reviewable in light of *Sutton*. Accordingly, the Court will **ORDER** additional briefing from the parties on this claim.

Because the merit of the underlying claim is critical to the prejudice prong of establishing the ineffectiveness of post-conviction counsel, the Court anticipates that the parties will argue the merits of both the exhausted and unexhausted claims. Those arguments should include citations to applicable federal law and to the evidence in the record supporting or refuting such claim, including citations to the transcript and exhibits entered during the 2012 evidentiary hearing in this proceeding. Conclusory references to the correctness of state court decisions are not helpful to this Court's analysis.

### C. Petitioner's Motion for Summary Judgment

Petitioner seeks summary judgment on a single issue: the alleged violation of his fundamental right to cross-examine a prosecution witness at his trial. As summarized by the Tennessee Supreme Court above, witness Linda Kelly provided critical testimony against Petitioner at trial. In addition to being the only witness to identify Petitioner at the scene of the crime, Kelly also testified to suspicious behavior by Petitioner the following day.

In January 1983 Kelly was indicted on two charges of sale of Schedule VI controlled substances alleged to have occurred in November 1982, and she remained under indictment at the time of her testimony at Petitioner's trial in March of 1983. (*See* Doc. No. 180-1.) Petitioner

alleges that Kelly testified against him in order to curry favor with the prosecution and receive favorable treatment on her own drug charges.[7] He argues that the trial court violated his rights under the Sixth and Fourteenth Amendments by preventing him from cross-examining Kelly about the pending drug charges and her motivation to give testimony favorable to the prosecution, and that the prosecution compounded this error by highlighting in his closing argument the absence of any evidence of motive for Kelly to lie.

On cross-examination, Petitioner's trial counsel asked Kelly, whose maiden name was apparently Fuqua: "Ms. Fuqua, are you presently under indictment of the Sumner County Grand Jury?" (Doc. No. 10, Addendum 1 vol. 5 at 220:6–7.)  At the prosecutor's request the trial judge immediately sent the jury out of the courtroom and heard argument about the propriety of counsel's line of inquiry. (*Id*. at 220:8–222:2.)  The court sustained the prosecution's objection, ruling that evidence of a witness's indictment was not admissible under the rules of evidence and instructing counsel not to ask the witness about any indictments.  The rationale for the court's ruling was that any criminal proceeding against a witness other than a felony conviction was "not admissible . . . for any purpose" and "[u]nless you have some proof of a felony conviction, you won't be able to ask it." (*Id*. at 221:7–222:2; 225:9–22.)  Upon the jury's return to the courtroom, at the prosecution's request, the trial judge instructed the jurors that counsel's question about the witness's indictment was "an improper question" and that they were not to "consider that for any purpose." (*Id*. at 222:8–13; 226:25–226:11.)

---

[7] Respondent acknowledges that Petitioner exhausted this claim in post-conviction proceedings in state court. (Doc. Nos. 66 at 18; 178 at 7.)  Respondent asserts, however, that Petitioner did not raise the issue of drug charges pending against Kelly's brother, and in the absence of any dispute on that point from Petitioner, the Court agrees that that aspect of Petitioner's claim is defaulted.

At closing argument, Kelly's testimony was the first piece of evidence recapped at length by the prosecutor (Doc. No. 10, Addendum 1, Arguments and Jury Charge at 6:22–9:9), and he has since acknowledged that Kelly was an important witness (Doc. No. 40, Addendum 26 vol. 1, Tr. at 48:11–20). Also at closing, the prosecutor said the following about defense counsel's suggestion that Kelly's testimony was fabricated:

> Then he talks about Mrs. Kelly. Did he show anything about Mrs. Kelly that would prove that she was lying? Did he show any reason for her to fabricate her testimony to you? Did he show any bad feelings between Mrs. Kelly and Mr. Duncan? Did he show any motive for her to come in here and tell you all a lie?

(Doc. No. 10, Addendum 1, Arguments and Jury Charge at 70:19–24.)

When Petitioner appealed the trial court's denial of his post-conviction claim on this issue, the Tennessee Court of Criminal Appeals affirmed the trial court:

> Next, the appellant contends that the limitation on Ms. Kelly's cross-examination at trial unconstitutionally abridged his right to confrontation and cross-examination. In this issue, he again attacks Ms. Kelly, contending that trial defense counsel's attempt to cross-examine her concerning a pending charge of selling marijuana should have been allowed by the trial judge and that to limit his cross-examination on that issue denied him his right to confrontation and cross-examination.
>
> As previously set forth, both Ms. Kelly and the District Attorney General denied any relationship between the plea bargain and her earlier testimony and the appellant presented no proof to rebut their testimony. Thus, the post-conviction judge did not err by finding no constitutional violation from the refusal to allow cross-examination regarding the pending marijuana charge and her impending guilty plea. This issue has no merit.

*Duncan Post-Conviction 2/3*, 1997 WL 700043, at *6.

Both the trial court's exclusion of the cross-examination and the appellate court's ruling on this issue are in error. The Sixth Amendment guarantees the right of a criminal defendant "to

be confronted with the witnesses against him." U.S. Const. amend. VI; *see also Crawford v. Washington*, 541 U.S. 36, 42 (2004). The Supreme Court has instructed that cross-examination is "the principal means by which the believability of a witness and the truth of his testimony are tested," and is a "primary interest" secured by the Sixth Amendment's confrontation clause. *Davis v. Alaska*, 415 U.S. 308, 315–16 (1974). It would be difficult to overstate the importance of this right to the proper function of our criminal justice system. As the Sixth Circuit has explained, "[t]here are few subjects, perhaps, upon which this Court and other courts have been more unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Stevens v. Bordenkircher*, 746 F.2d 342, 346 (6th Cir. 1984). "Accordingly, [the Sixth Circuit] has recognized that the bounds of the trial court's discretion are exceeded when the defense is not allowed to 'plac[e] before the jury facts from which bias, prejudice or lack of credibility of a prosecution witness might be inferred . . . .'" *Dorsey v. Parke*, 872 F.2d 163, 167 (6th Cir. 1989) (second alteration in original) (quoting *United States v. Garrett*, 542 F.2d 23, 25 (6th Cir. 1976)).

While trial courts have discretion to control the scope of examination, "cross-examination concerning the partiality of a witness is always relevant." *Bordenkircher*, 746 F.2d at 346. "Therefore, a trial court may not prevent a criminal defendant from exploring a witness' bias, prejudice or motive for testifying." *Id*. (citing *Davis*, 415 U.S. at 316–17). The Supreme Court has thus summarized the standard for Confrontation Clause violations:

> We think that a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors . . . could

> appropriately draw inferences relating to the reliability of the witness."

*Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986) (quoting *Davis*, 415 U.S. at 318).

Applying these principles, the Sixth Circuit found that it is "not difficult" to conclude that preventing defense counsel from cross-examining a prosecution witness about the pending charges against him and his consequent motivation to testify in favor of the prosecution constituted error and left the jury "unable to make a discriminating appraisal of [the witness's] bias and motive for testifying." *Bordenkircher*, 746 F.2d at 344–48. Accordingly, the court held that "the restriction of petitioner's cross-examination of the Commonwealth's key witness was improper." *Id*. at 347–48.

The restriction of Petitioner's cross-examination of Kelly was likewise improper in this case. Both Respondent and the state appellate court focus on the absence of conclusive evidence of a plea deal in exchange for Kelly's testimony, but the critical factor in this analysis is not the existence of a current deal, but the witness's desire to please the prosecution. *See Van Arsdall*, 475 U.S. at 676 (holding limitation of cross-examination improper even though charges against witness had already been dropped and witness denied that his testimony was impacted by any agreement). An existing plea deal is not a prerequisite for such witness bias to be relevant. To the contrary, when a witness under indictment for a crime lacks the assurance of a binding plea deal, the "uncertainty with regard to the status of his pending charges only makes his testimony more suspect since he would be more interested in pleasing the prosecutors who would be determining his fate." *Bragan v. Morgan*, 791 F. Supp. 704, 717 (M.D. Tenn. 1992). The trial court's preventing Petitioner from cross-examining Kelly about her potential bias in favor of the

prosecutor who would determine her fate with regard to then-pending drug charges thus amounted to constitutional error.

Unfortunately for Petitioner, however, "the denial of the opportunity to cross-examine an adverse witness does not fit within the limited category of constitutional errors that are deemed prejudicial in every case." *Van Arsdall*, 475 U.S. at 682. Having found a Confrontation Clause violation, a federal court on collateral review must still apply a harmless-error analysis to determine whether the violation "had substantial and injurious effect or influence in determining the jury's verdict." *See Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993). The factors in that analysis for Confrontation Clause violations "include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Van Arsdall*, 475 U.S. at 682.

The enormous importance of Kelly's testimony to the prosecution's circumstantial case, and the fact that it was not cumulative of any other testimony, weigh heavily in Petitioner's favor in this analysis. "Where the trial court has curtailed a defendant's cross-examination of a 'star' government witness – as it has done in this case – its ruling must be more carefully scrutinized." *Dorsey*, 872 F.2d at 166.

Kelly's placement of Petitioner at the location and approximate time of the murder, however, was corroborated by Petitioner's fingerprints found on a juice bottle that appears to have been the last item sold by the victim before her death. Even more importantly, Kelly's testimony at trial was consistent with the interview she gave to police in August 1982, several months ***before*** the date of the crimes for which she was under indictment when she testified at

Petitioner's trial. (*See* Doc. No. 186-1.)  Respondent correctly points out that this Court has seen a similar fact pattern in another case where it agreed with the state court's conclusion that "where the witness's prior statements to police were consistent with his testimony and were made long prior to his arrest, there was no argument that the pending charge could have affected his testimony." *Black v. Bell*, 181 F. Supp. 2d 832, 844–45 (quoting *State v. Black*, 815 S.W.2d 166, 177 (Tenn. 1991)).  Even if Petitioner had been permitted to impeach Kelly on cross-examination with evidence of bias arising from her pending criminal indictments, the prosecutor could have easily rehabilitated her on re-direct examination with evidence of her prior consistent statement given before she had any reason for such bias. *See Farmer v. State*, 296 S.W.2d 879, 882 (Tenn. 1956) ("[W]here it is insisted that the testimony of a witness is the result of a recent influence it is permissible to show that prior to the exercise of such influence the witness made statements consistent with his current testimony.")  Under these circumstances, the Court cannot conclude that preventing that cross-examination had a substantial and injurious influence on the outcome of Petitioner's trial.

Petitioner's motion for summary judgment will therefore be **DENIED**.

### D. *Respondent's Motion for Summary Judgment*

Respondent moves the Court for summary judgment in its favor on all of Petitioner's claims, arguing that each claim is either procedurally defaulted, fails to state a claim or is otherwise without merit.  The parties' respective positions with respect to each claim not already addressed above are set forth and analyzed below.  At the outset, however, the Court notes that Respondent includes throughout his memorandum the ubiquitous conclusion, without any discussion or elaboration, that the Tennessee Court of Criminal Appeals was correct in its

rejection of any exhausted claims. As explained above, the state court findings are not conclusive in this case. Accordingly, Respondent's blanket reliance on them, without analysis or elaboration, does not satisfy his burden as a summary judgment movant, and the Court sees no need to repeat that finding for each claim below.

1. Claim 1. Denial of Right to Cross-Examine Linda Kelly

For the reasons set forth above in addressing Petitioner's motion for summary judgment on this claim, the Court finds that there are no genuine issues of material fact in dispute, and that Petitioner's claim fails as a matter of law. Accordingly, Respondent's motion for summary judgment on this claim will be **GRANTED**.

2. Claim 2. Withheld Evidence Concerning Kelly

In a claim closely connected to his first claim, Petitioner alleges that Linda Kelly testified against him in order to fulfill a deal with the prosecution for favorable treatment on her drug charges. Specifically, he alleges that prior to his trial, Kelly was offered a plea deal of a $1000 fine and one-year incarceration with eligibility for release at 30%, but that after her testimony and Petitioner's conviction and sentence, she received a $150 fine and suspended sentence, was placed on misdemeanor diversion, and the charges were later expunged. He maintains that the same prosecutor handled both cases, and that he withheld evidence of a plea deal with Kelly to grant her favorable treatment in exchange for her testimony. He asserts that these circumstances deprived him of due process and cites case law finding the testimony of a witness expecting leniency on pending criminal charges, without disclosure of such expectation, to have been

presented in violation of *Brady v. Maryland,* 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972).[8] (Doc. No. 64 at 7–9, ¶ 9.)

In his Answer, Respondent asserted that this claim is entirely procedurally defaulted. (*See* Doc. No. 66 at 20.)  In support of his motion for summary judgment, he asserts that the claim is partially defaulted and that the exhausted portion was correctly decided by the state court. (*See* Doc. No. 178 at 7–8.)

In Petitioner's appeals to the Tennessee Court of Criminal Appeals from the dismissal of both his second and third post-conviction petitions, he asserted that the prosecution had a "sweetheart" deal with Kelly that would have impacted assessment of Kelly's credibility, which the prosecutor intentionally hid. (Doc. No. 40, Addendum 27 at 41–45; Addendum 35 at 30–32.) In both appeals, he characterized the prosecutor's behavior as posing "considerable due process problems under *Giglio v. United States*." (*Id.*)  These allegations are sufficiently specific to have "fairly presented" his *Brady* claim to the Tennessee Court of Criminal Appeals.[9]  Contrary to Respondent's assertion (*see* Doc. No. 66 at 20), the claim was thereby deemed exhausted by virtue of Tennessee Supreme Court Rule 39 and the law of this Circuit, regardless of whether it

---

[8] The Court need not address Petitioner's claim in 9-e that he is entitled to a hearing on this issue, as a hearing has since been afforded. (*See* Doc. Nos. 205; 229.)  This request is therefore moot.

[9] Petitioner's current claim includes a characterization of Kelly's trial testimony as false, and Respondent correctly asserts that Petitioner's filings in state court did not include an express claim that Kelly testified falsely. (Doc. No. 178 at 8.)  To the extent that Petitioner intended this characterization to be a substantive part of his claim, it is therefore defaulted.  Even if it were not defaulted, the Court concludes that it is without merit in this case.  In order to establish a constitutional violation in connection with false testimony, a petitioner must show that the testimony was indisputably false, that the prosecution knew it was false, and that it was material. *Byrd v. Collins*, 209 F.3d 486, 517 (6th Cir. 2000).  While Petitioner cites facts that arguably impact the credibility, accuracy or even significance of Kelly's testimony, he has not established that it was indisputably false.

was presented in an application for permission to appeal to the Tennessee Supreme Court. *See Adams v. Holland*, 330 F.3d 398 (6th Cir. 2003).[10]

Turning to the merits of Petitioner's claim, to establish a *Brady* claim, a petitioner must show that the state withheld exculpatory evidence material to either the petitioner's guilt or punishment. *Brady*, 373 U.S. at 87. The Supreme Court has articulated three components of a *Brady* violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (internal quotation marks omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (internal quotation marks omitted).

The Tennessee Court of Criminal Appeals affirmed denial of post-conviction relief to Petitioner on this count after a hearing in the trial court:

> As to the *Brady* issue, the appellant finally contends that the circumstances of this case "strongly suggest" that a prosecution witness was afforded "lenient treatment" with regard to her pending felony drug charge only after she testified against the appellant. However, no evidence was presented that the witness, Linda Kelly, was afforded any preferential treatment because she testified at the appellant's trial. Indeed, both Ms. Kelly and the

---

[10] Respondent has also asserted that Petitioner has abandoned this and several more of his claims by not raising them in his motion for summary judgment or request for evidentiary hearing. (*See* Doc. No. 193 at 2.) The Court rejects this argument. A party can assert the merits of a claim even while acknowledging that it presents a genuine dispute not appropriate for summary resolution. Petitioner has responded in opposition to Respondent's motion for summary judgment on most of his claims, asserting that the law and facts – although disputed – ultimately entitle him to habeas corpus relief; he has therefore not abandoned these claims.

> District Attorney General testified to the contrary. This sub-issue
> and the entire *Brady* issue lack merit.

*Duncan Post-Conviction 2/3*, 1997 WL 700043, at *5.

The law is clear that express and tacit agreements between the prosecution and a witness constitute *Brady* material that must be disclosed. *Bell v. Bell*, 512 F.3d 223, 233 (6th Cir. 2008). But Petitioner in this case has presented no evidence proving that any formal or informal agreement existed between Kelly and the prosecution. The Court is not permitted to infer such an agreement simply from the fact that Kelly received favorable treatment following her testimony. *Id*. at 233–34. And, as the state court observed, both Kelly and the prosecutor have expressly testified that there was no such agreement. (Doc. No. 40, Addendum 26 at 48–50, 60.) The prosecutor explained that the reason for the greatly reduced charge and penalty faced by Kelly after her testimony was a "problem with the proof" against her. (*Id.* at 49:7.) The key witness had misidentified Kelly in a hearing, and "there was likelihood that she might not have been found guilty," which prompted the prosecution to accept a plea to a lesser offense. (*Id.* at 49:7–50:1.)

"Without an agreement, no evidence was suppressed, and the state's conduct, not disclosing something it did not have, cannot be considered a *Brady* violation." *Bell v. Bell*, 512 F.3d at 234 (quoting *Todd v. Schomig*, 283 F.3d 842, 849 (7th Cir. 2002)).

Accordingly, the Court finds that Petitioner is not entitled to relief on this claim.

### 3. Claim 3-a. Racially Inflammatory Closing Argument

Petitioner, who is African American, alleges that the prosecution injected racial animosity into the all-white jury's decision-making process by arguing in closing on the guilt phase of Petitioner's trial that witness Kelly, who is white, "was kind of nervous and upset to

come in here and testify. . .. And she might not have wanted to come in here and testify about a black man here in Gallatin, Tennessee who has committed first degree murder and rape and robbery." (Doc. No. 64 at 10, ¶ 3-a.) He asserts this argument was racially biased in violation of his right to due process and equal protection under the Sixth, Eighth and Fourteenth Amendments, and that it mandates relief under *Donnelly v. DeChristophoro*, 416 U.S. 637 (1974), and *McCleskey v. Kemp*, 481 U.S. 279 (1987).

Respondent acknowledges that Petitioner asserted in his second post-conviction proceeding that the prosecutor's racial argument violated his right to a fair trial, but asserts that to the extent Petitioner relies on the Sixth or Eighth Amendments, his claim is procedurally defaulted for failure to cite those Amendments in connection with this claim in state court. (*See* Doc. No. 78 at 8.)

In his appeal to the Tennessee Court of Criminal Appeals from the denial of his second petition for post-conviction relief, Petitioner asserted that the prosecutor's argument at issue constituted a "gratuitous appeal to racial prejudice" that was "calculated to inflame the jury," and cited Supreme Court opinions applying the Sixth, Eighth and Fourteenth Amendments to alleged improprieties in capital cases. (*See* Doc. No. 40, Addendum 27 at 60–61 (citing *McCleskey* (Eighth and Fourteenth Amendments) and *Donnelly* (Sixth and Fourteenth Amendments)).) The Court concludes that Petitioner's claim in state court was sufficient to "fairly present" this current Claim 3-a.

Upon review of the merits of Petitioner's claim, the Court agrees with Petitioner that the prosecutor's reference to his race in the context in which it was made could have suggested to an all-white jury that a white woman – similar in that respect to the victim – had reason to fear Petitioner because he was "a black man." However, the standard for relief on the basis of

43

improper prosecutorial argument is extremely high. "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citations and internal quotation marks omitted) (denying relief on the basis of prosecutorial argument including reference to defendant as an animal who should be kept on a leash and an expressed wish that defendant had his face "blown away by a shotgun"). This is particularly true when a federal court reviews a case on habeas corpus, where the scope of review is "the narrow one of due process, and not the broad exercise of supervisory power." *Id.* (quoting *Donnelly*, 416 U.S. at 642). To require reversal, a prosecutor's misconduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial or so gross as probably to prejudice the defendant." *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005) (quoting *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997)).

The Sixth Circuit has instructed that in order to obtain relief on a claim of prosecutorial misconduct, a petitioner "must demonstrate that the prosecution's conduct was both improper and so flagrant as to warrant reversal." *Id.* Accordingly, once a court finds improper conduct, it must consider four factors to determine whether the challenged conduct is flagrant: "(1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the petitioner; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant." *Id.* Finally, in order to determine whether prosecutorial misconduct warrants a writ of habeas corpus, courts must find the error to be harmless unless it "had a substantial and injurious effect or influence in determining the jury's verdict." *Id.* (quoting *Brecht v.*

*Abrahamson*, 507 U.S. 619, 638 (1993)); *see also Moore v. Mitchell*, 708 F.3d 760, 799–800 (6th Cir. 2013).

In support of his claim, Petitioner cites three opinions from other circuits where reliance on race-based theories to convict the non-white defendants warranted reversal. None of them is similar to the case at hand, as each involved the admission into evidence of extensive expert testimony to the effect that the defendants were likely guilty by virtue of their membership in a racial or ethnic group that was predisposed to commit the crimes in question. *See United States v. Vue*, 13 F.3d 1206, 1211–13 (8th Cir. 1994) (government expert witness testified that "opium trade . . . in the Twin Cities primarily involves Hmong individuals" and that 95 percent of the opium smuggling cases in the area involved Hmong individuals); *United States v. Cruz*, 981 F.2d 659, 663–64 (2d Cir. 1992) (government expert witness correlated area's "inundat[ion] with drug dealing" with its "very high Hispanic population," including Dominicans, in a case where prosecutor referred to defendant throughout trial as "the Dominican"); *United States v. Doe*, 903 F.2d 16, 19–23 (D.C. Cir. 1990) (government expert witness testified that local cocaine and crack market had "been taken over basically by Jamaicans," in trial during which prosecutor frequently referred to defendants as "the Jamaicans" and argued in closing that "the cocaine that is coming into the city is being taken over by people just like this – just like this"). In those cases, therefore, the racially inflammatory content was delivered as evidence to be factored into the jury's decision-making. Moreover, as the D.C. Circuit suggested, the fact that the testimony came from expert witnesses made it even more likely to bias the jurors' deliberations, because of the "aura of special reliability and trustworthiness" surrounding expert witnesses. *Doe*, 903 F.2d at 19–20.

In contrast, Petitioner here complains of a single sentence uttered by the prosecutor during a closing argument that the jury was instructed not to consider as evidence. (*See* Doc. No. 10, Addendum 1, Arguments and Jury Charge at 92:24–93:1.)   Although the argument was improper, it does not come close to the level of impropriety presented by the cases on which Petitioner relies.   Hinting in argument that a defendant may be frightening because of his race, while reprehensible, is not nearly the same as packaging a theory of guilt-by-ethnicity as expert evidence that a jury is expected to consider as proof.

Moreover, all three of the cases Petitioner cites are direct appeals from federal criminal prosecutions in which circuit courts were able to exercise the broad supervisory powers that the Supreme Court warns are not applicable on habeas review. *See, e.g.*, *Darden*, 477 U.S. at 181 ("[T]he appropriate standard of review for such a claim on writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power.").

Returning to the legal analysis to be applied here, the Court cannot find this to be a "flagrant" case of prosecutorial misconduct under the Sixth Circuit's definition.   The comment into which the prosecutor unnecessarily injected the issue of Petitioner's race was in the context of his own speculation about Kelly's state of mind:

> I'm sure she was kind of nervous and upset to come in here and testify.  She was put under subpoena to do it.  And she might not have wanted to come in here and testify about a black man here in Gallatin, Tennessee who has committed first degree murder and rape and robbery.  Maybe that was the reason she didn't report this to Detective Lame about her testimony.  I don't know.  None of us know why she didn't do it earlier.

(Doc. No. 10, Addendum 1, Arguments and Jury Charge at 70:24–71:7.)   This supposition was not presented as fact and was therefore unlikely to mislead the jury about any fact in evidence. Perhaps more importantly, it was also offered in rebuttal to defense counsel's argument that

46

insinuated Kelly identified Petitioner because of racial stereotypes. Specifically, counsel argued that Kelly had not immediately reported seeing Petitioner near the time and place of the crime because – contrary to her testimony that she had recognized him on sight – she only decided that she had seen him after she spent days driving the "young black male with money" in her cab, hearing the news that "[s]ome black guy took four hundred dollars from the Short Stop Market, killed this lady and raped her" and suspiciously viewing Petitioner as "the young black male who is not supposed to have any money." *Id*. at 27–29. Once defense counsel had projected racial stereotypes into Kelly's mind, any prejudice to Petitioner from the prosecution's speculation about such stereotyping was minimal.

Whether deliberate or not, the prosecutor's remark was a single, isolated comment in a transcript spanning nine volumes. Its significance also pales in comparison to the weight of the evidence against Petitioner, as discussed herein. Again, even assuming a constitutional error, the Court cannot conclude that this single transgression by the prosecutor had a substantial and injurious effect on the outcome of Petitioner's trial.

Petitioner is not entitled to relief on this claim.

### 4.  Claim 5.  Withheld Exculpatory Evidence

Petitioner asserts that the prosecution withheld twelve categories of exculpatory evidence material to his guilt and sentencing. According to an amendment to his petition, the withheld evidence includes:

> a.  Evidence that Ruby Burgess was killed by David Key, her estranged boyfriend, who was described by witnesses as "a maniac" who "would knife you in a minute" and identified by authorities as the "strongest suspect" in the murder. Such evidence includes, but is not limited to, evidence that:

1) Key repeatedly beat and nearly killed Ruby Burgess before her murder, including, for example, incidents where:

    a) He nearly killed her after kidnaping her, telling her to take off her glasses, beating her face "to pieces" (including breaking her nose), and afterwards taking her to the lake to drown her;

    b) He beat her over the head with a champagne bottle, requiring numerous stitches;

    c) He blackened her eyes by beating her in the face on numerous occasions;

2) Before those beatings, Key would allow Ruby Burgess to take off her glasses, exactly as occurred before her murder, where Ruby Burgess' glasses were placed on the counter;

3) In 1979 or 1980, Key used a similar modus operandi to the deadly attack on Ruby Burgess here, having previously attacked her while she was at work, where a struggle ensued, leaving the store "in shambles";

4) Key had a motive to kill her because she had reported him to the Internal Revenue Service;

5) Key afterwards lied that he had only had one physical confrontation with Ruby Burgess, claiming that he never beat her, never hit her with a bottle, and never kidnaped her, though he admitted: "If I did, I was so drunk I didn't know what I did."

b. A report from Deputy Sheriff Danny White, in which White stated that he saw the victim standing at the counter of the store at 5:10 a.m. and that at 5:34 a.m. he saw a black Cordova [sic] bearing Nashville license tags with two Black men inside just over half a mile from the scene of the murder. This was significant, especially because:

1) Linda Kelly's claim was that she saw David Duncan at the market at approximately 4:45, but Officer White's sighting of the victim 25 minutes later confirms that the homicide did not occur at the time when David Duncan was allegedly at the market;

2) Glenn David Randolph drove an automobile similar to the described Cordova, had burned that automobile, and had

mentioned to some people that he had done something very, very bad and had shortly after burned his car;

3) Harold Pryor, who was at the market around 5:30 a.m., described a Black man at the market at that time, which was fully consistent with the spotting of the two Black men in the Cordova a short distance away from the market, and just minutes after Mr. Pryor saw the suspect near the market;

c. Evidence that Pat Freeman had knowledge of the circumstances of the murder which he reported to the police just after the offense;

d. Witness statements that the perpetrator had been wearing a green army jacket, which describes an individual different from David Carl Duncan, who was apparently wearing a dark colored windbreaker, according to Linda Kelly;

e. Evidence sent to the Tennessee Bureau of Investigation (T.B.I.) Lab for testing, including, but not limited to, blood samples on clothing of other suspects: It appears that at least one suspect (not David Duncan) had blood on his clothing which was sent for testing;

f. Polygraph test results from other suspects;

g. Evidence that Richard Baldassarre had committed a similar sexual assault at a 7-11 store in Hendersonville in 1980;

h. Evidence that Olie Thurman had previously threatened Ruby Burgess;

i. Evidence that Ruby Burgess was a bootlegger;

j. An August 30, 1982 statement from Linda Kelly, which was inconsistent with her subsequent testimony at trial, and in which she lied about her actions in reporting what occurred in February 1981 after the murder;

k. Jimmy Stafford escaped from the Tennessee State Penitentiary around the time of the murder and was apparently administered a second set of polygraph tests on July 27, 1982, after he was apparently given a polygraph examination on July 12, 1982, though no record of that initial examination apparently exists; and

l. Proof that in the months before her death, the victim had received obscene phone calls or calls from someone who said nothing; she was scared by these calls and reported them to the authorities.

(Doc. No. 118-1.)

Respondent argues that three of these categories – (c) evidence that Pat Freeman reported knowledge of the circumstances of the murder to police just after the offense; (e) evidence sent to the T.B.I. for testing, including blood samples on the clothing of at least one other suspect; and (f) polygraph test results from other suspects – were never raised at all in Petitioner's state court proceedings and are therefore defaulted. (*See* Doc. No. 178 at 10.) Petitioner counters that this evidence from the T.B.I. was first obtained by him through discovery in his federal court proceedings, and that the prosecution's failure to provide this material earlier constitutes cause for his default. (*See* Doc. No. 188 at 20 (citing *Smith v. Bell*, 381 F. App'x. 547, 552 (6th Cir. 2010), *vacated on other grounds sub nom. Smith v. Colson*, 132 S. Ct. 1790 (2012)).) Respondent does not dispute this point. (*See* Doc. No. 193 at 5.) As the Sixth Circuit acknowledged in *Smith v. Bell*, analysis of the prejudice prong of the procedural default inquiry for *Brady* claims requires review of the merits of those claims, *id.*, which are clearly in dispute in this case. Accordingly, the Court turns to the merits of Petitioner's claims.

a. Claim 5-a – Evidence regarding David Key

In a supplement to his amended petition, Petitioner alleges that the prosecution withheld material, exculpatory evidence about the victim's estranged boyfriend, who had a violent past with the victim and was at one time a suspect in her murder. (*See* Doc. No. 118-1 at 1, ¶ 12-a.)

The State has acknowledged that this evidence about another suspect was favorable to Petitioner and was suppressed. (*See* Doc. No. 40, Addendum 36 at 10.) The only question remaining is whether the evidence was material.

Information about other suspects that "does not even indirectly link any of the suspects to the murder" is "simply too remote to have been exculpatory or to undermine confidence in the verdict." *Apanovitch v. Houk*, 466 F.3d 460, 484 (6th Cir. 2006). In *Apanovitch* the Sixth Circuit rejected *Brady* claims based on suppressed evidence concerning several other suspects, including a former boyfriend that the victim's friend reported had reason to kill her, a man who had stolen the victim's purse and began calling her on the telephone, and a "drunk and loud mouth" recently evicted tenant whom the victim feared and who had "left on bad terms," citing the lack of connection between those suspects and the crime. *Id.*

To be material for *Brady* purposes, there must be "direct or circumstantial evidence linking the third person to the actual perpetration of the crime." *Spirko v. Anderson*, No. 3:95CV7209, 2000 WL 1278383, at *7 (N.D. Ohio July 11, 2000); *see Jalowiec v. Bradshaw*, 657 F.3d 293, 312 (6th Cir. 2011). Speculation about a connection is not enough to make suppressed information material. *Henness v. Bagley*, 644 F.3d 308, 325 (6th Cir. 2011).

The trial court heard evidence about David Key at a hearing held on Petitioner's third post-conviction petition. Detective Lame testified that as the chief investigating officer from the Gallatin police department in Ms. Burgess's murder, he went to Key's place of work in Nashville within days of the murder to interview him, and that Key cooperated fully. (*See* Doc. No. 40, Addendum 33 at 36:15–18, 37:4–38:19.) Key's fingerprints were compared to those found on the juice bottle at the crime scene and were negative for a match according to a March 4, 1981 report from the T.B.I. forensic services crime laboratory. (*Id.* at 39:15–40:12 and Exhibit 6.)

Key was a white man then in his 50s, and based on witness accounts of an individual spotted at the scene of the crime, police believed the perpetrator to be a black male in his early 20s. (*Id*. at 44:24–45:9.)  Nevertheless, Detective Lame returned to Key's workplace a few months later along with T.B.I. Agent Taylor, who obtained Key's sworn statement denying any knowledge of the murder and his agreement to submit voluntarily to a polygraph examination. (*Id*. at 40:22– 42:14 and Collective Exhibit 5-5.)  Agent Taylor testified that this second interview was prompted by his desire after becoming involved in the investigation to interview Key himself in order "to go the extra mile" to satisfy himself that Key was not involved, in light of the history between Key and the victim. (*Id*. at 93:3–24, 94:11–15.)  Key arrived of his own volition in Gallatin the following day and took the polygraph test, which revealed no indications of deception. (*Id*. at 42:24–43:8 and Exhibit 9.)  In total, investigators interviewed Key on three separate occasions about the murder, and the alibi provided by Key during those interviews has been independently corroborated. (*Id*. at 66:17–67:15.)  Key told investigators that he was unaware that the victim had reported him to the Internal Revenue Service. (*Id*. at 63:8–15.)

This Court agrees with the conclusion of the Tennessee Court of Criminal Appeals to the effect that there was absolutely no evidence linking Key to this crime, and that evidence of Key's violence toward the victim years before her murder is "simply too remote to have been exculpatory or to undermine confidence in the verdict." *See Apanovitch*, 466 F.3d at 484.

Petitioner is not entitled to relief on claim 5-a.

### b.  Claim 5-b – Deputy White's Report

In his supplemental pleading, Petitioner also alleges that the prosecution suppressed a report from Deputy Sheriff Danny White, in which he stated that he saw the victim alive at 5:10

a.m. and approximately 25 minutes later saw a black Cordoba occupied by two black men about half a mile from the crime scene. (*See* Doc. No. 118-1 at 2, ¶ 12-b.)

Again, the State's acknowledgment that this evidence was favorable and suppressed (*see* Doc. No. 40, Addendum 36 at 10), leaves only the question of whether the report was material.

Former deputy sheriff Danny White testified at the trial court's hearing on Petitioner's second post-conviction petition that he prepared the following report the morning of the murder after being asked to report his last observation of the crime scene before the murder was discovered:

> At 510 HRS 02-15-81 myself and Roy Weatherford JR stopped at the Sheriff's offices and got gas and went 109S to see if my wife was over at his house or mine. The lady that works at the Short Stop was standing behind the counter at the store. There were no vehicles in the parking lot. We went down 109S to pumping station over to Caro Rd. Went down to the turn around then to Hartsville Pk. Hwy 25. At this time I got a call on a 10-44 time 0534. We turn around came back to Gallatin. The red light got us at Kristal [sic]. Also a black Cordova [sic] with (2) two black males the driver app. 22 to 26 yrs app. 130 lbs. Had on dark cloths [sic], and a large hat texas flat top type, the other, slim app. 22-26 yrs. app. 130 lbs. Dark cloths [sic]. The passenger was bent over as if to be putting something under the seat, and moving around in the car as to be very nervis [sic].
>
> The car a black Cordova [sic] type license plate was up in the center of the car like a Cordova [sic]. Nashville tags. The car went across 31E west on Hwy 25.

(Doc. No. 40, Addendum 26 vol. 1, Tr. at 20:2–23; Addendum 26 vol. 2, at Exhibit 1.)

White further testified that Gallatin has a substantial black population, and that it is not unusual to see black people in cars in Gallatin or to see Davidson County cars in Gallatin. (*See* Doc. No. 40, Addendum 26 vol. 1, Tr. at 24:25–25:13.)

This Court agrees with the state court's conclusion that "[t]he mere presence of a vehicle with black male occupants at a location nearly a mile from the scene at about the time of the crime" is not material. *Duncan Post-Conviction 2/3*, 1997 WL 700043, at *5.

Petitioner alleges that White's report was significant because another individual, Glenn David Randolph, drove a vehicle "similar" to a Cordoba, and "mentioned to some people that he had done something very, very bad and had shortly after burned his car." (Doc. No. 118-1 at 3, ¶ 12-b.2.) Petitioner does not mention Randolph in his response to the motion for summary judgment, and has not cited or produced any evidence directly or indirectly connecting Randolph with the victim or the murder, despite the Court's March 2012 evidentiary hearing at which he could have done so if such evidence were to be found. Trial counsel's testimony at Petitioner's second post-conviction hearing indicates that no such evidence exists:

> Q.     Just to make it totally clear on the record in case this is going to be reviewed, did you find anything at all that would connect Glenn David Randolph to this crime that we're here today on?
>
> A.     No, sir.  I didn't find anything that I felt comfortable with.

(Doc. No. 40, Addendum 26 vol. 1, Tr. at 116:9–14.)

The Court concludes that Petitioner has abandoned any reliance on Randolph's suggested involvement as an aspect of this claim. Moreover, the allegation that Randolph drove a car similar to one seen some distance away from the scene of the murder, even combined with the "rumor and innuendo" discovered by counsel (*see* Doc. No. 40, Addendum 26 vol. 1, Tr. at 114:14) is not sufficient to link this third party to the crime and make the information about the vehicle White saw material.

Whether White's sighting of the victim alive at 5:10 – without seeing the dark car that Kelly testified Petitioner had at the scene shortly after 4:45[11] and toward which Pryor saw a black man hurry from the market at 5:30 – was material to the case is a slightly closer call, and one on which the state court did not comment. However, a *Brady* claim premised on withheld information about White's sighting of the victim is defeated by the fact that Petitioner's trial counsel was aware of the sighting before Petitioner's trial and simply failed to interview White in order to acquire the precise facts of his report:

> Q. Mr. Ligon, prior to Mr. Duncan's trial did you ever interview Danny White of the Sumner County Sheriff's Department?
>
> A. No, sir. My information was that Mr. White's testimony would probably would have been to the fact that he had passed the market and seen Mrs. Burgess alive at approximately 5:30 on the morning of the 15th.
>
> Q. You were told that prior to trial?
>
> A. Yes, sir, I was told that prior to trial.

(Doc. No. 40, Addendum 26 vol. 1, Tr. at 68:18–69:1.) "There is no Brady violation 'where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source.'" *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998) (quoting *United States v. Clark*, 928 F.2d 733, 738 (6th Cir. 1991)).

Moreover, materiality for *Brady* purposes is a "difficult test to meet," and must be determined in light of the totality of the evidence, including the weight of the evidence of Petitioner's guilt. *See Montgomery v. Bobby,* 654 F.3d 668, 678 (6th Cir. 2011). Accordingly,

---

[11] Specifically, Kelly testified that she observed the time of 4:45 on the clock at a bank in town before she arrived at the market 3-4 minutes later. (Doc. No. 10, Addendum 1 vol. 5 at 159:1–160:11.)

even a suppressed report that witnesses claimed to have seen the victim alive and well several days after the prosecution theorized the defendant had murdered her was found not to be material in light of overwhelming evidence of guilt, including the defendant's confession. *Id.* at 677–83.

The evidence against Petitioner was not as weighty as the evidence in *Montgomery*, but neither was the suppressed report as potentially disruptive to the prosecution's case. The prosecutor was clear from the outset of trial that, with regard to the timing of the murder and the witness observations surrounding it, "nothing is precise," explaining that Kelly had seen Petitioner at the scene "within thirty (30) minutes of the murder, thirty (30), maybe, forty (40)" and ultimately settling on "within a very short time of the murder." (*See* Doc. No. 10, Addendum 1 vol. 3, at 383:8–14.) Likewise, he explained that Pryor saw a black male hurry out of the market "somewhere around 5:30." (*Id*. at 383:15–23.) Accordingly, White's seeing the victim alive at 5:10 does not, as Petitioner now suggests, destroy the prosecution's timeline of events.

That White did not see a car in the parking lot could have permitted the defense to argue that the person Kelly identified as Petitioner had left the scene before the murder. However, that possibility would be evaluated in light of Petitioner's unexplained fingerprints found on the still cool juice bottle last rung up for sale by the victim;[12] the description and composite sketch drawn from Pryor's sighting of the likely perpetrator hurrying from the store, which resembled Petitioner; the fact that Petitioner had used a significant amount of cash for cab rides the week after the murder and robbery, despite telling investigators that he was ordinarily broke by Sunday after getting paid on Friday (*see* Doc. No. 10, Addendum 1 vol. 6, at 376:10–13); and Kelly's testimony about his suspicious behavior during a conversation about his having been present at

---

[12] The fingerprints appear even more inculpatory in light of Petitioner's sworn statement to investigators, admitted at trial, in which he claimed that he had "never been inside the One Stop Market and purchased any type of juice." (*See* Doc. No. 10, Addendum 1 vol. 6 at 355:19–20.)

the scene of the murder. Moreover, the prosecution's theory, as explained at closing argument, did not require Petitioner to be at the market continuously from the time Kelly saw him until the murder:

> Well, I will tell you, ladies and gentlemen, what I suggest to you as a theory as to how this happened. The murder happened. David Carl Duncan was out drinking, getting high, Saturday night, just like he told Mrs. Linda Kelly. Didn't have a whole lot to do. Went by the Short Stop Market to get some gas. While getting gas, while going into the Short Stop Market, he noticed that Ruby Evelyn Burgess was the only person around. She was the only one minding the store. She was a woman. He paid for his gas. The third from the last entry was three dollars in gas. It may or may not be Mr. Duncan's gas. Very well could have been. You heard Mr. Dobbs testify that things are really slow, it's the slowest time of the week, from midnight til six o'clock in the morning at the Short Stop Market. He went in and bought his three dollars worth of gas, saw that everything looked pretty clear, and he got something on his mind and this is where I will have to use my imagination. I don't know whether he got armed robbery on his mind or rape on his mind. But he got it on his mind. He went off a little while, waited and made sure the coast was clear, and went back in there to get a bottle of Tropicana juice – he may as well or just come up and gotten a candy bar or anything else. Something, go back there and check the store and make sure that everything is alright. There is nobody else in the store. Then he goes up and does his evil, dirty, vile deed. That's how it happened, ladies and gentlemen, I suggest to you.

(Doc. No. 10, Addendum 1, Arguments and Jury Charge at 82:16–83:19.) Viewed in that context, the fact that White did not see a car in the market parking lot a short time before the victim's murder does not undermine confidence in the jury's verdict and would not establish a *Brady* violation even if White's sighting had not been known to defense counsel before trial.

     c.  Claim 5-c – Pat Freeman

Petitioner asserts that the following hand-written note, acquired from T.B.I. files, was withheld and exculpatory:

Tiger, Pat Freeman called and said he was out on a week-end pass from VA this week-end and that he went out with the deceased Lady. He advised that if he could get his weapons back from the P.D. he could tell them some information about the murder. He requested to talk to Sgt. Brooks "only." He said he could be reached @ VA Hospital – Murf. Ward 1-A North in the morning. He said he would only talk to Sgt. Brooks. He also stated that we (P.D.) couldn't pin this murder on him. 2-15-81 PMS.

(Doc. No. 188-9.)

Because Petitioner only acquired this document through discovery in this proceeding, it was not addressed in any of his state-court hearings or appeals. Neither party has provided anything more than cursory treatment of the note in their summary judgment papers, and despite the opportunity to do so at the hearing held by this Court, Petitioner has not offered any evidence about what information Freeman could have provided about the murder. The message standing alone does not exactly ring with credibility, but more importantly, it offers no substantive information about the crime. To the extent Freeman actually had any facts to offer, they could just as easily have pointed to Petitioner's guilt as to his innocence.

The burden is on Petitioner to establish the elements of a *Brady* violation, and Petitioner has not demonstrated that this note is either favorable or material. Accordingly, while the recent production of this note provides cause for Petitioner's failure to raise it in state court, he has failed to establish any prejudice. This claim is both defaulted and without merit.

d. Claim 5-d – Green Army Jacket

Petitioner alleges that a *Brady* violation arises from the prosecution's withholding "[w]itness statements that the perpetrator had been wearing a green army jacket, which describes an individual different from David Carl Duncan, who was apparently wearing a dark colored windbreaker, according to Linda Kelly[.]" (Doc. No. 118-1 at 3, ¶ 12-c.)

58

At Petitioner's second post-conviction hearing, former Gallatin police officer William Rogan testified that on the day of the murder he was tasked with patrolling the north side of town in an effort to locate any individual matching the description of the man Pryor saw hurrying away from the market. (*See* Doc. No. 40, Addendum 26 vol. 1, Tr. at 39:11–16.)  In the course of that work, he encountered an individual whose clothing he believed matched the description because he was wearing "a toboggan or stocking cap" and "had on a green Army-like jacket, and he had some blood on him." (*Id*. at 39:22–40:1.)  This individual was quickly ruled out as a suspect due to an "iron-clad" explanation for the blood on his jacket (*id*. at 41:24–42:13), and Petitioner expressly disavows any claim that police were wrong to rule him out. (*See* Doc. No. 40, Addendum 27 at 40 n.19.)

Petitioner's point, apparently, is that Rogan's suspicion of this individual must indicate that someone had told him the perpetrator was wearing a green Army jacket, which would be potentially exculpatory in light of Kelly's testimony that Petitioner was wearing a dark windbreaker when she saw him at the market that morning.  However, Petitioner did not elicit any details from Rogan at the post-conviction hearing about the description of the perpetrator's clothing that had been conveyed to him.  Moreover, the only witness to describe the presumed killer to police the morning of the murder was Pryor, and there is already some degree of discrepancy between his observation that the man wore a dark colored shawl (*see* Doc. No. 10, Addendum 1 vol. 5 at 233:9–13, 242:25–243:5) and Kelly's testimony that Petitioner was wearing a dark windbreaker when she saw him (*id*. at 202:8–21).  That Rogan could have construed a green jacket with blood on it to fit the description he had been given does not give rise to a reasonable probability that the result of the trial would have been different and is therefore not material.

Petitioner is not entitled to relief on this claim.

### e. Claim 5-e – Blood Samples

Petitioner next alleges the following basis for a *Brady* claim: "Evidence sent to the T.B.I. Lab for testing, including, but not limited to, blood samples on clothing of other suspects: It appears that at least one suspect (not David Duncan) had blood on his clothing which was sent for testing . . .." (Doc. No. 118-1 at 3, ¶ 12-e.)

As discussed above, the material underlying this claim was apparently acquired from T.B.I. files by Petitioner in the course of this case, and it was never developed in state court. The entirety of this claim is quoted above, and it does not plead sufficient facts to entitle Petitioner to any relief. That it "appears" that some unnamed individual at some unfixed time and place had some blood on his clothing that was tested for unknown purpose and with unspecified results cannot be considered favorable or material to Petitioner's case. Petitioner does not refer the Court to the evidence supporting this claim in the record, does not address it in his response to the motion for summary judgment, and did not develop it at the evidentiary hearing on this matter.

Again, while recent discovery constitutes cause to excuse procedural default, Petitioner has failed to demonstrate any prejudice. Accordingly, the Court finds this claim to be defaulted, insufficiently pleaded and abandoned by Petitioner.

### f. Claim 5-f – Polygraph Results

The entirety of this claim is that a *Brady* violation is established by withholding "[p]olygraph test results from other suspects." (*See* Doc. No. 118-1 at 3, ¶ 12-f.)

This Claim is not sufficiently pleaded to state a claim for relief under Rule 2 of the Rules Governing § 2254 Cases, as it does not state any facts whatsoever. It is also abandoned due to Petitioner's failure to make any effort to support it in his response to motion for summary judgment. Alternatively, to the extent Petitioner is relying on the polygraph test results of Herbert Brown, Olie Thurman, James Davenport and/or David Key, those results indicated that without deception all of the subjects denied any knowledge of the murder (*see* Doc. No. 40, Addendum 33, Tr. vol. 1, at Exhibit 9), and are therefore neither favorable nor material to Petitioner.

Accordingly, Petitioner has not shown the prejudice required to excuse the procedural default of this claim.

### g. Claim 5-g – Richard Baldassarre

Petitioner claims that evidence of other early morning sexual assaults on women working in convenience stores in neighboring cities, which took place within a few months before and after Ms. Burgess's murder and were allegedly perpetrated by a man identified as Richard Baldassarre, are exculpatory. (*See* Doc. No. 118-1 at 3, ¶ 12-g; Doc. No. 188-11.) While the crimes are similar in that they involved sexual assaults in a convenience store stock room and cooler, none of the other victims were raped or murdered. (*See* Doc. No. 188-11.) More importantly, Baldassarre was described as a white male, 6'3" and 230 pounds (*id.* at 10), which does not remotely match the description given by Pryor of the assumed perpetrator. Petitioner's speculation that all of the crimes were committed by Baldassarre – without any evidence actually linking Baldassarre to the murder – is not sufficient to make the Baldassarre information

material. *See Thorne v. Timmerman-Cooper*, 473 F. App'x 457, 467 (6th Cir. 2012). Petitioner is not entitled to relief on this claim.

### h. Claim 5-h – Olie Thurman

Petitioner alleges that the prosecution violated *Brady* by withholding "[e]vidence that Olie Thurman had previously threatened Ruby Burgess." (Doc. No. 118-1 at 3, ¶ 12-h.)

Petitioner is presumably relying on the statement by the victim's daughter during an interview with Detective Lame that Thurman "did threaten her in some way." (*See* Doc. No. 188-2 at 1.) That comment was relayed to Lame based on the witness's grandmother's post-murder recollection of what the victim had told her, and amounted to triple hearsay. (*See id*.) Even assuming that this vague statement would have led directly to admissible evidence as necessary to establish a *Brady* violation, *see United States v. Phillip*, 948 F.2d 241, 249 (6th Cir. 1991), it is not material in the absence of any facts actually connecting Thurman with the murder. *See Thorne*, 473 F. App'x at 467. Petitioner is not entitled to relief on this claim.

### i. Claim 5-i – Burgess Was a Bootlegger

This Claim is not sufficiently pleaded to state a claim for relief under Rule 2 of the Rules Governing § 2254 Cases. Petitioner does not cite to evidence in the record for the Court's review,[13] and does not allege any facts that would make such evidence favorable or material. This claim is also abandoned due to Petitioner's failure to make any effort to support it in his response to motion for summary judgment.

---

[13] The Court notes that a sealed document in the record contains passing reference to the victim's having sold whiskey at some unspecified time, and that she later ceased that activity. (*See* Doc. No. 188-4.) If this is the basis for Petitioner's claim, he has failed to develop any theory that it constitutes exculpatory or impeachment material.

j.   Claim 5-j – Kelly's 1982 Statement

As discussed above, Kelly gave an interview to police on August 30, 1982, in which she reported having seen Petitioner at the market around 4:45 the morning of the murder, and described his strange behavior in her cab that week. (*See* Doc. No. 186-1.) Petitioner does not explain how that statement was inconsistent with Kelly's testimony at trial, and the Court's review does not reveal any material inconsistencies.

Petitioner's recurring complaint is that during this interview Kelly claimed to have reported her sighting of Petitioner to law enforcement officer Charlie Shates the day after the murder. (*Id.* at 3.) This is not inconsistent with her trial testimony, because she was not asked at trial when she first reported her information to police.[14] Petitioner maintains that this reference to an earlier report is false, based on the lack of any written police report about it, and on the testimony of trial counsel at a post-conviction hearing to the effect that Kelly told him she did not come forward earlier because she was frightened. (*See* Doc. Nos. 188 at 17; 10, Addendum 1 vol. 1 at 76:18–77:7.) Defense counsel capitalized on the lack of information at trial about the timing of Kelly's report by arguing that she later fabricated her sighting (*see* Doc. No. 10, Addendum 1, Arguments and Jury Charge at 29:11–16 ("Ms. Kelly called no one. . . . Because she made her mind up later as to who she saw that morning. If she saw anybody. If she was there.")), and it appears from the prosecutor's closing argument at trial that he, too, was unaware of an early report from Kelly. (*See* Doc. No. 10, Addendum 1, Arguments and Jury Charge at 71:6–7 ("None of us know why she didn't do it earlier.").)

---

[14] Although defense counsel questioned Kelly about who told her about the murder, he did not ask what, if anything, she said to anyone about what she had seen. (*See* Doc. No. 10, Addendum 1 vol. 5, at 205:17–206:19.)

However, Kelly's August 1982 interview is consistent with her testimony and offer of proof elicited by post-conviction counsel at Petitioner's state court hearing. (*See* Doc. No. 40, Addendum 26 vol. 1, Tr. at 55:12–58:24.) The fact that it is inconsistent with trial counsel's inadmissible hearsay statement and the attorneys' suppositions at trial is not material to the outcome of Petitioner's case. Despite being expressly authorized to present additional evidence in support of his *Brady* claim at the March 2012 hearing in this matter (*see* Doc. No. 205), Petitioner did not offer any new evidence to dispute the veracity of Kelly's report or to make the timing of her initial report material.

Kelly's identification of Petitioner at the scene is corroborated by his fingerprints found there and by Pryor's description that matched his general appearance, and any question of whether she delayed reporting her sighting out of fear does not undermine confidence in Petitioner's conviction. Petitioner is not entitled to relief on this claim.

k. Claim 5-k – Jimmy Stafford Polygraph

This claim alleges simply that Jimmy Stafford escaped from prison around the time of the murder and was polygraphed twice in 1982. (*See* Doc. No. 118-1 at 4, ¶ 12-k.) Those facts are insufficient to establish the existence of evidence that would be exculpatory or material to Petitioner's case. Furthermore, Petitioner has not cited any portion of the record in support of this claim, and has abandoned it by failing to make any effort to support it in his response to the motion for summary judgment.

l. Claim 5-l – Phone Calls to the Victim

This claim about anonymous harassing phone calls to the victim in the months before she died is presumably based on the reference to such calls, which had apparently been reported to

the police before the murder, during Detective Lame's interview with the victim's daughter. (*See* Doc. No. 188-2 at 6–7.) Petitioner has not offered any facts connecting those calls to the murder. His theory is apparently that the calls were placed by David Key (*see* Doc. No. 188 at 9), who, as discussed above, has not been connected to the murder by anything other than a violent past with the victim and her daughter's speculation. Petitioner has failed to establish that evidence of the phone calls would have been material to the outcome of his case.

### 5. Claim 8-b. Unconstitutional Aggravating Circumstances

Petitioner next contends that the second aggravating circumstance found by the jury – that "the murder was especially heinous, atrocious or cruel, in that it involved torture or depravity of mind" (*see* Doc. No. 10, Addendum 1 vol. 8 at 654) – was unconstitutionally vague on its face and was not adequately defined for the jury. (Doc. No. 64 at 22, ¶ 15-b.)

The Eighth Amendment requires that a state's capital sentencing scheme "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.'" *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). A state's definition of aggravating circumstances – those circumstances that make the defendant "eligible" for the death penalty – must be sufficiently specific to avoid the arbitrary and capricious infliction of the death penalty. *Id.* Accordingly, an instruction that a jury may impose the death penalty based on a finding that a crime is "heinous, atrocious or cruel," without further definition or guidance, is unconstitutionally vague. *Richmond v. Lewis*, 506 U.S. 40 (1992); *Maynard v. Cartwright*, 486 U.S. 356 (1988). Both the Sixth Circuit and the State of Tennessee have acknowledged that

Tennessee's former "heinous, atrocious or cruel" instruction, as given at Petitioner's trial, was constitutional error. *See Houston v. Dutton*, 50 F.3d 381, 387 (6th Cir. 1995).

What Petitioner fails to acknowledge, however, is that a state appellate court may cure an unconstitutionally vague aggravating circumstance by adopting a narrowing construction on appeal. The Supreme Court has specifically held that a state satisfies the constitutional requirement that it limit sentencing discretion by adopting a constitutionally narrow construction of a facially vague aggravating circumstance, and by applying that construction to the facts of a particular case. *Richmond*, 506 U.S. at 47; *Lewis v. Jeffers*, 497 U.S. 764 (1990); *Walton v. Arizona*, 497 U.S. 639 (1990). That is precisely what happened in this case.

While Petitioner's case was pending on direct appeal, the Tennessee Supreme Court adopted a narrowing construction of the "heinous, atrocious and cruel" aggravator in another case. *See State v. Williams*, 690 S.W.2d 517, 529 (Tenn. 1985). The court first explained that the second clause of the statutory provision ("in that it involved torture or depravity of mind") "qualifies, limits and restricts" the phrase in the first clause ("heinous, atrocious and cruel"). Therefore, the court concluded, in order to prove that the crime was heinous, atrocious or cruel, the State must prove that it involved "torture of the victim or depravity of the mind of the killer." *Id.* The court then held that "torture" means "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious," and that proving that torture occurred "necessarily, also proves that the murder involved depravity of mind of the murderer, because the state of mind of one who willfully inflicts such severe physical or mental pain on the victim is depraved." *Id.* The United States Supreme Court has approved similar narrowing constructions. *See Walton*, 497 U.S. at 654–55; *Maynard*, 486 U.S. at 364–65 (a heinous,

atrocious or cruel aggravator would be constitutionally acceptable if construed to require torture or serious physical abuse).

On Petitioner's direct appeal, the Tennessee Supreme Court found that "in the present case the trial court gave the pre-*Williams'* instruction with no interpretation of the words," but concluded that Petitioner had suffered no prejudice because "[t]he proof here, that the killer with great force sliced three times deeply into the victim's neck and left her to bleed to death, does support the aggravating circumstance as defined in *Williams*." *Duncan 1*, 698 S.W.2d at 71. Petitioner does not argue that this conclusion was a misapplication of the narrowing construction. Even if he did advance such an argument, this Court could not conclude that no reasonable sentencer could have reached the same conclusion as the state court based on the facts in this case. *See Jeffers*, 497 U.S. at 783. Respondent's motion for summary judgment on this claim shall be **GRANTED**.

6. <u>Claim 12. Malice</u>

Petitioner alleges that the trial court's instructions violated his right to due process by not requiring the jury to find the element of "malice" to convict Petitioner of murder. (Doc. No. 64 at 27, ¶ 19.)

Respondent acknowledges that Petitioner asserted this claim in state court, but states that the Tennessee Court of Criminal Appeals correctly decided the issue as a matter of state law, and that it does not state a claim for federal habeas relief. (*See* Doc. No. 178 at 17.)

On appeal from the dismissal of Petitioner's second post-conviction petition, the Tennessee Court of Appeals found this issue to be without merit:

> Next, the appellant says the trial judge, by his instructions to the jury, impermissibly relieved the State of its burden to prove the killing was malicious.
>
> In *State v. King*, 694 S.W.2d 941, 946 (Tenn. 1985), our Supreme Court, speaking through the late Justice Harbison, reviewed its prior holdings, and specifically found that felony murder does not require proof of malice. This issue has no merit.

*Duncan Post-Conviction 2/3*, 1997 WL 700042, at *8.

Likewise, the Sixth Circuit has repeatedly rejected habeas corpus claims based on malice instructions in felony murder convictions. Specifically, the court has found that omission of a malice instruction is not error in light of Tennessee law making clear that malice is not an element of felony murder. *See Workman v. Bell*, 178 F.3d 759, 777 (6th Cir. 1998). Even an admittedly unconstitutional instruction regarding malice is "superfluous, and therefore harmless error, in a clear case of felony murder" because "the petitioner's participation in the felony during which the murder is committed . . . is a substitute for the elements of intent to kill and malice which must normally be proved in a murder case." *Davis v. State*, 856 F.2d 35, 36 (6th Cir. 1988).

In his response to the motion for summary judgment, Petitioner attempts to frame this argument as an *ex post facto* violation, describing Tennessee Supreme Court rulings about the lack of a malice element in felony murder as a "reinterpretation" of state law that took place after the date of his offense in 1981. (*See* Doc. No. 188 at 84–85.) This effort fails. *State v. King*, which the Tennessee Court of Criminal Appeals cited in rejecting his claim below, did not announce a new rule, but relied on case law dating back to 1975 to reaffirm that felony murder does not require proof of malice. *See King*, 694 S.W.2d at 946. Furthermore, the Sixth Circuit cited the same case law to reject a similar claim in a case brought by an inmate whose crime was

committed in 1981, the same year as Petitioner's. *See Workman*, 178 F.3d at 777 (citing Tennessee case law); *State v. Workman*, 667 S.W.2d 44, 46 (Tenn. 1984) (noting August 5, 1981, date of offense).

The Court finds this claim to be without merit and will **GRANT** Respondent's motion for summary judgment on this claim.

7. Claim 13. Mitigating Circumstances Instruction

In his next claim, Petitioner asserts that the trial court's instructions regarding sentencing used the word "unanimously" in a way that misled the jurors into believing that any mitigating circumstances must be found unanimously. (Doc. No. 64 at 27.) Requiring a jury to find mitigating circumstances unanimously would violate the Eighth Amendment. *McKoy v. North Carolina*, 494 U.S. 433, 443–44 (1990).

The trial court instructed the jury on sentencing as follows:

> If the jury unanimously determines that, at least, one (1) statutory aggravating circumstance or several statutory aggravating circumstances have been proved by the State, beyond a reasonable doubt, and said circumstance or circumstances are not outweighed by any sufficiently substantial [sic] mitigating circumstances, the sentence shall be death.
>
> * * *
>
> If the jury unanimously determines that no statutory aggravating circumstance or aggravating circumstances have been proved by the State, beyond a reasonable doubt, or if the jury unanimously determines that a statutory aggravating circumstance or circumstances, have been proven by the State beyond a reasonable doubt, but the said circumstance or circumstances are outweighed by one (1) or more mitigating circumstances, the punishment shall be life imprisonment."

(Doc. No. 10, Addendum 1 vol. 8 at 656:10–15, 657:2–10.)

The Tennessee Court of Criminal Appeals rejected Petitioner's claim:

> Next, the appellant contends that the trial judge's jury instructions at the penalty phase left the incorrect impression that mitigating circumstances had to be found unanimously in order to impose a life sentence.
>
> The appellant quoted two paragraphs from the judge's charge which he claims has the "unfortunate effect" of equating the requirement that aggravating factors be unanimously found beyond a reasonable doubt with a similar requirement for mitigating factors. The jury instructions contain no such language. In the charge the requirement of unanimity is applicable only to aggravating circumstances, never to mitigating circumstances. This issue has no merit.

*Duncan Post-Conviction 2/3*, 1997 WL 700043, at *10.

As Petitioner forthrightly acknowledges, the Sixth Circuit has rejected an Eighth Amendment challenge to precisely the same instructions given at Petitioner's trial, quoting identical instructions and concluding that "the plain language of . . . the instructions . . . require[s] unanimity as to the weighing of aggravating and mitigating circumstances – not the existence of a mitigating circumstance. In other words, these admonitions simply and unobjectionably require a unanimous verdict." *Henley v. Bell*, 487 F.3d 379, 391 (6th Cir. 2007).

The Court finds that Respondent is entitled to judgment on this claim as a matter of law, and will **GRANT** his motion for summary judgment on this claim.

8. Claim 14. Unconstitutional Death Penalty Statute

Petitioner alleges that the Tennessee death penalty statute is unconstitutional: (a) for failure to narrow meaningfully the class of persons subject to capital punishment; (b) because it imposes the death sentence arbitrarily and capriciously; and (c) because electrocution and lethal injection are cruel and unusual punishments; because the appellate review process is

constitutionally inadequate; and because the statute embraces more than one subject. (Doc. No. 64 at 27–29, ¶ 21.) For the reasons set forth below, each of those claims is without merit.

a. 14-a. Meaningful Narrowing

Petitioner claims that Tennessee's death penalty scheme does not meaningfully narrow the class of persons subject to capital punishment in two ways. (*See* Doc. No. 64 at 27–28, ¶ 21-a.) The first – that Tennessee's "heinous, atrocious and cruel" aggravating circumstance was unconstitutionally vague – is already addressed and rejected above. Because the vagueness of this aggravator was remedied, and the Tennessee Supreme Court applied an appropriate narrowing construction to Petitioner's case on appeal, Petitioner has suffered no prejudicial error.

Petitioner also asserts that Tennessee's aggravating circumstances fail to narrow the class of death penalty eligible offenders because they encompass a majority of all homicides in Tennessee. To justify imposition of the death penalty, a statutory aggravating circumstance must genuinely narrow the class of persons eligible for the penalty and must reasonably justify imposition of a more severe sentence on the defendant in the case at bar as compared to others found guilty of the same crime. *See Zant v. Stephens*, 462 U.S. 862 (1983). An aggravating factor fails to satisfy this requirement if a "sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty." *Arave v. Creech*, 507 U.S. 463, 474 (1993). Petitioner does not allege that to be the case for Tennessee's aggravating factor scheme. Moreover, only two aggravators were found in his case, and he suffered no prejudicial error as the result of their application, as discussed above. This portion of Petitioner's claim is without merit.

b.  14-b.  Arbitrary and Capricious

Petitioner next asserts that Tennessee's death penalty is imposed arbitrarily and capriciously for a laundry list of reasons. Specifically, Petitioner's sub-subclaims are:

1)  Unlimited discretion is vested in the prosecution to seek the death penalty;

2)  The death penalty is imposed in a discriminatory manner;

3)  There are no uniform standards or procedures for jury selection to ensure open inquiry concerning prejudicial matters;

4)  The death-qualification process skews the jury in favor of the prosecution and in favor of death;

5)  Defendants are precluded from addressing jurors' popular misconceptions concerning the cost of execution, deterrence, method of execution;

6)  The jury is prohibited from being told the effect of a non-unanimous verdict and erroneously told that their verdict must be unanimous, when this is not required by Tennessee law;

7)  Requiring a unanimous life verdict precludes the full consideration of mitigating evidence;

8)  There is a reasonable likelihood that jurors believe they have to find mitigating circumstances unanimously;

9)  The jury is not required to make the ultimate determination of the appropriate penalty; and

10) The defendant is denied final closing argument at sentencing.

(*See* Doc. No. 64 at 28, ¶ 21-b.)

Petitioner correctly acknowledges that "the courts have consistently ruled against" these claims. (*See* Doc. No. 188 at 109.)  Indeed, the judicial rejection of these claims has grown even more resounding since Petitioner's acknowledgment. *See, e.g., Morris v. Bell,* No. 07-1084-JDB, 2011 WL 7758570, at *64–71 (W.D. Tenn. Sept. 29, 2011) (granting summary judgment to respondent on petitioner's claims that death penalty is imposed arbitrarily and capriciously based upon prosecutorial discretion; discriminatory imposition; lack of uniform standards for jury

selection; skewing effect of death-qualification process; prohibition against addressing "popular misconceptions" surrounding the death penalty; prohibition against explaining to the jury the consequences of a non-unanimous verdict; preclusion of full consideration of all mitigating evidence by requirement of unanimous life verdict; lack of requirement that jury determine the appropriate penalty; denying defendant final closing argument at sentencing); *McNish v. Bell*, No. 2:00-cv-95, 2013 WL 5442404, at *42–43 (E.D. Tenn. Feb. 12, 2013) (holding petitioner not entitled to relief on claims that death sentence is arbitrary and capricious because of prosecutorial discretion; discriminatory imposition; lack of uniform standards for jury selection; prohibition against addressing "misconceptions" related to the death penalty; prohibition against explaining to the jury the consequences of a non-unanimous verdict; lack of requirement that jury determine the appropriate punishment; and giving prosecution final closing argument at sentencing).

The Court has already addressed and rejected above Petitioner's claim that his jury was misled by the sentencing instructions to believe they were required to find any mitigating circumstances unanimously. The remaining claims of this paragraph are without merit.

c. 14-c. Cruel and Unusual Punishment

Petitioner next argues that both electrocution and lethal injection constitute cruel and unusual punishment. (*See* Doc. No. 64 at 29, ¶ 21-c.) This claim lacks any support in federal law.

Petitioner does not have a current claim with regard to electrocution, because current Tennessee law provides for execution of the death sentence by lethal injection. Tenn. Code Ann. § 40-23-114(a) (2000). Because he committed his offense prior to January 1, 1999, Petitioner may elect by written waiver to be executed by electrocution instead of lethal injection. Tenn.

Code Ann. § 40-23-114(b). Should he choose to make such a waiver, Petitioner would waive any claim that electrocution is unconstitutional. *See Stewart v. LaGrand*, 526 U.S. 115, 119 (1999). A recent amendment to the controlling statute provides that execution by electrocution is otherwise authorized only in the event that lethal injection is held to be unconstitutional by a court of competent jurisdiction or the Commissioner of the Tennessee Department of Correction certifies to the governor that an essential lethal injection ingredient is unavailable. Tenn. Code Ann. § 40-23-114(d).  In the absence of any allegation that either of those triggering events has happened, any challenge to the constitutionality of electrocution is not ripe for review.

Moreover, the Supreme Court found execution of the death penalty by electrocution to be constitutional in 1890, *see In re Kemmler*, 136 U.S. 436, 449 (1890), and no federal court since that time has held it to be unconstitutional. *But see State v. Mata*, 745 N.W.2d 229 (Neb. 2008) (finding electrocution unconstitutional under Nebraska constitution).  The Sixth Circuit has reiterated its rejection of such a claim as recently as 2004, *see Williams v. Bagley*, 380 F.3d 932, 965 (6th Cir. 2004), and at least one district court in Tennessee has rejected such a challenge within the last three years, *see Morris v. Bell*, No. 07-1084-JDB, 2011 WL 7758570, at *68 (W.D. Tenn. Sept. 29, 2011).

It is even clearer that Petitioner's challenge to the constitutionality of lethal injection is without merit.  The Sixth Circuit and district courts within the circuit have held single-drug lethal injection protocols to be constitutional. *See, e.g.*, *Cooey v. Strickland*, 589 F.3d 210 (6th Cir. 2009) (rejecting challenge to single-drug sodium thiopental protocol); *Hand v. Houk*, No. 2:07-CV-846, 2013 WL 2372180, at *80–81 (S.D. Ohio May 29, 2013) (rejecting challenge to single-drug pentobarbital protocol).  The Supreme Court has held that a state's lethal injection protocol satisfies the Eighth Amendment unless it is shown to "create[] a demonstrated risk of severe

pain" that is "substantial when compared to the known and available alternatives." *Baze v. Rees*, 553 U.S. 35, 61 (2008). Petitioner has not even attempted such a showing in this case.

Petitioner is not entitled to relief on this portion of his claim.

### d. 14-d. Appellate Review Process

Petitioner asserts that Tennessee's appellate review process for capital cases is constitutionally inadequate, citing both the methodology and outcome of past proportionality reviews. (*See* Doc. No. 64 at 29, ¶ 21-d.)

This claim is without merit because, as discussed in further detail below, the Constitution does not require the proportionality review envisioned by Petitioner. *See Hodges v. Bell*, 548 F. Supp. 2d 485, 552 (M.D. Tenn. 2008) (citing *Pulley v. Harris*, 465 U.S. 37, 44–51 (1984) and *Buell v. Mitchell*, 274 F.3d 337, 368 (6th Cir. 2001)). Moreover, while Petitioner complains that Tennessee juries are not required to make written findings of mitigating circumstances, "[t]he Constitution does not require a jury that imposes a death sentence to make specific written findings of mitigating circumstances." *Austin v. Bell*, 927 F. Supp. 1058, 1063 (M.D. Tenn. 1996). Petitioner is not entitled to relief on this claim.

### 9. Claim 19. Proportionality Review

In this claim Petitioner asserts that his rights under the Sixth, Eighth and Fourteenth Amendments were violated by a Tennessee Supreme Court proportionality review of his case that was fatally flawed due to insufficient and inaccurate data from other similar cases. (*See* Doc. No. 64 at 30–31, ¶ 26).

Respondent argues that this claim is without merit because Tennessee's proportionality review exceeds the requirements of the federal constitution. (*See* Doc. No. 78 at 19–20.)

It is clear that appellants in state court are not constitutionally entitled to a proportionality review comparing their sentences to those imposed in similar cases. *Getsy v. Mitchell*, 495 F.3d 295, 305 (6th Cir. 2007) (citing *Pulley*, 465 U.S. at 42–43). The only proportionality review to which offenders sentenced to death are entitled as a matter of federal law is an examination of "the inappropriateness of the sentence in relation to the particular characteristics of the crime and the criminal at issue." *Id.*

In this case, the victim was raped – her clothes torn and thighs bruised – and killed with "three cuts to her neck of such force that they cut through her neck muscles, jugular vein, trachea, larynx and esophagus and nicked the carotid artery." *Duncan 1*, 698 S.W.2d at 66, 69. Petitioner makes no effort to argue that the death penalty is inappropriate in relation to the circumstances of the crime for which he is convicted.

Petitioner acknowledges that the Constitution does not require a proportionality review, but argues that Tennessee's statutory review process provides him with a liberty interest to have such a review properly conducted. (*See* Doc. No. 188 at 97–98.) The Sixth Circuit has rejected this argument, holding that Tennessee's death penalty review statute allows for too much official discretion to create a liberty interest. *See Coe v. Bell*, 161 F.3d 320, 352 (6th Cir. 1998); *King v. Bell*, 392 F. Supp. 2d 964, 1007 (M.D. Tenn. 2005) (applying *Coe* and rejecting claim that Tennessee death penalty review statute created liberty interest).

The Court will **GRANT** Respondent's motion for summary judgment on this claim.

10. Claim 20.  Inadequate State Review

This paragraph represents Petitioner's third iteration of the same claims presented in Claims 14-d and 19 and is without merit for the reasons explained by the Court in disposing of those claims above.

The only new allegation posed by this paragraph is the statement in sub-paragraph d that "[t]he appellate review process fails to take into account human factors and does not explore the wellspring of human emotion." (*See* Doc. No. 64 at 31, ¶ 27-d.)  In support of his motion for summary judgment, Respondent urges that this bald, vague assertion is insufficient to state a claim for habeas corpus relief, and Petitioner has abandoned this claim by failing to respond to this point in his response. (*See* Doc. No. 188 at 97–100.)

The Court will **GRANT** Respondent's motion for summary judgment on this claim.

11. Claim 21.  Broadened Indictment

Petitioner's indictment for felony murder did not include all of the elements of deliberate, premeditated murder, but the trial court nevertheless charged the jury on both theories at the conclusion of the guilt phase of his trial.  Petitioner essentially asserts that his conviction was therefore the result of jury instructions that broadened his indictment and thus violated his right to due process. (*See* Doc. No. 64 at 31, ¶ 21.)

a.  Exhaustion

Respondent asserts that this claim is procedurally defaulted. (*See* Doc. No. 178 at 20.)

Petitioner first raised this challenge *pro se* in his initial state habeas corpus action, which the Tennessee Court of Criminal Appeals rejected because the guilty verdict returned under Petitioner's indictment for felony murder was "valid on its face," and state habeas corpus relief is

77

limited to "the case of a void judgment or to free a prisoner held in custody after his term of imprisonment has expired." *Duncan Habeas 1*, No. 01C01-9301-CR-00004, 1993 WL 331822, at *1 (Tenn. Ct. Crim. App. Aug. 26, 1993). The court advised that a post-conviction proceeding was the proper avenue for Petitioner's constitutional claims about his indictment:

> To the extent the appellant's allegations contend that he was improperly convicted because of constitutional errors, the post-conviction process, see T.C.A. §§ 40-3-101, *et seq.*, was applicable. In this regard, as the state argues in its brief, ***if the appellant has a post-conviction case pending, as he alleges, it remains the appropriate proceeding in which to litigate the issues he seeks to raise***, provided he complies with all post-conviction procedural requirements.

*Id*. at *2 (emphasis added). This holding is consistent with that court's approach to similar claims in other state habeas corpus cases. *See, e.g.*, *Cooper v. Carlton*, No. E2011-00783-CCA-R3HC, 2012 WL 1523960, at *5 (Tenn. Ct. Crim. App. Apr. 30, 2012) (rejecting habeas corpus claim based on constructive amendment to indictment via jury instructions and explaining that such defect would render conviction voidable, not void, and could only be addressed on post-conviction). Accordingly, the state court's holding on habeas corpus review was not that Petitioner's claim lacked merit, but that it did not state a claim for the particular relief sought in that case.

Heeding the appellate court's advice, Petitioner repeated his challenge to the sufficiency of his indictment in his second post-conviction petition, ultimately arguing on appeal in two separate briefs that he was unconstitutionally tried for an offense for which he was not indicted, in violation of his right to due process and to notice of the nature and cause of the charge against him. (*See* Doc. No. 40, Addendum 27 at 20–26; Addendum 37.) Petitioner clearly advanced this alleged defect as, *inter alia*, a federal due process notice violation for which he cited numerous

Supreme Court and Sixth Circuit opinions. (*See* Doc. No. 40, Addendum 27 at 22, 23, 25 n.10 (explaining that his claim was based in part on the Sixth and Fourteenth Amendment rights to be informed of the charge against him).)   In affirming the dismissal of Petitioner's claim, the Tennessee Court of Criminal Appeals recounted the basis of its previous rejection of Petitioner's claim on habeas corpus appeal, and that of the Tennessee Supreme Court in its refusal to permit an appeal of that ruling, before concluding that "[t]his issue clearly has no merit." *Duncan Post-Conviction 2/3*, 1997 WL 700043, at *2.   Later in the same opinion, the court returned to Petitioner's claim that he was put to trial on a charge not contained in his indictment, and ruled that the claim was barred from review:

> As the appellant concedes in his brief, this is the same issue addressed and rejected by this Court in [*Duncan Habeas 1*].  Thus, this is a matter already decided adversely to the appellant by Judge Tipton's opinion in that habeas corpus case and ***cannot be relitigated in a subsequent post-conviction proceeding***.

*Id.* at *4 (emphasis added).

Relying on this latter holding, Respondent argues in support of summary judgment that the claim at issue is procedurally defaulted. (*See* Doc. No. 178 at 20.)

As discussed above, a state court's refusal to address the merits of a claim due to a violation of an applicable state procedural rule will ordinarily preclude review by this Court on habeas corpus. *See Coleman*, 501 U.S. at 729–30.  However, "when the record reveals that the state court's reliance upon its own rule of procedural default is misplaced, we are reluctant to conclude categorically that federal habeas review of the purportedly defaulted claim is precluded." *Greer v. Mitchell*, 264 F.3d 663, 675 (6th Cir. 2001).  Accordingly, "when a state erroneously relies upon its own rule of procedural default, the claim is not barred." *Post v. Bradshaw*, 621 F.3d 406, 423 (6th Cir. 2010).

Although the Tennessee Court of Criminal Appeals did not explain or cite any law in support of its holding that Petitioner could not "relitigate" this claim in his post-conviction proceeding, Tennessee does maintain a doctrine of issue preclusion, or collateral estoppel, which "operates to prevent relitigation of an issue which has been previously determined between the same parties in another suit, even if the suit was based upon a separate cause of action." *Dickerson v. Godfrey*, 825 S.W.2d 692, 694 (Tenn. 1992). The doctrine only applies, however, where the issue in question was *actually* and *necessarily* decided in the previous litigation. *Id.* Moreover, Tennessee courts do not apply collateral estoppel in every case to which it would arguably pertain, but recognize exceptions when, for example, "there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation." *Mullins v. State*, 294 S.W.3d 529, 538 (Tenn. 2009) (quoting *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 481 (1982)). In such a case, the Tennessee Supreme Court instructs that "[r]edetermination of issues is warranted." *Id.* (quoting *Kremer*, 456 U.S. at 481).

It is clear from the face of the two state appellate decisions at issue here that Tennessee's doctrine of issue preclusion did not apply to Petitioner's post-conviction constitutional challenge to the apparent conflict between his indictment and the jury instructions. A constitutional challenge was not actually and necessarily decided in his state habeas corpus proceeding where the court in that case unambiguously held that it was NOT reaching that question – explaining that its habeas corpus review was confined to the facial validity of Petitioner's conviction, and that a post-conviction proceeding was the "appropriate proceeding in which to litigate the [constitutional] issues he seeks to raise." *Duncan Habeas 1*, 1993 WL 331822, at *1–2. To the extent that holding could be construed to constitute a judgment on the merits of Petitioner's constitutional claims, there is ample reason from the face of the ruling to doubt the quality and

extensiveness of the court's analysis of those claims. After Petitioner followed the court's instructions and returned with his claim on post-conviction, the court again avoided addressing the constitutional claim by erroneously relying on its own procedural rule.

The Court concludes that under these circumstances, Petitioner's claim is not procedurally defaulted. *See Post*, 621 F.3d at 423; *see also Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986) (procedural default applies where "the court . . . determine[s] that there is a state procedural rule that is applicable to petitioner's claim and that the petitioner failed to comply with the rule"). Because procedural default is the sole basis offered by Respondent for summary judgment on this claim, the motion for summary judgment on this claim will be **DENIED**.

b. Merits of the Claim

Turning to the merits of Petitioner's claim, at the time of the murder, Tenn. Code Ann. § 39-2402 provided for alternate theories of first degree murder, including premeditated murder and felony murder:

> Every murder perpetrated by means of poison, lying in wait, or by other kind of willful, deliberate, malicious, and premeditated killing, ***or*** committed in the perpetration of, or attempt to perpetrate, any murder in the first degree, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or the unlawful throwing, placing or discharging of a destructive device or bomb, is murder in the first degree.

Tenn. Code Ann. § 39-2402(a) (1979) (emphasis added).

Petitioner's indictment for murder, which expressly referenced the statute quoted above,

charged as follows:

> The Grand Jurors of the State and County aforesaid, upon their
> oath, present that DAVID CARL DUNCAN heretofore on or about
> the 15th day of February, 1981, in the County and State aforesaid,
> did unlawfully, feloniously, wilfully, with premeditation and with
> malice aforethought kill and murder Ruby Evelyn Burgess in the
> perpetration of the act of aggravated rape on Ruby Evelyn Burgess
> and, therefore, DAVID CARL DUNCAN did commit murder in
> the first degree, against the peace and dignity of the State of
> Tennessee.

(Doc. No. 10, Addendum 1, Transcript No. 2497 to the Tennessee Supreme Court at 2.)  The

indictment thus lacked the "malicious, deliberate" elements of deliberate, premeditated murder,

but according to the Tennessee Court of Criminal Appeals, "[t]his was the standard language

used in indictments for felony murder." *Duncan Post-Conviction 2/3*, 1997 WL 700043, at *2.

At the conclusion of the guilt phase of Petitioner's trial, the trial court instructed the jury

in relevant part as follows:

> Murder in the first degree.  Any person who willfully,
> deliberately, maliciously and with premeditation kills another
> person is guilty of murder in the first degree.  For you to find the
> Defendant guilty of murder in the first degree the State must have
> proven, beyond a reasonable doubt, (1) that a Defendant
> unlawfully killed the alleged victim; (2) that the killing was
> malicious, that is that the Defendant was of a state of mind to do
> the alleged wrongful act without legal justification or excuse.  If it
> is shown beyond a reasonable doubt that the alleged victim was
> killed, the jury may, but is not required to, infer the killing was
> malicious in the absence of evidence to the contrary.  That the
> killing was willful.  That is, that the Defendant must have intended
> to take the life of the alleged victim. (4) that the killing was
> deliberate.  That is, with cool purpose; and (5) the killing was
> premeditated.  This means that the intent to kill must have been
> formed prior to, or before the act itself.  Such intent or design to
> kill may be conceived and deliberately formed in an instant.  It is
> not necessary that the purpose to kill pre-exist in the mind of a
> Defendant for any definite period of time.  It is sufficient that it

preceded the act, however short the interim. The mental state of a Defendant at the time he allegedly instigated that act which resulted in the alleged death of the deceased must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion and has to be capable of premeditation. Passion does not always reduce the crime below murder in the first degree since the person may deliberate, may premeditate and may intend to kill after premeditation and deliberation, although prompted and to a large extent controlled by passion at the time.

If the design to kill was formed with deliberation and premeditation, it is immaterial that the accused may have been in a passion or excited when the design was carried into effect. *A person commits murder in the first degree also, as charged in this case, if he kills any person during the perpetration of, or attempt to perpetrate any robbery or rape.* For you to find the Defendant [guilty][15] of murder in the first degree as charged, the State must have proven beyond a reasonable doubt 1) that the Defendant unlawfully killed the alleged victim; 2) that the killing was committed during the alleged perpetration or attempt to perpetrate the alleged robbery; 3) that the Defendant specifically intended to commit the alleged robbery; 4) that the killing was committed during the alleged perpetration or attempt to perpetrate the alleged rape and that the Defendant specifically intended to commit the alleged rape.

If you should find beyond a reasonable doubt that the Defendant killed the deceased during the perpetration of or during an attempt to perpetrate robbery or rape as alleged, and that the Defendant specifically intended to commit the alleged robbery or rape, it is not necessary that the State prove any intention to kill or that the alleged killing was done willfully, deliberately with premeditation with malice. To render the alleged killing murder in the first degree, the alleged killing must have been done in pursuance of the unlawful act of rape or robbery and not collateral to it. That is, the alleged killing must have been closely connected with the alleged robbery or rape and not a separate, distinct and independent event.

\* \* \*

---

[15] With the exception of this correction of this particularly conspicuous error in transcription, the Court has repeated the jury charge transcription verbatim, without regard to any errors in enumeration or punctuation, which likely would not have been evident in the trial court's oral recitation of the instructions to the jury.

> If after considering all the evidence and the Court's instructions, you find beyond a reasonable doubt that the Defendant is guilty of murder in the first degree, you should report your verdict as follows:
>
> We the jury find the Defendant guilty of murder in the first degree.

(Doc. No. 10, Addendum 1, Arguments and Jury Charge at 95:13–98:14 (emphasis added).)

After deliberation, the jury returned its verdict on the murder charge: "We, the jury find the defendant guilty of first degree murder." (Doc. No. 10, Addendum 1, Transcript No. 2497, Supplemental Record to the Tennessee Court of Criminal Appeals at 57.)

It is apparent from the instructions quoted above that, despite the fact that "[c]learly, the indictment charges first degree murder in terms of felony murder," *Duncan Habeas 1*, 1993 WL 331822, at *1, the trial court also instructed the jury on a charge not fully set forth in the indictment: willful, deliberate, malicious and premeditated murder. Based on these facts, Petitioner claims that he was put to trial for an offense not charged in his indictment.

Of the three recognized classes of indictment modifications, the informal modification at issue here could only constitute a variance or a constructive amendment. *See United States v. Hynes*, 467 F.3d 951, 961 (6th Cir. 2006). "[T]he distinction between a variance and a constructive amendment is sketchy," *id*. at 962 (quoting *United States v. Chilingirian*, 280 F.3d 704, 712 (6th Cir. 2002)), but it is critical, because a constructive amendment arguably warrants reversal as prejudicial per se, while a variance is subject to harmless error analysis. *Watson v. Jago*, 558 F.2d 330, 334 (6th Cir. 1977).[16]

---

[16] In the context of federal prosecutions, "[a]mendments are considered prejudicial per se, warranting reversal of a conviction, because they directly infringe upon the Fifth Amendment guarantee to hold a defendant answerable only for those charges levied by a grand jury." *United States v. Combs*, 218 F. App'x 483, 486 (6th Cir. 2007) (internal quotation marks omitted). Because *Watson* arose from habeas corpus review of a state prosecution, the court acknowledged that federal case law grounding the per se prejudicial rule on the Fifth Amendment right to a

In *Watson*, although the petitioner was charged only with deliberate, premeditated murder, the prosecutor at trial was allowed to proceed on a theory of felony murder despite the defendant's objection and motion to dismiss the indictment. *Id.* at 332. Much of the examination of witnesses at trial focused on the alleged robbery. *Id.* Although the trial court ultimately did not instruct the jury on felony murder because the prosecutor thought better of his plan after resting his case, the defense had already been derailed by that point:

> It thus clearly appears that the strategy of counsel was vitally affected by the trial court's ruling allowing the prosecution to prove felony-murder. . . . A major portion of the trial, during the State's case, concerned the possible robbery and not facts going to a determination of premeditation. The trial court ruling that the State could prove felony-murder was critical to defense strategy because appellant at trial claimed self-defense, which is not a defense to felony murder.

*Id.* at 336. Accordingly, the court concluded that Watson had "unquestionably" suffered a prejudicial violation of his due process right to fair notice of the charges against him. *Id.* at 339.

In determining whether it was presented with a variance or a constructive amendment, the *Watson* court explained that "the question to be asked in identifying a constructive amendment is

---

grand jury, which has not been imported to the states via the Fourteenth Amendment, did not apply to the case at hand. *Id.* at 336–37. It therefore held that the legality of an amendment was primarily a matter of state law, and looked to Ohio law for the permissibility of the amendment in question. *Id.* at 337. The court went on, however, to instruct that "[m]ore important to appellant's petition . . . is the fact that an amendment to an indictment in certain cases can implicate rights under the United States Constitution which are applicable to the states, such as fair notice of criminal charges, double jeopardy, and effective assistance of counsel." *Id.* at 338. Given the court's careful examination of the impact of the constructive amendment to the petitioner's defense at trial, it seems clear that its holding that "[a]s a matter of law, appellant was prejudiced by the constructive amendment" was the product of a harmless error analysis. *Id.* at 335–36, 339. Nevertheless, since *Watson* was decided, several opinions within this circuit have cited federal prosecution cases for the proposition that constructive amendments are per se prejudicial on habeas corpus review of state convictions. *See Martin v. Kassulke*, 970 F.2d 1539, 1532 (6th Cir. 1992); *Cooper v. Bell*, No. 1:03-276, 2014 WL 1366657, at *16 (E.D. Tenn. April 7, 2014). While it is not entirely clear that this application is proper, *see Joseph v. Coyle,* 469 F.3d 441, 464 (6th Cir. 2006) (alluding to lack of clarity and finding it "prudent" to conduct harmless error analysis); *Lucas v. O'Dea*, 179 F.3d 412, 419 (6th Cir. 1999) (acknowledging that the question of whether the per se prejudice rule from cases arising in the federal court system is applicable to cases arising from state courts had not been decided), the question it is not critical to the outcome of this case.

whether there has been a modification at trial in the elements of the crime charged," and that "if a different crime was added to the charges against which the defendant had to meet, there would have been a constructive amendment." *Id.* at 334. The crime at issue was a matter of state law, so the answer to that question was determined by how Ohio treated the distinction between premeditated murder and felony murder. *See id.* Because Ohio's Supreme Court had expressly ruled that premeditated murder and felony murder constituted separate offenses requiring separate indictment, adding a felony murder theory to Watson's trial effected a constructive amendment that violated his right to fair notice of the criminal charges he was facing. *Id.* at 334– 35.

That decision does not aid Petitioner in this case. Unlike Ohio law, Tennessee law is very clear that premeditated murder and felony murder are merely different theories of guilt for the same crime rather than separate offenses, and that a single first degree murder indictment is sufficient to support a conviction under either theory. *Blake v. Morford*, 563 F.2d 248, 251 (6th Cir. 1977) (distinguishing case from *Watson v. Jago* and holding that in Tennessee it was not necessary for indictment to allege that murder took place in perpetration of another crime in order to proceed on that theory at trial);[17] *Gilliland v. Turner*, No. No. 3:06-0361, 2009 WL 2777366, at *13 (M.D. Tenn. Aug. 28, 2009); *State v. Howard*, 30 S.W.3d 271, 274 n.4 (Tenn. 2000); *Tosh v. State*, 527 S.W.2d 146, 147–48 (Tenn. Ct. Crim. App. 1975); *Strouth v. State*, 999 S.W.2d 759, 768 (Tenn. 1999) (Holder, J., concurring).

---

[17] The Sixth Circuit speculated in a footnote in *Blake* that under a revised codification of Tennessee's first degree murder law that post-dated the crime at issue, "felony-murder and premeditated murder appear to be separate offenses." *Blake*, 563 F.2d at 251 n. 4. As evidenced by the more recent Tennessee cases cited herein, Tennessee courts have expressly rejected that view.

Accordingly, instructing the jury on an alternate theory of first degree murder under Tennessee law does not add a different crime to the charges against a defendant and does not amount to a constructive amendment under *Watson*. Instead, this case is conceptually more similar to the first degree rape case the Sixth Circuit analyzed in *Martin v. Kassulke*, 970 F.2d 1539 (6th Cir. 1992). In that case, the petitioner was indicted under Kentucky law for aiding and abetting first degree rape by forcible compulsion, but the judge instructed the jury that they could find the petitioner guilty under either of two statutory theories of first degree rape: forcible compulsion *or* physical helplessness of the victim. *Id*. at 1542. Just as it had done in *Watson*, the Sixth Circuit explained that "the key question" in deciding whether the circumstances amounted to a constructive amendment or variance was whether the two theories of rape "should be seen as two alternative crimes or merely two alternative methods by which the one crime, rape, could have been committed." *Martin*, 970 F.2d at 1543. Because the court determined that the Kentucky statute provided for a single offense with two different methods of commission, it applied the harmless error analysis appropriate to variances, and reversed the district court's grant of the writ. *Id*. at 1544–47; *accord Rutherford v. Carlton*, No. 3:00-654, 2005 WL 2127758 (E.D. Tenn. Aug. 31, 2005) (reaching same conclusion with respect to Tennessee aggravated rape conviction). In so doing, the Sixth Circuit expressly rejected the argument that the Fourteenth Amendment right to fair notice of criminal charges guarantees "notice of the exact method by which the criminal actions were alleged to have been committed." *Martin*, 970 F.2d at 1543.

Moreover, Petitioner does not allege that the facts developed at trial by the prosecution, or even the prosecutor's arguments to the jury, differed from the charge in the indictment. He simply alleges that the jury instructions added a charge not in the indictment. The Sixth Circuit

has repeatedly refused to find constructive amendment where the only difference presented is between the indictment and the instructions. *See United States v. Kuehne*, 547 F.3d 667, 685 (6th Cir. 2008) ("[W]here the jury instructions alone differ from the indictment to charge the same crime, but on an alternative theory, a mere variance occurs and a defendant must demonstrate prejudice."); *Martin*, 970 F.2d at 1546; *accord Cooper v. Bell*, No. 1:03-276, 2014 WL 1366657, at *16 (E.D. Tenn. April 7, 2014).

Applying these cases to Petitioner's claim, the Court finds that the modification about which Petitioner complains is only a variance. Accordingly, to prevail, Petitioner must demonstrate that the trial court's improper instruction affected his substantial rights. *Kuehne*, 547 F.3d at 685. "In this context, substantial rights are affected only when a defendant shows prejudice to his ability to defend himself at trial, to the general fairness of the trial, or to the indictment's sufficiency to bar subsequent prosecutions." *Id.* (quoting *Hynes*, 467 F.3d at 962).

Petitioner cannot demonstrate any of those factors, and in fact has made no effort to do so. Unlike the defendant in *Watson*, whose original defense strategy of self-defense was largely derailed because it served as no defense to the constructively added charge, Petitioner's defense theory – that he did not kill Ms. Burgess and was simply a victim of mistaken identity – applied equally to either method of first degree murder and could not have been impacted by the variance. *See Kuehne*, 547 F.3d at 685 ("Kuehne's ability to defend himself at trial was not undermined by the instruction because his defense was premised on an assertion that he did not participate in any of the alleged crimes."); *Rutherford*, 2005 WL 2127758, at *20 (finding defense of mistaken identity was not prejudiced by instruction on alternate theory of aggravated rape).

The extraneous instruction here did not destroy the general fairness of Petitioner's trial. Petitioner was charged with felony murder. The evidence at trial established the elements of felony murder, and the jury convicted Petitioner of first degree murder and the underlying felony of aggravated rape (*see* Doc. No. 10, Addendum 1, Transcript No. 2497, Supplemental Record to the Tennessee Court of Criminal Appeals at 57, 59), and unanimously found that the murder was committed while the defendant was engaged in committing rape.[18] (*See* Doc. No. 10, Addendum 1 vol. 8 at 662:6–15.) There is therefore no plausible risk that Petitioner was convicted on any theory other than felony murder.

Petitioner does not claim that his indictment would not bar a subsequent prosecution for Ms. Burgess's murder. Any such claim would almost certainly have no merit in light of the abundance of case law establishing that Tennessee's first degree murder statute creates only a single offense, verdicts for which are to be merged into a single judgment of conviction carrying a single sentence. *See, e.g.*, *State v. Cribbs*, 967 S.W.2d 773, 788 (Tenn. 1998) (only one judgment and sentence for first degree murder could be maintained where "[o]nly one killing had occurred").

Petitioner thus experienced no prejudice as a result of the variance between his indictment and jury charge. He is not entitled to relief on this claim.

---

[18] Despite the impropriety, discussed above in connection with Claim 8-a, of imposing the death penalty on the basis of this factor in a felony murder conviction, this finding provides unassailable evidence of the jury's unanimous assessment of the circumstances of Petitioner's crime.

12. Claim 22.  Insufficient Evidence to Support Convictions

Petitioner next asserts that there is insufficient evidence to support his conviction, because the evidence did not exclude every other reasonable hypothesis except his guilt. (Doc. No. 64 at 31–32, ¶ 29.)  Respondent acknowledges that this claim is exhausted, and the entirety of his argument in support of summary judgment is that "the decision of the Tennessee Supreme Court is not clearly erroneous in light of the facts or wrongly decided as a matter of law."  This wholly unsupported conclusion is insufficient to carry a movant's burden on a motion for summary judgment, and Respondent's motion is **DENIED**.

Turning to whether Petitioner's claim warrants relief, the right to due process guaranteed by the Constitution ensures that no person will be made to suffer the onus of a criminal conviction except upon sufficient proof.  Sufficient proof has been defined as the "evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v. Virginia*, 443 U.S. 307, 316 (1979).  Circumstantial evidence alone can be sufficient to sustain a criminal conviction. *Newman v. Metrish*, 543 F.3d 793, 796 (6th Cir. 2008); *York v. Tate*, 858 F.2d 322 (6th Cir. 1988).  When weighing the sufficiency of the evidence to support a criminal conviction, the Court must view the evidence in a light most favorable to the prosecution. *Jackson*, 443 U.S. at 319.  The only question this Court must answer is whether the jury's verdict "was so unsupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 132 S. Ct. 2060, 2065 (2012).

This Court has found a combination of physical identification and fingerprints to be sufficient to support a conviction, even when they conflicted with a defendant's alibi and explanation for the fingerprints. *See Hammer v. Bowlen*, 934 F. Supp. 911, 915 (M.D. Tenn. 1996).  In this case, as discussed above, Petitioner was identified at the scene shortly before the

crime by someone who knew him personally, and he matched the description provided by another witness who saw someone leave the scene later, around the time of the crime. His fingerprints were found on a frosty bottle left at the scene, which circumstances suggest was the last item the victim rang up for sale before she was raped and killed. The victim's clothes were torn, her thighs bruised, and there were mobile sperm in her vagina. $246 was missing from the cash register she had been operating, and Petitioner spent a significant amount of cash on cab rides the following week despite telling investigators he was usually broke by Sunday. Although Petitioner's girlfriend testified that he was at her home the entire night that the early-morning killing took place, Petitioner offered no explanation for how his fingerprints came to be on the bottle. Viewed in the light most favorable to the prosecution, the Court cannot conclude that the evidence supporting Petitioner's conviction "fell below the threshold of bare rationality."

Petitioner is not entitled to relief on this claim. This conclusion also disposes of Petitioner's Claim 29, in which he specifically alleges insufficient evidence to support his robbery conviction. (*See* Doc. No. 64 at 33, ¶ 36.)

### 13. Claim 26. Juror Margaret Culbreath

Petitioner claims that the trial judge violated his right to due process and to a fair and impartial jury by dismissing for cause prospective juror Margaret Culbreath because of her expressed reservations about the death penalty. (*See* Doc. No. 64 at 32, ¶ 33.)

Respondent moves for summary judgment on the basis that this claim lacks merit under the standard reiterated by the Supreme Court in *Wainwright v. Witt*, 469 U.S. 412 (1985).

As explained in *Wainwright*, a prospective juror may be dismissed for cause if "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in

accordance with his instructions and his oath.'" *Id.* at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). This standard "does not require that a juror's bias be proved with 'unmistakable clarity.'" *Id.* Even where *voir dire* fails to make a prospective juror's bias unmistakably clear, "there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law," and federal courts should defer to the trial judge in such cases and review its decision with a presumption of correctness. *Id.* at 425–29.

In *Wainwright*, the Supreme Court held that a trial court's finding of bias was properly supported by the record where the prospective juror stated on *voir dire* that she was "afraid" that her personal beliefs about the death penalty would interfere with her ability serve as a juror in the case and to judge the guilt or innocence of the defendant. *Id.* at 415–16. The Court quoted the entire exchange:

> "[Q. Prosecutor:] Now, let me ask you a question, ma'am. Do you have any religious beliefs or personal beliefs against the death penalty?
>
> "[A. Colby:] I am afraid personally but not—
>
> "[Q]: Speak up, please.
>
> "[A]: I am afraid of being a little personal, but definitely not religious.
>
> "[Q]: Now, would that interfere with you sitting as a juror in this case?
>
> "[A]: I am afraid it would.
>
> "[Q]: You are afraid it would?
>
> "[A]: Yes, Sir.
>
> "[Q]: Would it interfere with judging the guilt or innocence of the Defendant in this case?

"[A]: I think so.

"[Q]: You think it would.

"[A]: I think it would.

"[Q]: Your honor, I would move for cause at this point.

"THE COURT: All right. Step down."

*Id*. at 415–16.  Similarly, in this case Ms. Culbreath's *voir dire* established that she believed

herself incapable of judging Petitioner's guilt and sentence because of her personal views:

> THE COURT: . . . If a person were found guilty of first-degree murder and you were on the jury and I told you that you either had to find him – you had to fix the punishment at life imprisonment or death by electrocution, you had a choice based on what the evidence was, could you consider both of them or would you automatically rule out one or the other?
>
> *   *   *
>
> [MS. CULBREATH]: I don't believe that I could.
>
> THE COURT: You couldn't consider which?
>
> [MS. CULBREATH]: I – I don't believe I could judge anybody's death.
>
> THE COURT: All right, and, you know, that's the reason I asked the question, I want an honest answer.  What you're saying, if I understand you correctly, and if I put words in your mouth – you correct me, that regardless of what the proof was in a case, you could not consider the death penalty?
>
> [MS. CULBREATH]: Regardless of what the proof was or what I think the truth is or what they present the truth to be – if I knew, if I knew – if I saw it, I think I could consider the death penalty.
>
> THE COURT: Yeah.
>
> [MS. CULBREATH]: If I saw the act, but, otherwise, I don't believe I could.
>
> *   *   *

THE COURT: All right. . . . I think what you're saying is, that you could consider the death penalty if you were absolutely, one hundred percent positive of the guilt.

[MS. CULBREATH]: I don't believe I could live with myself if I did anything like that.

THE COURT: All right. Are you saying you would not consider the death penalty as an alternative then?

[MS. CULBREATH]: I don't believe I could.

(Doc. No. 10, Addendum 1 vol. 2 at 219:15–221:5.) While this exchange might not strike Petitioner as unmistakably clear with regard to Ms. Culbreath's bias, it certainly could fairly have left the judge with the definite impression that she would be unable to follow his instructions and to apply the law to determine Petitioner's sentence. Excusal of Ms. Culbreath on that basis was not error.

Respondent's motion for summary judgment on this claim shall be **GRANTED**.

14. Claim 28.  Late Night Deliberation

Petitioner claims that allowing jurors to deliberate over his sentence until 11:40 p.m. violated his right to due process by influencing tired jurors to vote in favor of the death penalty in order to conclude the case. (Doc. No. 64 at 33, ¶ 35.)

Respondent argues that Petitioner did not specifically allege in state court that the late night deliberations influenced jurors in favor of the death penalty, just that it caused them to be too tired to function properly. (Doc. No. 178 at 22.)

The Court concludes that regardless of whether this claim was fairly presented to the state court, it does not entitle Petitioner to relief. The trial court record reflects that on the final day of Petitioner's trial, the jury began deliberations on Petitioner's guilt at 4:30 p.m. (*See* Doc. No. 10,

Addendum 1 vol. 8 at 636:12.)  At 5:30 the jury returned with a verdict on the first degree murder count, after which they returned to deliberation and returned verdicts on the aggravated rape and robbery counts at 6:22 p.m. (*Id*. at 639:15.)  The trial court then permitted the jury to take a supper break before the sentencing hearing began. (*Id*. at 641:2.)  Although the record does not reflect what time the sentencing hearing began, arguments and instructions had concluded and the jury retired to deliberate Petitioner's sentence for first degree murder at 8:40 p.m. (*Id*. at 660:3.)  The judge had the jury returned to the courtroom to hear brief additional instruction concerning sentencing, and they again retired to deliberate at 8:43 p.m. (*Id*. at 660:8– 661:8.)  The jury returned the sentence of death at 11:40 p.m. (*Id*. at 661:15.)  Despite live testimony by a juror at the March 2012 evidentiary hearing (*see* Doc. No. 299 at 196–204) and multiple affidavits containing statements by jurors (*see* Doc. Nos. 188-20, 188-21), there is nothing in the record to suggest that any juror ever requested that the court adjourn for the night or that the jury felt or appeared to be exhausted or unduly taxed by the proceedings or the hour of the day.

These facts differ materially from those of the single federal case on which Petitioner relies for the proposition that late night deliberations constitute a violation of due process.  In *Leguillou v. Davis*, 115 F. Supp. 392 (D.V.I. 1953), *rev'd on other grounds*, 212 F.2d 681 (3d Cir. 1954), the court found the petitioner's due process rights were violated where the verdict was reached by a jury that had been pushed beyond "the limitations of human strength and endurance." *Id*. at 401.  In that case the trial began at 10 a.m., and the presentation of evidence, arguments and instruction did not conclude until approximately 2 a.m., at which time the jury began its deliberations. *Id*. at 400.  The jury deliberated until 6:20 a.m. when they rendered their verdict. *Id*.  Beyond the fair assumption that most jurors would indeed be physically and

mentally fatigued by what amounted to 20 straight hours of trial and deliberation, the court in

*Leguillou* apparently had access to direct evidence of the jurors' actual exhaustion:

> I find *from the testimony before me* that the jurors were tired and sleepy during their deliberations and that some of them were so fatigued as to be unable to enter into the discussion of the issues and simply wanted to get the case decided, without too much caring how, so that they could go home and get some sleep. Indeed one of the jurors had been up all of the preceding night as well.

*Id.* at 401 (emphasis added). Based on that evidence, the court concluded that the jurors'

exhaustion was so extreme that it gave rise to "an element of coercion" and deprived the

petitioner of his due process right to a tribunal that is "mentally competent to afford a hearing."

*Id*.

There is no such evidence in this case. Nor is the timeline of Petitioner's final day of trial

so extreme that the Court can presume the jury experienced fatigue severe enough to render them

mentally incompetent or materially affect their judgment. Deliberation into the evening is not

uncommon and cannot, standing alone, establish a constitutional violation. *See United States v.*

*Johnson*, 935 F.2d 1288 (4th Cir. 1991) ("Juries that cannot reach a verdict during normal

working hours are often kept in deliberation until late at night or overnight or over the

weekend.").

This claim fails on its merits and does not entitle Petitioner to relief.

15. Claim 33. Cumulative Effect

Finally, Petitioner alleges that "the cumulative effect of the errors at trial" deprived him

of a fair trial and sentencing hearing. (*See* Doc. No. 64 at 34, ¶ 40.) This claim is without merit

and will be **DISMISSED**. "The law of this Circuit is that cumulative error claims are not

cognizable on habeas because the Supreme Court has not spoken on this issue." *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006).

**VI.     CONCLUSION**

As detailed above, Petitioner's motion for summary judgment will be **DENIED**, and Respondent's motion for summary judgment will be **GRANTED IN PART** and **DENIED IN PART**.     All of Petitioner's claims will be **DISMISSED**, with the exception of Claim 6 (ineffective assistance of counsel).  The parties will submit additional briefing on Claim 6.

An appropriate Order is entered herewith.

_____
JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT