# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

DAVID CARL DUNCAN,      )
                              )
    Petitioner,           )
                              )      No. 3:88-00992
v.                        )
                              )      Judge Nixon
WAYNE CARPENTER, Warden,  )
                              )
    Respondent.          )

## MEMORANDUM

Petitioner David Carl Duncan, a prisoner in state custody confined under a sentence of death at Riverbend Maximum Security Institution, has filed a petition under 28 U.S.C. § 2254 for the writ of habeas corpus. By Order entered August 11, 2014, the Court disposed of all of Petitioner's claims except for his claims of ineffective assistance of counsel, and ordered additional briefing on the latter claims in light of intervening case law including *Martinez v. Ryan*, 566 U.S. –, 132 S. Ct. 1309 (2012). (Doc. No. 238.) The parties have now completed their supplemental briefing (Doc. Nos. 242, 248, 249), and Petitioner's ineffective-assistance claims are ripe for adjudication.

For the reasons set forth below, Petitioner David Carl Duncan is entitled to federal habeas relief on the ground that his trial attorney rendered ineffective assistance at the sentencing phase of his capital murder trial. The Court will accordingly vacate Petitioner's sentence of death subject to the State's right to commence a new sentencing hearing consistent with this ruling. The petition will be denied in all other respects, and Petitioner's convictions and other sentences will not be affected by this ruling.

# I.  HISTORY AND STANDARD OF REVIEW

Petitioner was convicted on April 1, 1983, in Sumner County, Tennessee, of the first degree murder, armed robbery and aggravated rape of convenience store clerk Ruby Evelyn Burgess.[1]  The trial court imposed life sentences for the robbery and rape.  At the sentencing phase for the capital murder offense, the jury found two aggravating factors: (1) that the murder was heinous, atrocious or cruel, and (2) that it was committed during the perpetration of a felony. It further found that any mitigating factors did not outweigh the aggravating factors, and accordingly sentenced Petitioner to death.  All of Petitioner's efforts to obtain relief from his convictions or sentences – including direct appeal, three state post-conviction proceedings and a motion to reopen the third, and two state habeas corpus actions – have been unsuccessful.  The present action was filed in November 1988, stayed in 1990 pending Petitioner's exhaustion of state remedies, and reactivated in December 1999.  Since that time, Petitioner has conducted discovery and filed two amendments to his petition, and the Court held a full evidentiary hearing on Petitioner's claims in 2012.  In August 2014, the Court ruled on both parties' motions for summary judgment and disposed of all but 1 of Petitioner's 33 distinct claims for relief. (Doc. No. 238.)  The only claim remaining for resolution is Petitioner's claim that he received ineffective assistance of counsel at the guilt and sentencing phases of his trial and on direct appeal, about which the parties submitted additional briefing through December 4, 2014. (Doc. Nos. 242, 248, 249.)

---

[1] The Court's previous Memorandum (Doc. No. 237) contains a thorough recitation of the procedural and factual histories and standard of review applicable to this case. *Duncan v. Carpenter*, No. 3:88-00992, 2014 WL 3905440, at *1–7 (M.D. Tenn. Aug. 11, 2014).  The Court reaches its conclusions now in light of those histories and standards, which it will not repeat here beyond this relatively brief synopsis.

The Amended Petition breaks Petitioner's ineffective-assistance claim (Claim 13) into five sub-claims (13(a) through 13(e)), the first two of which are themselves broken into 18 and 14 subparagraphs respectively, amounting to an actual total of 35 claims. (Doc. No. 64, at 16–21.) Of that total, Petitioner asserts in his supplemental brief that he is pursuing relief on claims asserted in 4 subparagraphs that he maintains are exhausted: 13(a)(3), 13(a)(17), 13(b) and 13(d); and in 6 subparagraphs that he acknowledges are defaulted: 13(a)(1), 13(a)(2), 13(a)(5), 13(a)(6), 13(c) and 13(e). He also seeks to revive substantive claims from 10(b) and (c), which the Court previously dismissed as procedurally defaulted. The Court addresses those claims below.[2]

A state prisoner is entitled to a writ of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Because Petitioner filed his original petition prior to the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the pre-AEDPA standard of review applies. *Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Under that standard the Court may "make its own independent determination of [Petitioner's] federal claim, without being bound by the determination on the merits of that claim reached in the state proceedings." *Buell v. Mitchell*, 274 F.3d 337, 344 (6th Cir. 2001) (quoting *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)).

State court findings of fact relevant to a district court's review of a habeas corpus petition are entitled to a presumption of correctness. 28 U.S.C. § 2254(d) (1966). However, under pre-AEDPA standards, that presumption can be overcome by any of eight statutory exceptions, including the district court's independent finding that the state court's findings are not fairly

---

[2] In the Court's Order requiring re-briefing of this "superclaim," Petitioner was instructed to "set forth each subparagraph of that claim [he] still wishes to pursue" and provide specific information and analysis for each. (Doc. No. 238, at 2.) Accordingly, Petitioner's "[w]ithout waiving any claims" caveat notwithstanding, the Court limits its review to the specific claims enumerated and addressed in Petitioner's Supplemental Brief (Doc. No. 242). The remainder of Claim 13 will be dismissed as abandoned.

supported by the record. *Id.*; *Bragan v. Morgan*, 791 F. Supp. 704, 717–18 (M.D. Tenn. 1992). The presumption of correctness does not attach to a state court's pure legal conclusions or to findings that involve mixed questions of law and fact. *Sumner v. Mata*, 449 U.S. 539, 597 (1981).

Subsections (b) and (c) of pre-AEDPA § 2254 require a habeas corpus petitioner to exhaust the state remedies available to him before raising claims in federal court. Exhaustion requires that petitioners "fairly present" federal claims to the state courts to provide them with an opportunity to correct alleged violations of state prisoners' federal rights. *Picard v. Connor*, 404 U.S. 270, 275–76 (1971). If the petitioner has no remedy currently available in state court, the exhaustion requirement is satisfied. *Gray v. Netherland*, 518 U.S. 152, 161–62 (1996); *Teague v. Lane*, 489 U.S. 288 (1989).

Although a claim may be deemed fully exhausted under these circumstances, the petitioner's failure to assert the claim in state court may constitute procedural default barring federal review. *Gray*, 518 U.S. at 162. The procedural default doctrine is an extension of the comity policy that underscores the exhaustion doctrine. As explained by the Supreme Court, under this doctrine "[t]his Court will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1992). Thus, when a claim is procedurally barred under state law, it is procedurally defaulted for the purpose of federal habeas review, and cannot be considered on its merits unless the petitioner establishes cause and prejudice for the default, or that failure to review the claim will result in a miscarriage of justice, i.e., that he is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 318–21 (1995); *Alley v. Bell*, 307 F.3d 380, 385–86 (6th Cir. 2002).

4

The constitutional standard for effectiveness of counsel applies to retained counsel and appointed counsel alike. *Cuyler v. Sullivan*, 446 U.S. 335, 344-45 (1980) ("The vital guarantee of the Sixth Amendment would stand for little if the often uninformed decision to retain a particular lawyer could reduce or forfeit the defendant's entitlement to constitutional protection. Since the State's conduct of a criminal trial itself implicates the State in the defendant's conviction, we see no basis for drawing a distinction between retained and appointed counsel that would deny equal justice to defendants who must choose their own lawyers."). Claims of ineffective assistance of counsel are subject to the highly deferential two-prong standard of *Strickland v. Washington*, 466 U.S. 668 (1984), which asks: (1) whether counsel was deficient in representing the defendant; and (2) whether counsel's alleged deficiency prejudiced the defense so as to deprive the defendant of a fair trial. *Id.* at 687. To meet the first prong, a petitioner must establish that his attorney's representation "fell below an objective standard of reasonableness." *Id.* at 688. Mere attorney ignorance or inadvertence will not constitute "cause" unless the error rises to the level of a constitutional violation. *See Coleman*, 501 U.S. at 752–55. The "prejudice" component of the claim "focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

In assessing counsel's performance, a reviewing court must be highly deferential and avoid the "second-guess[ing of] counsel's assistance . . . , [as] it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689. The court must determine whether under the circumstances counsel's allegedly unreasonable acts or omissions "were outside the wide range of professionally competent assistance." *Id.* at 690. In order to avoid "the

distorting effects of hindsight," a reviewing "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (citation omitted).

Prejudice, under *Strickland*, requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The Supreme Court has further explained the *Strickland* prejudice requirement as follows:

> In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, *Strickland* asks whether it is "reasonably likely" the result would have been different. This does not require a showing that counsel's actions "more likely than not altered the outcome," but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case." The likelihood of a different result must be substantial, not just conceivable.

*Harrington v. Richter*, 562 U.S. 86, –, 131 S. Ct. 770, 791–92 (2011) (internal citations omitted).

With these standards in mind, the Court turns to Petitioner's specific claims of ineffective assistance.

## II. EXHAUSTED CLAIMS

### A. Paragraphs 13(b) and 13(d): Ineffectiveness Concerning Background, Intelligence and Mental Health Mitigation Evidence

At the sentencing hearing following Petitioner's murder conviction, his trial counsel, William Ligon, offered no proof in defense of Petitioner's life, and delivered this argument that

fills less than two and a half pages of the trial transcript:

Ladies and gentlemen, it's not often that I lose my composure. It is not very often that I am at a loss for words, but, as the General said, mercy, because you all have already discharged a portion of your duties and we went through thirteen (13) hours the other day to let you know what you have to do if you came to the decision that you came to. There are two (2) families involved here. At this particular point in time, neither of them are happy with this situation. The family of Ms. Burgess, they know she won't be back. They knew she wouldn't be back when they found out that this serious crime has occurred. But I'll tell you what, I have learned something in the last two (2) or three (3) hours here, and I hope I'm not putting anyone on the spot, but Reverend Anderson and I have found out that charity and hope is still alive. And, in what you conveyed to me, after the jury came back with their verdict, I conveyed to my client and if I've ever met someone that I felt was a Christian and a giving person, sir, it's you. Now, when I leave here, no matter what your decision will be, I'm going to have to walk down and tell the mother that – all that's gone on here in the last two (2) or three (3) hours. That her baby boy – and I told her before she left, and think about it, ladies and gentlemen, the best he can do is life. That's the best. She knows what the worst is. David Carl Duncan, sitting over here, believe it or not, ever since he's been picked up, knew what the worst was. And, in a few minutes, after your deliberation, I hope I'm able to prove him wrong. But the disappointment that I have standing here, and not so much disappointment in the outcome of this circumstance, ladies and gentlemen, just disappointment in the fact that faced with your choices, I'm disappointed that you have to make it. I sincerely hope that you will consider the Duncan family, and I sincerely hope that you will consider Ms. Anderson's family, and I sincerely hope that you consider the fact that even though she's gone, this woman left here among us a very, very forgiving, charitable and Christian son, whom I've had only the occasion to met [sic] in the last two (2) hours. I'm not going to put any words in Reverend Anderson's mouth or anything like that, but the message that I got from him, I sincerely hope that permeates this courtroom. If it does permeate this courtroom, then I would, at least, be able to step in the door in just a little while and say, at least, you will be alive. Now, I understand you made your decision based on the fact that there was a death, but to wear out a biblical phrase that probably already been over used time after time, an eye for an eye and a tooth for a tooth. Every since I heard the verdict on the first Count, that's been running through my mind. It's always been taken out of context. It's always been abused and misused, and I would pray that you twelve (12) good people, citizens of this county, would not take it out of context again. There is very little that you do here that will be able to salvage the wounds that Ms. Burgess' family felt over the last two (2) years. And, I would only ask and I will only plead, and I will only beg, that you twelve (12) good people in your attempt to heal up the old wounds, please don't open up new wounds. Thank you.

(Doc. No. 10, Add. 1 vol. 8, Tr. 647–49.)

In Paragraph 13(b) of his Amended Petition, Petitioner claims that Ligon was ineffective at sentencing for failing to investigate and present numerous categories of available mitigating evidence, including: his being raised in extreme poverty with no indoor plumbing in a small house with seven other people and an abusive, alcoholic father who denied being Petitioner's father; his childhood head injury, below average I.Q. and poor academic performance before dropping out of school at an early stage; his good employment history; his kindness to others; his close relationship with his mother; the taunting he endured as a child because of his stutter and crossed eye; his heavy drinking, including blackouts, and drug use; his psychological impairments; and his good adjustment to prison life. (Doc. No. 64, at 18–20.) In Paragraph 13(d) he adds that counsel was ineffective at sentencing for failing to secure the assistance of mental health experts to present some of those mitigating factors to the jury. (*Id.* at 21.)

1. Exhaustion

There is some disagreement between the parties about the extent to which this combined claim was exhausted in state court and whether any of the legal or factual bases upon which Petitioner now relies are procedurally defaulted. Respondent urges, without any specificity, that:

> To the extent [Petitioner] now seeks to raise additional basis for ineffectiveness at sentencing, those claims are now procedurally defaulted. Further, to the extent he failed to develop the factual basis of his claims in the state court, additional facts are likewise defaulted under *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 11–12 (1992) (under pre-AEDPA standard, petitioner entitled to evidentiary hearing if he can show cause for his failure to develop the facts in state-court proceedings and actual prejudice resulting from the failure). Furthermore, *Martinez* [*v. Ryan*, 132 S. Ct. 1309 (2012)] provides no basis to excuse either of these defaults, which occurred outside initial-review collateral proceedings. *Martinez*, 132 S. Ct. at 1320 ("The holding . . . does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts.").

8

(Doc. No. 248, at 16–17.) This disagreement necessitates a thorough (and unfortunately lengthy) review of when and how this claim was presented during state court proceedings.

  a. First Post-Conviction Proceeding

  Petitioner's amended petition in his first state post-conviction action, filed by appointed counsel William Vest, included a bare-bones claim that trial counsel was ineffective for "[i]ntroducing no proof during the sentence stage of the trial." (Doc. No. 10, Add. 12, at 2.) Trial counsel Ligon testified at the first post-conviction hearing in December 1986 that he had graduated from college in 1974 and from law school in 1979, and had passed the bar exam in 1980. (Doc. No. 10, Add. 2 vol. 1, Tr. at 43.) He was paid a total of $4,000 to defend Petitioner in this trial and a second unrelated murder trial, and at the time this case went to trial in March 1983, he had never represented a defendant in a capital case or *any* other criminal jury trials. (*Id.*, Tr. at 5–6.) Ligon acknowledged that the Tennessee Supreme Court had cited him for contempt of court and sanctioned him for failing to file Petitioner's appeal timely, and that at the time of his testimony he was in the process of appealing a one-year suspension by the Board of Professional Responsibility. (*Id.*, Tr. at 43–44.)

  Ligon's hearing testimony about his strategy for the sentencing phase of the trial was as follows:

> Q. Now did you consult and advise Mr. Duncan during the sentencing stage of this trial as to whether he should testify or not?
>
> A. Well, we didn't – once again, we went out and discussed it as to whether or not anybody would take the stand. The unfortunate thing about this sentencing phase was that what we were looking for or what we thought the jury would be looking for was some particular type of remorse. It was not the time to maintain your innocence which was what Mr. Duncan did throughout the entire proceedings. So at that particular time we didn't really feel we could put anybody on. We didn't have anybody on. I asked Mrs. Duncan would she think it was

wise to go back, but if I recall everybody was pretty much devastated by the fact that our story was not believable. At least the jury did not believe it and there was a general reluctance of anybody to get back on that stand and actually go along with the conviction.

\* \* \*

Q. Now, is that also the reason you didn't have Mr. Duncan's mother testify during the sentencing phase?

A. Well, she was pretty upset as I recall. And if I recall the conversation that we had in the back here it was all centered around the fact that no one was believed. The reason that no one was believed I think we understood or thought was the fact that one of our witnesses had changed her testimony on the stand -- testified differently as to what we had previously discussed and what they had talked to Detective Lame about and that was pretty inflammatory.[3] It came out in the proof in chief and we were pretty much afraid that at this particular time that anything we said would be subject to question because we had put on a witness who had changed their testimony and that had been brought out on rebuttal. But in answer to your question, sir, no, sir, nobody felt confident in getting back on the stand based on the limitations that we would have at a sentencing hearing which would basically be in a capital case like this we would have to ask for some type of mercy or leniency presupposing that the conviction was correct.

(Doc. No. 10, Add. 2 vol. 1, Tr. at 38:7–39:22.) Ligon elaborated about his perspective on the

sentencing phase during cross-examination:

Q. Just generally tell us what your discussion [about testifying during the sentencing hearing] concerned?

A. Well, the discussion at that particular time was after the jury had determined that Mr. Duncan was guilty of all three counts. And I recall explaining to perspective [sic] witnesses that the testimony now would have to be one of a kind of remorse, of stating that, you know, Mr. Duncan or the family would be very sorry that he had been involved in this and express some kind of grief for the loss of the victim's family and ask for some type of forgiveness and some particular type of leniency. And that argument had to presuppose that the jury was correct in its determination. At that particular time no one really that I spoke to saw it that way. They either felt that there had been -- that the jury had not taken into consideration everything that had come down or that either they

---

[3] This is almost certainly a reference to the testimony of Leony Jenkins, who, according to Ligon, unexpectedly testified at trial that Petitioner was with her on the night of the murder, contrary to all of her previous statements. (Doc. No. 10, Add. 2, Tr. at 55–56.) Ms. Jenkins explained that she did so because Ligon "had me feeling like he did want me to lie." (*Id.* at 140.)

10

had not believed them. And I recall there was some general hesitance of anybody to go back and get on the stand because they had only testified maybe a few hours earlier and didn't feel that they had been believed.

Q.    What about Mr. Duncan himself, did he want to testify at the hearing?

A.    Well, at that particular time I don't recall whether he wanted to or not but the decision was made for him not to take the stand. He had just been sentenced to death by electrocution.

Q.    He had just been convicted.

A.    Well, I had to explain to him that I didn't think it was going to be anything more than a foregone conclusion that if the jury came back as fast as they did with a murder conviction that I thought they were going to lean more toward the death penalty. I did explain that to him when we first got the verdict back. And, you know, he took it fairly well but I could still tell, of course, he was pretty much affected by it and I was pretty much afraid to advise him to take the stand under those particular circumstances.

Q.    Did you not advise him to take it?

A.    Well, sir, I didn't advise him to take it or not to take it. The decision was made in concert, I guess, with everybody involved that I would just have to come out and make some kind of plea. That's basically how it boiled down. I didn't really have anybody to put on. Nobody was willing to get back up there under the circumstances.

(Doc. No. 10, Add. 2 vol. 1, Tr. at 63:11–65:2.)

Ligon's reference to the notion that "no one was believed" by the jury, in connection with the decision about whether to have Petitioner's mother testify at sentencing, requires some discussion of her brief testimony during the guilt phase of the trial. (*See* Doc. No. 10, Add. 1 vol. 8, Tr. at 603–18.) During Mrs. Duncan's direct testimony at trial, she said that it was not unusual for Petitioner to spend nights or even weeks at his girlfriend Leony Jenkins's house, but she was not asked where Petitioner was at the time of the murder, and on cross-examination she acknowledged that she did not recall where he was that night. The primary point of her testimony appears to have been to rebut the prosecution's evidence that Petitioner had access to

two green cars like the one that a witness identified Petitioner with at the murder scene. She testified that her son Jimmy did not buy his green Buick Electra until 1982, the year after the murder. She further testified that although her son Albert had a green Chevrolet Nova parked in her yard at the time of the murder, he had given strict instructions for no one to drive the vehicle because it had a busted headlight, expired tags and no insurance, and that he had come home for his birthday a few days before the murder and would not have allowed anyone to drive the car while he was home. She acknowledged that the Nova was capable of being driven and that Petitioner did at times drive it, but said he never did so without Albert's permission. Mrs. Duncan's only testimony at trial about Petitioner's background was that he had worked off and on ever since dropping out of school. Contrary to Ligon's apparent assumption, nothing about Mrs. Duncan's testimony was necessarily discredited by Petitioner's conviction.

Mrs. Duncan testified at the post-conviction hearing that Ligon never talked to her about the possibility of testifying at the sentencing hearing and asking the jury to spare her son's life, and that she thought she would have done so if she had known that she could. (Doc. No. 10, Add. 2 vol. 1, Tr. at 146:1–14.)

Petitioner testified at the post-conviction hearing that he did not testify during the sentencing phase because Ligon "said it mostly wouldn't do no good. He said that if there was anything that had to be said that he would say it." (Doc. No. 10, Add. 2, Tr. at 110:12–14.) Petitioner further testified that although he had dropped out of school without finishing the ninth grade, he had never had any mental problems and had never seen a psychiatrist or other mental health professional. (*Id.*, Tr. at 111:8–12, 126:22–127:2.)

Finally, Petitioner's appointed appellate counsel, Edward Yarbrough, testified at the first

post-conviction hearing as follows about his opinion of the defense strategy at trial generally:

> I think that's what disturbs me the most and what jumped out at me when I first read the transcript. There was no strategy. And now that I've learned that this was Mr. Ligon's first jury trial ever it's apparent why there was no strategy. Mr. Ligon, a very nice fellow, was out of his league. He had no business being in this courtroom defending a capital case with the experience that he had. . . . He had no idea what he was doing. And I don't say he's a bad person for that. I just think it should have been stopped. He should not have been permitted to do that given the fact that he had no experience and really didn't understand what he was about.

(Doc. No. 10, Add. 2 vol. 2, Tr. at 167:19–168:10.)

In its ruling from the bench denying relief on the first post-conviction proceeding, the court made a single reference to counsel's handling of the sentencing phase of Petitioner's trial:

> And another reason that the defendant did not testify according to Mr. Ligon on his sentence [sic] hearing is because neither the defendant nor his family could accept or did accept the verdict of guilt and could show no remorse and would not be such a state of mind to impress the jury in any way because of the lack of remorse.

(Doc. No. 10, Add. 2 vol. 2, Tr. at 247:17–22.) In its written order, the trial court rejected this claim as follows:

> No proof was offered at the hearing of this Petition as to what testimony was available to be offered by trial counsel at the sentencing hearing. Trial counsel has testified that no proof was, in fact, available that could have been offered at the sentencing hearing. The Court finds this testimony to be credible and the record supports it. This allegation is without merit.

(Doc. No. 10, Add. 14, at 4 ¶15.)

In his appeal from this dismissal, Petitioner quoted testimony by Yarbrough to the effect that trial counsel should have called Petitioner's mother as a witness to plead for his life during the sentencing phase, and should perhaps have called Petitioner himself or other people familiar with him, although he "won't debate the judgment call of whether to call the defendant at the sentencing hearing." (Doc. No. 10, Add. 15, at 23–24.) The Tennessee Court of Criminal

13

Appeals affirmed the holding that Petitioner's trial counsel was not ineffective, without specifically addressing the alleged ineffectiveness during sentencing, and both the Tennessee Supreme Court and the United States Supreme Court denied review. *Duncan v. State*, No. C.C.A. 87-6-III, 1988 WL 10072 (Tenn. Ct. Crim. App. Feb. 9, 1988).

b. Second Post-Conviction Proceeding

Petitioner maintains that claims in subparagraphs 13(b) and 13(d) were exhausted during his second state post-conviction action, in which he was represented by his current counsel.[4] (Doc. No. 242, at 4–5.) In one of many amendments to his second petition for post-conviction relief, Petitioner asserted that trial counsel ineffectively failed to present mitigating evidence at the penalty phase of his trial as "the result of a complete failure to investigate the Petitioner's background, character and life circumstances," and that the failure "was manifestly not the result of any informed, legitimate strategic or tactical choice made by counsel upon adequate preparation." (Doc. No. 40, Add. 26 vol. 1, T.R. at 53–55.) Petitioner further asserted that this issue had not been fully and fairly heard during his first post-conviction proceeding because his previous post-conviction counsel, William Vest, "inexplicably failed to present the full range of mitigation evidence which could have been presented at trial had trial counsel done adequate

---

[4] Petitioner acknowledges that his claim that counsel failed to deliver a meaningful argument at sentencing, raised in Paragraph 13(c) of the Amended Petition, was never expressly raised in state court. (Doc. No. 242, at 6.) However, he argues that it "clearly relates" to the exhausted claims of ineffective assistance at sentencing. (*Id.*) The Court agrees, and finds the issue of counsel's argument at sentencing to be so inexorably intertwined with the issue of his lack of investigation and presentation of evidence that they must be addressed together herein. The Court notes, however, that no amount of investigation or expert assistance would have been necessary for trial counsel to argue Petitioner's youth at the time of the offense – age 19 – as a mitigating factor, and he failed to do even that. *See* Tenn. Code Ann. § 39-2404(j)(7) (1977) (listing "[t]he youth or advanced age of the defendant at the time of the crime" among the available statutory mitigating factors).

14

investigation and preparation," as "the result of Mr. Vest's inadvertence, inexperience and/or failure to fully investigate the Petitioner's life history."[5] (*Id.* at 55–56.)

Petitioner presented evidence relevant to this claim at a second post-conviction hearing on April 7, 1993, despite argument by the state and acknowledgment by Petitioner that the issue had been "ventilated somewhat" during the first post-conviction proceeding. (Doc. No. 40, Add. 26 vol. 1, Tr. at 12:14–15, 15:8–17.) Counsel at the second post-conviction hearing expressly stated that the purpose of some of the evidence offered was to demonstrate the "very substantial mitigation evidence" that could have been presented at trial, but which previous counsel had failed to develop at the first post-conviction hearing, and the trial court permitted him to proceed. (Doc. No. 40, Add. 26 vol. 1, Tr. at 127.)

To that end, Petitioner again called his trial attorney, William Ligon, who testified that he "had no doubt" from the beginning of the case that if the jury convicted the Petitioner, he would be sentenced to death. (Doc. No. 40, Add. 26 vol. 1, Tr. at 79.) Ligon testified that because Petitioner is black and the victim was white, "I kind of anticipated that a Sumner County jury, in light of the situation, there was probably going to give a capital penalty. I just — You know, we knew it all along. We knew it prior to when we went out and started the case." (*Id.*, Tr. at 80:21–25.) He testified to the effect that he believed an effective case at sentencing was foreclosed by the guilt-phase theory that Petitioner was not involved with the crimes:

> Granted, I knew that if we took a posture that we took going into the trial of no involvement, no involvement whatsoever, not on the scene, that we were going to have a really difficult time during the penalty phase of switching gears and turning around and seeking to avoid the death penalty based on the – our theory of defense, a theory I knew we probably weren't going to be able to put before the jury. If we did not have a discernible theory that we could pretty much turn

---

[5] Petitioner alleges that Vest was appointed to represent him in his first post-conviction action despite a total lack of experience in capital case litigation.

around and argue, it was going to be all done on cross-examination with a slim hope of being able to establish an alibi, and if we failed at that, I kind of knew that we were going to be out there. And I explained that to my client and also explained it to his family that it was going to be very, very tough to avoid what the General was asking for, which would be the death penalty, based on the theory that we were taking into – taking into the trial.

(*Id.*, Tr. at 79–80.) In terms of his focus in trial preparation, Ligon testified to the effect that he really only concerned himself with the guilt stage:

Q. So, your primary focus was overwhelmingly on the guilt phase of the trial?

A. Well, sir, my primary focus is overwhelmingly on the guilt phase of the trial. As I stated earlier, we knew if we were found guilty they were going to give us the — the electric chair. They was going to give us the electric chair regardless of who we trooped in there on the sentence hearing. If I had had somebody that I thought could have stood the heat, we'd have put them in there, but I don't really think anybody involved in this thing, then or now, realizes how very little we had to go on. Mr. Herbison, we did not have anything.

(*Id.*, Tr. at 94:9–20.)

Ligon testified that during the course of his investigation he spoke to Petitioner's previous employers, his family, friends and associates. (Doc. No. 40, Add. 26 vol. 1, Tr. at 85–86.) Ligon had known Petitioner's family his entire life, and "didn't really have to make a whole heck of a lot of investigation" into Petitioner's family history or his relationship with his father, because he had known them for some time and "knew pretty much everything." (*Id.*, Tr. at 99, 109–10.) Ligon was not aware of anything unusual about Petitioner's relationship with his father, although he knew that the father "was not above taking a drink." (*Id.*, Tr. at 110, 120–21.) Similarly, Ligon testified that he "really didn't have to do anything to investigate" Petitioner's family's financial circumstances while he was growing up, because "everybody's financial circumstances were pretty much the same," and "I did not think, to me, at that particular time, that Mr. Duncan's poverty was any different than anyone else's poverty growing up." (*Id.*, Tr. at

110–11.) He knew Petitioner's mother's reputation to be excellent, and testified that she was a soft-spoken, very articulate woman who cared very much about her son, and about whom nobody ever said anything negative to him. (*Id.*, Tr. at 99.) He testified to the effect that he chose not to present character witnesses because he was concerned they would open the door to facts "that I did not want to go into because I didn't think it would sit well with a Sumner County jury on a case of this manner," including Petitioner's marriage to a white woman, a previous rape charge that was dismissed, and Petitioner's drinking and recreational drug use. (*Id.*, Tr. at 86–91.)

Ligon testified that he never requested a psychological examination of Petitioner. (Doc. No. 40, Add. 26 vol. 1, Tr. at 92:2–4.) He explained why he did not pursue that evidence:

> Were you — Are you intimating to the fact we should have gotten some kind of psychological test or psychological evaluation there? I did not think of that based on the posture and the approach that Mr. Duncan himself and me as a defense attorney were forced into taking. We were saying we were not there, didn't have anything to do with it. Therefore, I had no reason to think that a psychological evaluation or any particular type of experts in and outside would have helped us. We would have had to have changed our approach or posture as far as this case was concerned, in my opinion, at that time in order to benefit from some expert testimony regarding his psychological state of mind or something to that effect.

(*Id.*, Tr. at 93:7–19.) On cross-examination, he reiterated:

> I really saw no reason to do so in light of the posture that Mr. Duncan was taking in regard to his involvement in the very first trial. Our approach and his information to me was that he had not been on the scene, did not participate in this particular crime, and knew nothing about it.

(*Id.*, Tr. at 119:13–18.) When asked if he ever saw anything that would indicate that Petitioner might have any psychological or psychiatric problems, he responded:

> No. There was no indication either from the family or from Mr. Duncan himself. Like I said, based on the fact that we were looking at kind of a double-barreled shotgun, I understood people's reluctance at the time. Very few people at the

time that hired me trusted me; therefore, there was a large reluctance to sit down and tell you a lot about some of the things we talk about now, that people talk about a lot more freely than they did at that particular time. They were not the type people that were going to sit down and give me specific details about a family-life-type circumstances. I just didn't get that. I didn't get any particular indication.

(*Id.*, Tr. at 120.)

Ligon testified that Petitioner's first post-conviction counsel, William Vest, did not interview him before calling him to testify at the first post-conviction hearing. (Doc. No. 40, Add. 26, Tr. at 85.)

Petitioner also presented the testimony of a Dr. Malone, who was a neighbor and owner of the home in which Petitioner's family lived when he was a child. Dr. Malone testified that Petitioner's family, consisting of two parents with their six children and one grandchild, lived in a small three-room house, and at times Petitioner's mother had to borrow money from her to buy milk for the children. (Doc. No. 40, Add. 26 vol. 1, Tr. at 128–29.) Dr. Malone felt that the Duncan family's poverty was a little worse than others in the community, because she viewed having to borrow money for milk for children to be "extreme." (*Id.*, Tr. at 138.) She testified that Petitioner's mother was well-regarded in the community, was an outstanding church member who never missed a service and was active in the choir and auxiliaries. (*Id.*, Tr. at 129.) Petitioner's mother was soft-spoken and close to all of her children. (*Id.*)

Dr. Malone testified that Petitioner's father, however, was "very abusive verbally" to his children, and would fly into a rage over very minor things and "say what he was going to do to them." (Doc. No. 40, Add. 26 vol. 1, Tr. at 130.) She testified that she smelled alcohol on his breath on weekends and heard from Mrs. Duncan that he drank on weekdays as well. (*Id.*, Tr. at 131.) Two or three times a month Petitioner's sister would go to Dr. Malone's house to get away

from their father "and she would say I want to come over here until he gets through ranting and raging because he's on a drunk again." (*Id.*, Tr. at 133.) Petitioner visited Dr. Malone's home almost every day, and his mother told Dr. Malone that it was because he was "tired of his father ranting and raging at him." (*Id.*, Tr. at 136.) A half dozen times a year, Petitioner's mother would come with all of the children to Dr. Malone's home, saying "we're going to stay here until he cools down a little bit." (*Id.*, Tr. at 137.) At times Petitioner's father would deny being his father, and he was reputed to gamble away money needed to care for the children. (*Id.*, Tr. at 134.) Dr. Malone never saw him physically abuse his children. (*Id.*, Tr. at 140.)

Dr. Malone also described witnessing an incident when Petitioner was a preschooler, approximately three or four years old, and fell down some concrete steps on his head. She explained that she remembered it very well because he did not breathe for so long after the fall that she thought he was dead. "After that I knew he wasn't because he screamed and yelled for a long time." (Doc. No. 40, Add. 26 vol. 1, Tr. at 132:5–15.) She testified that once he started school, she helped him almost daily with homework, and that he was either slow academically or just did not do his work, and that she had "many discussions and many paddles" with him about that. (*Id.*, Tr. at 132:16–23.) Dr. Malone testified that at one point Petitioner told her that he was not going to go to school anymore because other children always teased him about having one eye that was smaller and "a little bit off-focus," and that Petitioner also had a stutter when he was young. (*Id.*, Tr. at 135.)

Dr. Malone testified that nobody associated with Petitioner's original defense team ever contacted or interviewed her in connection with his defense, although she would have been willing to talk to them and to testify on Petitioner's behalf at trial if she had been asked. (Doc. No. 40, Add. 26 vol. 1, Tr. at 126, 137.) For his part, Ligon testified that his reason for not

19

interviewing or even approaching Dr. Malone about assisting the defense was that she was the cousin of the victim in a separate murder charge then pending against Petitioner, and he did not want to give her the chance to "bury us" on the witness stand. (*Id.*, Tr. at 97:14–19, 98:16–18.)

Elizabeth Carter, who lived around the corner from the Petitioner when he was young, testified that when Petitioner visited he was always nice, a "perfect gentleman," and that he did errands and chores for her like carrying in her groceries. (Doc. No. 40, Add. 26 vol. 1, Tr. at 141–43.) She said that she spoke to Ligon before the trial about appearing as a character witness, and that she went to the courthouse for that purpose, but that Ligon never called her as a witness and never explained why. (*Id.*, Tr. at 143–44.)

Rosie Jenkins testified that she knew Petitioner's mother and had known him since his birth, and that he had lived in her home for a period of two to three years while he was dating her daughter, after he left school and was working for Mid-Tenn Building Maintenance. (Doc. No. 40, Add. 26 vol. 1, Tr. at 146–48.) While he lived in her home, he was nice to her family, contributed to the household food and never caused any trouble. (*Id.*, Tr. at 147–48.) As far as Ms. Jenkins knew, Petitioner "got along all right" with his family. (*Id.*, Tr. at 148.)

Petitioner's sister, Alice Duncan, also testified at the second post-conviction hearing. She said that Ligon never interviewed her to discover Petitioner's family background or social history, and that she would have told him if he had asked. (Doc. No. 40, Add. 26 vol. 2, Tr. at 152.) She testified to the effect that when she was young her family "got along with one another fine," but that later her father became violent when he drank, leading to fights between her and her father that caused injuries to both of them. (*Id.*, Tr. at 152–54.) Her father was also physically violent with her mother, which she testified upset Petitioner. (*Id.*, Tr. at 157.) She testified that Petitioner started drinking when he was around 16 or 17, and sometimes drank

heavily, although she could not say how often or how much he typically drank. (*Id.*, Tr. at 155-57.) She believed he quit school in or after the 6th grade because kids in school were teasing him about an abnormality with one of his eyes. (*Id.*, Tr. at 157–58.) After leaving school, he always worked to support himself and was known as a hard worker. (*Id.*, Tr. at 158–59.) His family was supportive and maintained close contact with Petitioner after his arrest, and she did not know of any discipline problems he had in jail. (*Id.*, Tr. at 159.) She testified that none of Petitioner's previous lawyers, including his post-conviction counsel Vest, had ever asked her about any of the facts to which she testified. (*Id.*, Tr. at 159–60.)

Herschel Adams testified that Petitioner worked with him on a construction site and for Middle Tennessee Building Service for approximately seven years before Petitioner left to work for Job Corps about a year and a half before his arrest. (Doc. No. 40, Add. 26 vol. 2, Tr. at 160–61, 169.) He described Petitioner as an excellent worker who was reliable and punctual. (*Id.*, Tr. at 162.) Adams and Petitioner were also social friends, and he knew Petitioner to get along well with people and never knew him to be in any trouble prior to his arrest. (*Id.*, Tr. at 163.) He was not aware that Petitioner had been indicted for rape before his arrest for the Burgess murder. (*Id.*, Tr. at 170.)

Geneva Utley testified that she lived near the Petitioner's family home when he was a child, and that he was frequently in her home. (Doc. No. 40, Add. 26 vol. 2, Tr. at 171–72.) She did not know of any trouble he had with his family, and she heard that Petitioner's father drank but did not know of any effect that had on Petitioner. (*Id.*, Tr. at 172–73.) When they were in their 20s, Petitioner and Utley's sons worked and rode to work together, and she presumed Petitioner went to work. (*Id.*, Tr. at 173.) She testified that Petitioner's trial attorney Ligon never had a "serious conversation" with her, although she and members of Petitioner's family did meet

around a conference table with him and have some conversation, and that she went to the courthouse during the trial to serve as a character witness if needed, but that Ligon never called her to testify and never explained why. (*Id.*, Tr. at 173–75, 177.) She did not recall ever being contacted by Petitioner's first post-conviction counsel Vest. (*Id.*, Tr. at 175–76.)

Petitioner also testified at the second post-conviction hearing. He maintained his innocence of the crimes at issue, as he said he had done consistently throughout his trial. (Doc. No. 40, Add. 26 vol. 2, Tr. at 183.) He testified that he and Ligon had discussed possible mitigation evidence "a little bit," and described Ligon's questioning of him on that topic as follows:

> He asked me, you know, various things, you know, as, you know, my work, you know, uh, a little bit about my own life, my own life, as to how I grew up myself, you know, as far as, you know, my family, treatment, things like that. Wasn't in depth like you went into today.

(*Id.*, Tr. at 190:11 – 191:1.)

At the time of the murder, Petitioner was 19 years old. (Doc. No. 40, Add. 26 vol. 2, Tr. at 191.) At the time of his trial, he did not have any adult criminal convictions, although he had been on probation as a juvenile for driving without a license, failing to yield to an emergency vehicle and possession of a controlled substance. (*Id.*, Tr. at 191–92.) He had been charged with rape, but the charge had been dismissed. (*Id.*, Tr. at 192.)

Petitioner testified that until he was 11 or 12 years old, his family, which grew to 9 people before they moved, lived in a small house on Bledsoe Street that consisted of a living room, kitchen, one bedroom and a back porch, with no indoor plumbing or bathroom. (Doc. No. 40, Add. 26 vol. 2, Tr. at 196.) He testified that his father drank, and that when he drank he would direct foul language at the entire family and sometimes hit his mother, which upset him.

(*Id.*, Tr. at 193–94.) When he was upset about his father's behavior, and felt like there was nothing he could do about it because his father was bigger than he was, he would run to a woodshed and just sit by himself. (*Id.*, Tr. at 194.) He testified that both his parents "whopped us," but that his father only did so about once a year, and that his father did not strike blows but rather cursed and did things like turning off the television when the children were watching it. (*Id.*, Tr. at 195–96.) He had not known until the day of his testimony that his father had struck his sister. (*Id.*, Tr. at 195.)

According to Petitioner's testimony, he started drinking before his family moved from the Bledsoe Street house. (*Id.*, Tr. at 197.) He did not limit his drinking to weekends, but he drank a lot on weekends, to the point that he passed out. (*Id.*, Tr. at 198.) He had no memory of being at the Short Stop Market three to four blocks from his mother's house the morning of the murder, and had no idea how his fingerprints came to be on a juice bottle there. (*Id.*, Tr. at 198–99.)

Petitioner testified that he went to the seventh grade in school and quit because he "was just young and just didn't know no better." (Doc. No. 40, Add. 26 vol. 2, Tr. at 200.) He testified that he used to "get looks" and be criticized and called names because of his roving eye, bottom lip and stutter, and that "[y]ou get tired of people just picking at you, and I guess that was one of the reasons that I left school." (*Id.*, Tr. at 200–01.) Petitioner started working after he quit school and worked all of his adult life before his arrest. (*Id.*, Tr. at 201.) He did not recall whether Ligon ever asked him about his work history. (*Id.*, Tr. at 202.)

Petitioner testified that he did not have any discipline problems or problems getting along with anyone in jail after his arrest, but that Ligon never asked him about that. (Doc. No. 40, Add. 26 vol. 2, Tr. at 202.) At the time that Ligon advised him that his testimony would not be useful

23

at trial, Petitioner did not understand that guilt and sentencing would be determined separately. (*Id.*, Tr. at 203–04.)

Finally, Petitioner attempted to present the testimony of a clinical psychologist about Petitioner's psychological background and condition. The prosecutor objected to admission of her testimony, arguing that "As I understand, this goes to the issue of whether or not testimony should or should not have been introduced at the sentence hearing, . . .. And it's further irrelevant inasmuch as this issue has been previously raised by William Vest, who represented Mr. Duncan on the first post-conviction proceeding all the way to the Court of Appeals. That was addressed by Mr. Vest and has been previously determined by Your Honor in Your Honor's decision in that case as well as the Court of Appeals." (Doc. No. 40, Add. 26 vol. 2, Tr. at 227–28.) Agreeing that "this question has certainly been decided," the trial court sustained the objection but allowed Petitioner to proceed with the following offer of proof of the testimony of clinical psychologist Dr. Gillian Blair, who evaluated Petitioner after seeing him five times from December 1990 through May 1991. (*Id.*, Tr. at 229, 231–32.)

Dr. Blair administered Petitioner a standard battery of psychological tests, a number of neuropsychological tests because of the possibility of residual damage from Petitioner's history of drug and alcohol abuse and possible dependence and from his childhood head injury. (Doc. No. 40, Add. 26 vol. 2, Tr. at 232.) She stated that based on records she reviewed, Petitioner's academic functioning during his employment with Job Corps before his arrest was around the fourth grade level. (*Id.*, Tr. at 236.) His intellectual functioning at the time of her assessment was low-average, with no particular areas of strength or weakness, and his memory was consistent with his intellectual functioning. (*Id.*, Tr. at 236–37.)

Based on information provided by Petitioner, Dr. Blair said it was clear that he was a heavy binge user of alcohol and drugs since he was a teenager. (Doc. No. 40, Add. 26 vol. 2, Tr. at 238.) She described him as having "a very severe substance abuse slash dependence disorder," including the use of alcohol, marijuana and LSD. (*Id.*, Tr. at 253.) Asked about the effects of binge consumption of alcohol, she stated that people who drink heavily may have blackouts, leaving them with no memory of events during the blackout but with other memories unaffected. (*Id.*, Tr. at 238.) She said Petitioner could also be diagnosed with polysubstance abuse and probably dependence, although he was in remission during incarceration, and that he has an underlying chronic depressive disorder known as dysthymia. (*Id.*) She stated that although he is not mentally ill, Petitioner "has problems," including dependent and passive aggressive personality traits. (*Id.*)

Dr. Blair's report, included in the offer of proof, included the following results:

Intellectually, Mr. Duncan functions within the low-average range (Verbal IQ 80; Performance IQ 84; Full Scale IQ 80). Scaled scores on the individual subtests of the WAIS-R have a mean of 10, with a standard deviation of 3. Thus, scaled scores between 8 and 12 fall within the average range. Scaled scores achieved by Mr. Duncan ranged from 6 to 9. His performance was flat with no significant strength or weaknesses demonstrated.

Academic achievement was consistent with measured intelligence. Standard scores ranged from 79-85. His academic achievement was within the sixth to eighth grade range. Memory functions were similarly commensurate with intellectual level, with no evidence of significant deficit.

Word knowledge was within normal limits. Tracking and sequencing skills were low average. Higher cognitive functioning was not well developed. In part, this was consistent with intellectual/educational level. However, motivation appeared to have some impact.

Mr. Duncan endorsed items on the BDI consistent with depression. This appeared mild and situational in nature. Projective data and direct observation was not consistent with a significant depressive disorder. Mr. Duncan has rigid views, and an immature cognitive style. He does not demonstrate well developed

problem solving strategies. However, a need to achieve was evident, and failure may lead to disappointment and frustration. Emotional control appeared tenuous, and Mr. Duncan's avoidance of emotional situations may reflect an awareness of this problem.

The MMPI-2 validity scales indicated symptom exaggeration. This was supported by significant elevations on a number of clinical scales. The MCMI-II profile indicated endorsement of paradoxical symptoms in that Mr. Duncan attempted to present himself in a good light, and as significantly troubled. Mr. Duncan has conflicts between his need for dependence and his desire to withdraw. He is resentful of those who fail to support him appropriately. His distrust of others is deep, and he responds to rejection and disillusionment in a moody and passive aggressive fashion.

Diagnostic impressions are as follows:

> Polysubstance abuse/dependence
> Dysthymia
> Personality Disorder with dependent and passive-aggressive traits.

(Doc. No. 40, Add. 26 vol. 2, Tr. Ex. 10, at 3–4.)

On cross-examination during the offer of proof, Dr. Blair acknowledged that "I'm not suggesting that this person is mentally ill or is paranoid schizophrenic or anything that goes completely against the grain of his history." (Doc. No. 40, Add. 26 vol. 2, Tr. at 246:5–8.) She testified that Petitioner agreed for her to talk to his family after some initial reluctance, but that because her findings were consistent with the social history that had already been provided to her, she ultimately determined that it was not necessary for her to interview his family members. (*Id.*, Tr. at 246–47.) With regard to the reported head injury, she stated that "Even if David had sustained a serious head injury as a young child, there is no residual damage from that. . . . No damage that I could tell. . . . All I can tell you is that there is nothing on psychological or neuropsych testing to suggest that he has any residual effects from a head injury[.]" (*Id.*, Tr. at 251:18–252:5.) She further acknowledged that Petitioner had no history of psychiatric or

psychological problems, no prior psychiatric evaluation or treatment, and was not mentally ill. (*Id.*, Tr. at 252–53.)

At the conclusion of the offer of proof, the trial judge – noting that "The last position I will be in will be cross-examining a witness, but I have to be fair and just" – engaged Dr. Blair in this exchange:

Q. He told you he was reared in abject poverty? He used those words?

A. Well, he didn't use those words. He did not say abject poverty. Those are my words.

Q. What did he say?

A. That's my description of it. He described a house that had no indoor plumbing. There [sic] were a fairly large family. It was a three-roomed house. You know, to me that is abject poverty.

Q. It was below the poverty level at the time in the black community? Did he tell you that he lived in a higher type black community than was generally prevalent in Gallatin?

A. I'm sorry.

Q. A higher type, that his family was well thought of in Gallatin, and he lived in part of the town that was considered a higher standard of living than many of the places in Gallatin, if he did. All right if he didn't. I'm trying to get in my mind what you're basing your testimony on.

A. I'm basing – I mean, he did not describe – We're talking about a man who has an eight-grade education and I.Q. –

Q. Let me be specific: Did he tell you there were three banks in Gallatin at that time, regular banks, and that his father was janitor for both those banks, and he worked not only during banking hours but after hours?

A. He told me his father was a janitor.

Q. Considered a trustworthy citizen of Gallatin as far as his employment in those banks was concerned?

A.      Yes. Mr. Duncan, in talking about his parents – well, particular in talking about his mother was extremely positive and was positive about his father. He said that his father always worked, that the father supported the family. But his description of the way – of the way they lived to me signified poverty.

Q.      That was your description rather than his?

A.      Yes.

THE COURT: That would help me in determining your testimony. And he was correct about his mother being considered one of the outstanding ladies of the community, and I wanted to know whether it was his words or your conclusion.

(Doc. No. 40, Add. 26 vol. 2, Tr. at 255:16–257:8.)

In denying relief to Petitioner after the hearing, the trial court ruled as follows with respect to the claim about ineffectiveness for failure to present mitigation evidence:

Much of the Petitioner's thrust concerns the lack of preparation or the fact that no testimony was presented on behalf of the Petitioner at the sentencing phase of the trial. Upon hearing all of the background, the Court finds no reason for requesting a psychological examination of the Petitioner and that there was no defense at the sentencing hearing that had not been previously presented at the guilt phase. Contrary to the allegations, testimony regarding the Petitioner's character was filled with pitfalls and could have been of little benefit to the Petitioner and may well have resulted in exacerbating his plight. The nature of the crime committed was especially heinous in that the victim was dragged to the back of the market, raped, and murdered by having her throat cut with evidence of struggle and all the horrible aspects of fear, pain and death by the nature of the wound which would accompany such a crime.

Considerable testimony was presented to the effect that the deprived background of the Petitioner should have been presented to the Jury at the sentencing phase. Simply put, the Court finds that the facts do not support the allegations of the Petitioner's childhood. He suffered no hunger, no deprivation of clothing or living conditions and the only abuse was verbal when his father would occasionally be under the influence of alcohol. While not an ideal family condition, the Petitioner's youth was ordinary and not unusual for the many persons in that time and place. The Defendant's father was a well thought of black man who held janitorial positions in two banks in Gallatin and was fully trusted by both institutions. The Petitioner's mother can be described as kind, religious, wise, and well respected in her community. The Court finds that there

was nothing in Petitioner's background that would disclose him to have psychological defects that would have been considered exculpatory by the Jury.

> The questions regarding the correctness of the sentences rendered by the Jury have been decided previously on appeals and the previous Post-Conviction Relief Petition. The Court finds that the testimony presented was not credible enough to raise a serious challenge to the previous decisions by the various Courts nor to warrant further proceedings. It was obvious to this Court that much of the testimony was calculated to be of what little assistance it might be to the Petitioner. The Petitioner's trial attorney was aware of all of these facts and weighed both the pro and con and there is no basis for second guessing his decisions at trial and no prejudice to the Petitioner has been shown.

(Doc. No. 40, Add. 26 vol. 1, T.R. at 85–86.) The court ultimately concluded that "the facts developed in this Petition simply do not support" Petitioner's position. (*Id.* at 86.)

Petitioner appealed from this decision, raising as one of his issues that "trial counsel's decision to offer no proof at the penalty phase falls below the standard of competence expected of defense attorneys in capital cases." (Doc. No. 40, Add. 27, Brief at ii ¶ G.) He devoted more than ten pages of his initial brief to developing this argument, in which he quoted some of the same testimony by Ligon set forth above, and argued that:

> This testimony strongly suggests that trial counsel regarded the guilt phase as the whole ballgame, such that no evidence presented in mitigation could have made any difference, in that a death sentence would naturally follow a first degree murder conviction. There is no evidence that trial counsel developed any theory nor made any factual investigation consistent with the proposition that, even if a conviction for first degree murder occurred, Mr. Duncan was nevertheless someone for whom a life sentence was more appropriate than the electric chair.

> The Petitioner submits that trial counsel's testimony indicates a complete failure to understand the full range of what constitutes capital mitigation evidence.

(*Id.*, Brief at 51.)

In affirming the trial court on this issue, the Tennessee Court of Criminal Appeals simply

recited the relevant portion of the trial court's holding and ruled as follows:

> The trial court's findings of fact at a post-conviction proceeding have the weight of a jury verdict and are conclusive on appeal unless the evidence preponderates against the findings. *Turner v. State*, 698 S.W.2d 90, 91 (Tenn. Ct. Crim. App. 1985). The evidence does not preponderate against the trial judge's findings. This issue has no merit.

*Duncan v. State*, Nos. 01C01-9311-CR-00412, 01C01-9510-CR-00347, 1997 WL 700043, at *7 (Tenn. Ct. Crim. App. Nov. 10, 1997).

### c. Standard for Exhaustion

As set forth above, a petitioner is not entitled to relief under 28 U.S.C. § 2254 unless he has first exhausted his remedies in state court, which requires petitioners to "fairly present" federal claims to the state courts to provide them with an opportunity to correct alleged violations of state prisoners' federal rights. *Picard v. Connor*, 404 U.S. 270, 275–76 (1971). A claim has been "fairly presented" if the petitioner identified the specific constitutional guarantee allegedly violated, and presented a statement of the facts which entitle the petitioner to relief. *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996). At least prior to AEDPA's enactment, the introduction in federal habeas proceedings of additional facts in support of a claim did not render the claim unexhausted under § 2254 as long as the new evidence "did not fundamentally alter the legal claim already considered by the state courts." *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986); *but see Cullin v. Pinholster*, 131 S. Ct. 1388 (2011) (holding that review of state court's merits determination under current § 2254 is typically restricted to the record before the state court).

The Court finds that Petitioner's claim that his trial counsel was ineffective for failing to investigate and present any mitigating evidence in his defense at sentencing has been exhausted in state court. Respondent's position that any additional facts offered in this Court beyond those presented in state court are "defaulted" (Doc. No. 248, at 16) has been rejected by the United

States Court of Appeals for the Sixth Circuit in *Abdur'Rahman v. Bell*, 226 F.3d 696, 705–06 (6th Cir. 2000). In *Abdur'Rahman*, which involved a pre-AEDPA analysis because the inmate had filed his petition the day before AEDPA went into effect, the Sixth Circuit held that this Court had the inherent discretion to order an evidentiary hearing regardless of whether a petitioner is *entitled* to a hearing under *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), upon which Respondent relies.[6] *Abdur'Rahman*, 226 F.3d at 705–06; *see also Harries v. Bell*, 417 F.3d 631, 635 (6th Cir. 2005).

    2. Presumption of Correctness

Under the version of 28 U.S.C. § 2254(d) applicable to this pre-AEDPA case, the state court's factual determinations after a hearing are presumed to be correct during habeas review *unless* it appears that any one of the following eight criteria is satisfied:

    (1) That the merits of the factual dispute were not resolved in the State court hearing;

    (2) That the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

    (3) That the material facts were not adequately developed at the State court hearing;

    (4) That the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

    (5) That the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

    (6) That the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

---

[6] Respondent's argument is further weakened by the fact that, as related above, it was the state's objection – affirmed by the trial court – that prevented Petitioner from further developing the facts at his second post-conviction hearing.

> (7) That the applicant was otherwise denied due process of law in the State court proceeding;
>
> (8) Or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record . . ..

28 U.S.C. § 2254(d) (1966). The statute goes on to provide that even in the absence of any of those eight factors, a habeas petitioner might still prevail by establishing by "convincing evidence" at a federal evidentiary hearing that the state court's factual determination was "erroneous." *Id.*

Upon review of the state court proceedings summarized above, it is clear that facts material to Petitioner's claim were not adequately developed at the first post-conviction hearing. Indeed, the state court's basis for denying relief on the claim at that time was the lack of any facts in evidence about what mitigating information could have been presented at trial.

Additionally, the record before the state court in the second post-conviction hearing did not fairly support the state court's determination that there was nothing about Petitioner's background that would have constituted mitigating evidence at sentencing. The state courts made multiple determinations that are flatly contradicted by the evidence admitted at that hearing. The finding that "the only abuse was verbal when his father would occasionally be under the influence of alcohol" ignores the undisputed facts that Petitioner's father physically abused his mother in his presence, causing him to feel powerless and upset and to flee alone to a woodshed, and that his father's rages frequently caused Petitioner – and at times his mother and siblings as well – to seek refuge in neighbors' homes. The finding that "Petitioner's trial attorney was aware of all of these facts and weighed both the pro and con," is disproved by

Ligon's testimony to the effect that because he was generally acquainted with Petitioner's family he did not feel the need to conduct any formal background investigation, and by the testimony of Petitioner's sister and neighbors that Ligon never made any inquiry of them about Petitioner's background.

And finally, the record at the second post-conviction hearing does not objectively support the state court's finding that "Petitioner's youth was ordinary and not unusual." Petitioner's childhood in the 1960s and 1970s was spent in a small three-room house with no indoor plumbing, shared by a family of nine who at times had to borrow money just to buy milk. According to Dr. Blair those conditions constitute "abject poverty," and the undisputed facts in the record obviously substantiate that assessment. The Sixth Circuit has specifically noted the lack of running water or indoor plumbing among the potentially mitigating facts in a capital case. *See Carter v. Bell*, 218 F.3d 581, 593 (6th Cir. 2000). According to data published by the United States Census Bureau, in 1969 only 15.9% of the residents of Sumner County, Tennessee were below the poverty level, which was significantly below the Tennessee state average of 21.8%. *See* https://www.census.gov/hhes/www/poverty/data/census/1960/.[7] Against the backdrop of those facts, the state court's remark that "Petitioner's youth was ordinary and not unusual *for the many persons in that time and place*," closely juxtaposed with its comment that his "father was a well thought of black man," suggests that the court was actually concluding – and perhaps accurately so – that Petitioner's impoverished childhood conditions were not unusual for the black community in Gallatin in which he grew up. The standards for what constitutes mitigating evidence, however, cannot vary with a defendant's race or immediate surroundings. The effects

---

[7] Federal courts may take judicial notice of published census data. *Mitchell v. Rose*, 570 F.2d 129, 132 n.2 (6th Cir. 1978), *rev'd on other grounds*, 443 U.S. 545 (1979).

of "abject poverty" are no less mitigating because they are shared by one's neighbors, and are no less worthy of consideration by a jury when they affect a child of one race in a certain "time and place" rather than a child of another race or another community. The state court's finding that Petitioner did not establish that he suffered from a deprived background was simply incorrect.

Beyond the lack of support in the state record for the state court's conclusions, this Court finds that the facts presented during its own evidentiary hearing, summarized below, amount to convincing evidence that the state court's conclusion about the unavailability of significant mitigating evidence was erroneous. Accordingly, the Court has properly dispensed with the presumption of correctness of the state court's determination of this claim.

3. Federal Evidentiary Hearing

The Court held its own evidentiary hearing in 2012, as authorized by both the then-applicable § 2254(d) and the Court's pre-AEDPA inherent discretion to order an evidentiary hearing in a habeas corpus proceeding. *See Abdur'Rahman*, 226 F.3d at 705–06; *Harries*, 417 F.3d at 635.

a. Dr. Dale Watson

Clinical psychologist Dale Watson was properly qualified to testify as an expert in the field of neuropsychology. (Doc. No. 229, at 9–10.) Having only been licensed since 1990, Dr. Watson could not have testified as an expert at Petitioner's 1983 trial. (*Id.* at 59–60.) Dr. Watson conducted a forensic evaluation of Petitioner over the course of 15 hours in August 2009 that led him to conclude that Petitioner suffers from borderline intellectual functioning, significant deficits in academic skills and significant brain dysfunction. (*Id.* at 11.)

Dr. Watson administered a battery of tests to Petitioner, all of which existed in some form at the time of his trial in 1983. (Doc. No. 229, at 12–13.) In comparison, he said that Dr. Blair

did very limited neuropsychological testing in preparation for the state post-conviction hearing, but that her results were consistent with his. (*Id.* at 60.) Dr. Watson testified first about the Wechsler Adult Intelligence Scale 4, or WAIS-4, which he used to measure Petitioner's intelligence. Specifically, the test measures intellectual functioning, including the ability to problem-solve, to think abstractly, to do things efficiently and to process visual-spatial information. Dr. Watson's test results showed Petitioner had a full scale IQ of 78, placing him at around the seventh percentile of the population in a borderline range a few points above intellectual disability (which he testified is 70 or 75 or lower) but below low average. (*Id.* at 14–15.) According to Dr. Watson, the population's IQ is distributed along a bell curve, with about 68% of the population having IQs within the 15 point standard deviation from the average of 100 – so falling between 85 and 115. (*Id.* at 15–16.) Petitioner's component scores for crystallized intelligence, short-term memory and visual processing were all within normal limits. (*Id.* at 16.) His one significant deficit on the WAIS-4 was in fluid reasoning or "on-the-spot problem-solving," for which he scored in the third percentile with a 72. (*Id.* at 17.) Dr. Watson testified that fluid reasoning is associated with executive functioning and is "one of the most important elements of intellectual abilities because it is that kind of raw native ability to be able to problem-solve." (*Id.* at 17.) Dr. Watson believed his test results to be reliable because of the innate reliability designed into the test, because in his judgment Petitioner demonstrated good effort on the test, and because his IQ score was close to the 80 Petitioner scored during his post-conviction proceedings and the 78 he scored as a child on a group IQ test. (*Id.* at 17–18.)

Dr. Watson also administered the Wide Range Achievement Test, fourth edition, or WRAT, to measure Petitioner's academic skills – specifically, his word-reading and math-computation abilities. (Doc. No. 229, at 18.) Petitioner's scores were 78 and 83, respectively,

which Dr. Watson testified were consistent with his overall IQ and meant that Petitioner now performs essentially at the fifth to sixth grade level. (*Id.* at 19.) Dr. Watson testified that Petitioner's history, including failing the second grade and being socially promoted after repeating it, dropping out of school in the seventh grade and consistently performing as low as the fourth grade level on previous academic skills testing, indicates that his academic deficiencies are long-standing. (*Id.* at 19–20.)

Petitioner scored a 54 on the General Neuropsychological Deficit Scale ("GNDS") of the Halstead-Reitan Battery, reflecting moderate brain impairment. (Doc. No. 229, at 20.) In tests designed to differentiate between deficits in the left and right hemispheres of the brain, Petitioner's results showed "decided evidence of dysfunction" in both hemispheres. (*Id.* at 21–22.)

According to Dr. Watson's testing, Petitioner's executive functioning, associated with the frontal lobe of the brain, is "significantly impaired" as compared to other people of his age, race, gender and education level, with his score of 36 well below the average of 50 and the impairment level of 40. (Doc. No. 229, at 22–24.) Dr. Watson testified that executive functioning is "probably the most important element of this." (*Id.* at 23.) He described executive functioning like this:

> And these are abilities related to judgment and problem-solving and planning and the ability to stop oneself and to start, initiate behaviors and then also to shift back and forth, to understand that something is not working now, I should try something else. You know, it's the kind of ability to problem-solve at the most basic level.

(*Id.* at 24.) Dr. Watson took several different measures of Petitioner's executive functioning. On the Wisconsin Card Sorting Test, Petitioner's score of 5 is substantially below the average of 10, and fell at about the fifth percentile even in comparison to others with very limited education.

(*Id.* at 24–25.) On other tests requiring mental flexibility, including the Trail Making B test and components of the Delis-Kaplan Executive Function System test, Petitioner's results reflected "significant impairment" and provided "pretty solid evidence of frontal lobe dysfunction." (*Id.* at 25–27.)

Asked to describe his conclusions about Petitioner's executive function, Dr. Watson testified as follows:

> Well, he is decidedly impaired in terms of executive functioning. I think it's a major area of difficulty for him. It's going to mean he is going to have difficulty being mentally flexible. He is going to get stuck in mental ruts. He may be perseverative, which means to persevere too long, again get stuck in these mental ruts and not be able to work his way through novel situations.
>
> * * *
>
> . . . [P]eople with these kinds of problems tend to be impulsive. So they don't inhibit themselves very well. They go with – sometimes they become bound to the environment so the stimulus in the environment controls their behavior more than they control their behavior.

(Doc. No. 229, at 32–33.)

Other testing revealed a "very significant attentional disorder," but not ADHD, and a low average memory consistent with his intellectual functioning. (*Id.* at 35–36.) Petitioner's auditory processing test results indicated a definite impairment in his temporal lobe functioning. (*Id.* at 36–37.)

Dr. Watson's overall conclusion about Petitioner's mental functioning was as follows:

> Yeah. He is functioning intellectually within this borderline range. He is limited intellectually. He particularly struggles with on-the-spot problem-solving. So in novel situations where he has never really seen it before, he has difficulty. He can't process information very quickly. And he will get confused in complex tasks.
>
> He's also got academic deficiencies. Both these academic deficiencies and the borderline intellectual functioning are longstanding. You know, he has been this way since early childhood at least, because otherwise we would see his academic skills at a normal level, and we don't see that.

So developmentally something went wrong very early. And these are real limitations. People with borderline intellectual functioning struggle. They struggle in school. They struggle in the job. They can't compete at the same level that other people can compete at. So it's a real limitation.

And then in addition to that, he has solid indications of brain dysfunction, primarily involving executive difficulties. So he has problems with problem-solving. He tends to be impulsive. He tends to get stuck in mental ruts, so he is not mentally flexible. So he has difficulty accepting feedback from the environment and using that to alter his behavior. So again he kind of gets in these mental ruts.

(Doc. No. 229, at 40–42.) Dr. Watson reiterated that he believed his test results to be highly accurate because Petitioner gave good effort generally, as measured "in a number of ways," and because his results were consistent with Petitioner's history and previous results. (*Id.* at 42.) He also stated that Petitioner's functioning during their personal interactions were consistent with his test results. (*Id.* at 63.)

On cross-examination, Dr. Watson acknowledged that he had not seen Petitioner's post-conviction testimony or his *pro se* briefs or letters to counsel, and was not aware that Petitioner had testified that he had no mental health issues. (Doc. No. 229, at 45–47.) Dr. Watson also acknowledged that his report did not include any formal diagnoses from the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV"), and that borderline intellectual function and academic deficiencies are not themselves DSM-IV diagnoses, although there are several possible diagnoses related to those conditions. (*Id.* at 49.) For example, he testified that "cognitive disorder not otherwise specified" would be an appropriate diagnosis for Petitioner. (*Id.* at 59.) He did not, however, diagnose Petitioner as intellectually disabled or with ADHD. (*Id.* at 58–59.)

38

Dr. Watson testified that the margin of error on the 78 IQ score he gave Petitioner allowed for a score anywhere from 74 to 83, and that the borderline range extends up to 84 under the DSM-IV. (*Id.* at 50–51.) He acknowledged some dispute about whether Petitioner left school in the seventh grade or ninth grade (the latter indications based on secondary reports), and that Petitioner had obtained his G.E.D., although it took him eight years to do so. (*Id.* at 51–52.) Petitioner's crystallized IQ score, measuring his academic skills, of 87 was within the standard deviation of the 100 average, but Dr. Watson's opinion was that "it does show that he can take some information in, but his ability to use it is not particularly good." (*Id.* at 54–55.)

Dr. Watson continued to maintain, based on Petitioner's academic history, that his deficiencies were long-term, although he could not specify whether they dated from birth or from the head injury he suffered around the age of three or four. (Doc. No. 229, at 52–53.) Challenged on whether Petitioner's brain function would be expected to be significantly worse in one area of the brain than others if he had suffered a traumatic brain injury, Dr. Watson said that it depends on the nature of the trauma and whether the brain bounces inside the skull causing a contrecoup injury, and also that "I think there is a baseline deficiency that might have an overlay of a trauma brain injury on top of it." (*Id.* at 53–54.) He also testified that because the brain works as a whole, in cases of early head injury, "all of the development that proceeds after that is on a different course. It veers off the normal developmental course and into an area of impairment." (*Id.* at 62.) He did acknowledge that on a chart of nine different areas of potential impairment, Petitioner is only impaired in two, and that Petitioner's performance on the Iowa Gambling Test of his executive functioning was below average but did not strictly indicate impairment. (Doc. No. 229, at 56–57.) He later clarified that an assessment of deficient executive functioning does not require that a subject score below the norm on every test

administered, and that certain test results might show Petitioner is relatively normal in some parts of his brain, like the orbitofrontal cortex tested by the Iowa Gambling Test, but damaged in other areas. (*Id.* at 61–62.)

Finally, Dr. Watson acknowledged that he believed that Petitioner did not give his best effort on one particular test, but improved his result on re-taking the test. (*Id.* at 57–58.)

       b.  Dr. Ruben Gur

Petitioner also presented the testimony of Dr. Ruben Gur, a highly qualified neuropsychologist specializing in the link between brain function and behavior, who was admitted as an expert in the field of neuropsychology. (Doc. No. 229, at 63–68.) Dr. Gur testified that he analyzed the data from tests Dr. Watson administered to Petitioner, which he described as a "comprehensive standard battery of well-established tests." (*Id.* at 70–71.) Dr. Gur testified that his analysis uses a behavioral imaging algorithm developed with funding from the National Institutes of Mental Health, which increased the consistency and reliability of expert assessments that were previously more variable and dependent on a particular neuropsychologist's training and level of expertise. From a subject's psychological test scores, the algorithm generates "an image of the brain that reflects the likelihood of damage in different areas." (*Id.* at 72–74.) The behavioral image generated by the algorithm is to be used as a guide to assist a clinical neuropsychologist in reaching conclusions based on his or her clinical judgment. (*Id.* at 77.) Although the algorithm was not in use at the time of Petitioner's trial, Dr. Gur testified that a competent neuropsychologist should have drawn the same conclusion from the data even without the algorithm, and that his expert opinion was the same with or without the algorithm. (*Id.* at 75, 77.) Specifically, he said he could have testified about the same conclusion in 1982 that that he gave in 2012. (*Id.* at 77–78, 94.)

Dr. Gur testified that his overall opinion regarding Petitioner is as follows:

> My opinion is that Mr. Duncan suffers from brain damage. The brain damage seems to have multiple foci or areas of concentration. It looks like most of the damage is in the frontal lobe, but there also seems to be damage in the posterior, the back of the brain on the left side.
>
> So this is a pattern that is observed in individuals who suffered from head injuries or some other possibly developmental problems, but it looks like there is an element of both.

(Doc. No. 229, at 71–72.) Dr. Gur went on to testify in more detail about the apparent locations and effects of Petitioner's brain damage, which he characterized as "significant" and "in some areas beyond moderate." (*Id.* at 85.) Specifically, he testified that in his opinion Petitioner suffers from: left posterior brain damage, which causes deficits in language comprehension; right parietal area damage, which causes deficits in coherent integration of visual/auditory information; dorsolateral prefontal cortex damage, which causes deficits in a subject's "working memory"; right orbitofrontal damage, which impacts the ability to assess danger and determine an appropriate course of action; other frontal lobe damage that causes deficits in the ability to take society's moral codes into consideration and to apply the "brakes" to or reconsider his behavior. (*Id.* at 85–89.)

Asked to give an opinion about whether or how a head injury may have contributed to Petitioner's dysfunction, Dr. Gur testified that the pattern of Petitioner's brain damage – with damage appearing in the left rear and right front of the brain, with damage in the middle likely caused by torque as the brain twisted – is often seen in individuals with head injuries, especially injuries to the back of the head. (Doc. No. 229, at 89–91.) He explained, however, that Petitioner may have had some underlying cognitive deficits, and that it is difficult to differentiate between

underlying deficits and damage from injury in the same way that it is difficult to determine the cause of damage to "a poorly-constructed house that was hit by a storm." (*Id.* at 91–92.)

On cross-examination, Dr. Gur acknowledged that he had not met Petitioner prior to the hearing, and that his opinion was based solely on the test data provided by Dr. Watson. (Doc. No. 229, at 97–98.) He testified that the data he relied on was corrected for Petitioner's age, although he did not explicitly state that in his report. (*Id.* at 99.) He acknowledged that aging affects brain function, with some degree of intellectual deterioration beginning in men around age 45, so that it was possible that aging had had some impact on Petitioner's brain function between the time he committed the crime in his late teens and the time of Dr. Watson's testing in his late 40s. (*Id.* at 99–102.) Dr. Gur was adamant, however, that the damage revealed by Petitioner's tests could not be the result of aging: "What you see in terms of intellectual deterioration after 45 is miniscule compared to what we see here. . . . [T]his is a different league of deficits. . . . [T]he kind of deficit that you see in those tests where Mr. Duncan has a deficit is nothing that you can attribute to aging. It's much more than the subtle aging effects you would see. . . . [T]his is a whole standard deviation of a difference, and it's over and beyond what you get with normal aging which is – which is very little." (*Id.* at 101–03.)

c. Dr. George Woods

Petitioner next presented the testimony of neuropsychiatrist Dr. George Woods. Among other credentials, Dr. Woods teaches Clinical Aspects of Forensic Psychiatry at Morehouse School of Medicine and is the Secretary General of the International Academy of Law and Mental Health. (Doc. No. 229, at 106–07.) He was admitted as an expert in the field of forensic neuropsychiatry. (*Id.* at 109.)

Dr. Woods personally evaluated Petitioner over three dates in 2009. (Doc. No. 229, at 109.) He met with Petitioner alone and formed his initial opinion of Petitioner's condition through a mental-status examination during which he observed Petitioner's gait, orientation, speech, mood, insight and judgment. (*Id.* at 125–27.) Dr. Woods testified to the following "overview" of his diagnosis:

> The overview, in terms of what I saw with Mr. Duncan, shows that Mr. Duncan has had lifelong cognitive impairments as a function of early brain impairment as well as early brain injuries. These lifelong cognitive impairments have limited Mr. Duncan's ability to effectively manage his life. It impaired his academic functioning. It limited his ability to obtain meaningful professional status. And, as I have noted, it precludes his participation in meaningful and productive personal relationships.

(Doc. No. 229, at 109–10.)

Dr. Woods's primary Axis I diagnosis of Petitioner is "cognitive disorder not otherwise specified,"[8] which he testified reflects impaired brain function and is one of the few neurological diagnoses in the DSM. (*Id.* at 110.) Asked to describe the disorder, Dr. Woods testified as follows about its impact on Petitioner:

> Mr. Duncan's brain does not work well. He has problems in terms of being able to effectively weigh and deliberate. He has problems in terms of being able to sequence his behavior. He has problems in being able to – in getting stuck. So his brain does not work as effectively as someone that would not have the kinds of brain injuries that he has had or brain impairments.

(*Id.* at 112.) Dr. Woods testified that there were several indicators that the impairment was caused by a brain injury. (*Id.*) He recounted Dr. Malone's testimony about seeing Petitioner fall down his concrete back steps at around age 3, and believing for a time that he was dead because

---

[8] Dr. Woods also reached an Axis I diagnosis of severe substance abuse with institutional remission. (*Id.* at 111.)

he did not breathe,[9] and the fact that Petitioner was not taken to the hospital after the fall. (*Id.* at 113.) Dr. Woods testified that the fall described by Dr. Malone "is consistent with the circumstances that would cause a contrecoup lesion . . . where the brain moves back and forth in the skull" and hits the skull both in the front and in the back. (*Id.* at 124.) He said that Petitioner's brain impairment is consistent with childhood injury but could also be consistent with prenatal injury or impairment. (*Id.* at 123.)

Dr. Woods testified that several important problems had been caused by that impairment, including poor academic functioning. Even with the relatively distraction-free ability to focus on academics in prison, Petitioner has only improved to the level of the fifth or sixth grade, which Dr. Woods says is "well within the academic prowess of someone that is mildly mentally retarded." (Doc. No. 229, at 114.) Another problem is frontal lobe dysfunction, which impairs the ability to deliberate and to change course when "we are going down a path that doesn't seem to be the right way." (*Id.*) It also impairs social functioning and decision-making. (*Id.*) In addition to the frontal lobe dysfunction, Dr. Woods testified that Petitioner has temporal lobe impairments and "global cognitive deficits." (*Id.* at 127–28.)

On Axis II, Dr. Woods diagnosed Petitioner with dysexecutive functioning, which is a neurological syndrome that encompasses the effects of the described frontal lobe impairment. (Doc. No. 229, at 110, 115.) He elaborated on its significance:

> And what that really means is those parts of the brain that really allow you to register memory, recall, to effectively weigh issues and deliberate, to what we call perseverate, to shift from one mental state to another, to limit – to accurately gauge what is going on in social situations, these are impaired. It's not as though you can't do those things at all. But they are often not as effectively accomplished, particularly in stressful, new and novel situations.

---

[9] Dr. Woods suggested this was an incidence of a neurological syndrome in children called breath-holding syndrome. (*Id.* at 113.)

44

(*Id.* at 115–16.)

Dr. Woods also determined that Petitioner's amblyopia (commonly known as "lazy eye") and stutter were neurological in nature. (Doc. No. 229, at 116–17.)

Dr. Woods testified that the neuropsychological testing as administered by Dr. Watson is "the gold standard of brain function" and is much more effective than simple clinical examination. (Doc. No. 229, at 118.) Based on Dr. Watson's "comprehensive battery," Woods was able "to dismiss any question of effort or malingering" in this case and to determine from Petitioner's general abilities index ("GAI") that his impairments have been longstanding in his life rather than recent developments. (*Id.* at 118-19.) Dr. Woods said that Dr. Watson's test results corroborated and "certainly verified" his own clinical observations, and explained how several of the tests illuminated Petitioner's impairments, particularly in terms of executive function. (*Id.* at 119–23, 126.)

Dr. Woods provided the following opinion about how Petitioner's documented impairments affect his functioning:

> You really see difficulty in weighing and deliberating, taking into consideration multiple factors, holding onto those factors and utilizing them in effective ways.
>
> You also see difficulty understanding social context because you can't pull in all of the issues that may be going on. Impulsivity in stressful situation. When things become stressful, you're not really able to pull everything together. You're not able to slow down. You're not able to take everything into consideration. And really perseveration when faced with stressful choices. As I look at this, it's interesting because you would think that impulsivity and perseveration are the opposite of each other, but they are not. When someone is impulsive, they act often without thinking and their actions, however, may be repetitive. They get stuck in a pattern.
>
> And, clearly, Mr. Duncan because his brain injuries have been ongoing all of his life was experiencing these at the time of the offense.

45

These are not deficits that wax and wane. These are not deficits like perhaps depression or anxiety that can come and go. These cognitive deficits are there, and they don't change. They get worse under stress. They get worse in novel situations. And we see evidence of them certainly in his academic functioning. We see evidence of them in the types of jobs he was involved in. We see evidence of them in the Job Corps records where his academic functioning was still significantly impaired. And we see them in Dr. Watson's testing recently. These are constant.

And so if they are constant, they certainly were there at the time of the offense as they have been throughout his life. And they isolated him early in his life. They showed him to have poor adaptive skills and really subjected him to academic failure.

(Doc. No. 229, at 124–25, 129.)

On cross-examination, Dr. Woods acknowledged that he had been publicly reprimanded in California in 1994 for failing to write down a secondary diagnosis of alcoholism on a patient discharge summary. (Doc. No. 229, at 132–33.) He also acknowledged that other than his mental-status examination, he did not personally administer any tests to Petitioner but relied on Dr. Watson's testing. (*Id.* at 133.) He stated that all the materials he reviewed about Petitioner were provided to him by Petitioner's counsel and that, although he had not read Petitioner's post-conviction testimony, the fact that Petitioner had denied having any mental health problems did not impact Dr. Woods's testimony. (*Id.* at 135.)

Dr. Woods agreed that he had not diagnosed Petitioner with intellectual disability or ADHD. He stated that Petitioner does have a "borderline IQ," although that is not a formal diagnosis. (Doc. No. 229, at 140–41.) He disagreed that "cognitive disorder not otherwise specified" was a "catch-all category," and explained that it is a specific diagnosis for cognitive disorders not caused by a general medical condition, such as fetal alcohol spectrum disorder. (*Id.* at 141–42.) He testified to the effect that he was not positive whether the diagnosis "cognitive

disorder not otherwise specified" existed at the time of Petitioner's trial, but that even at that time there would definitely have been a diagnosis that would have covered Petitioner's problems, such as "minimal brain damage" or "organic brain syndrome."

Asked to admit that Petitioner's constructional dyspraxia – the inability to conceptualize and accurately re-create shapes in drawing – "really doesn't have much to do with his culpability for committing a crime as far as his ability to control his impulses," Dr. Woods disagreed:

> That is a – yes, it does. And the ways in which it does is the drawing of the cross and the drawing of the key really are motor manifestations of the ability to conceptualize. There are other tests that really have to do with drawing. But the visual-spatial conceptualization is not far off from the emotional conceptualization. And both of them are in the right parietal lobe. And so consequently, the ability to conceptualize is roughly captured in a motorway in the constructional dyspraxia. But it's in the same area that we would use to conceptualize almost any type of action.
>
> \* \* \*
>
> His ability to premeditate effectively would be impaired by his ability to conceptualize, because you have to conceptualize in order to premeditate effectively. So it wouldn't be impacted by his construction, but what the construction reflects is his ability to conceptualize, it would be impaired by.

(Doc. No. 229, at 143–54.)

Finally, Dr. Woods acknowledged that although he had finished his residency at the time of Petitioner's trial, he was not board certified in psychiatry until 1992, so there was some question about whether he could have testified as an expert in 1983. (Doc. No. 229, at 148.)

### d. Counsel William Ligon

Petitioner's trial counsel, William Ligon, testified for the third time. In addition to Petitioner's murder trial being his first murder case and first jury trial, he testified that he had never received any specialized training for defending a murder case or death penalty case before the trial in issue. (Doc. No. 229, at 150–51.) He had not received any training regarding the investigation or presentation of mitigating evidence in a capital case. (*Id.* at 151.)

47

In preparation for Petitioner's sentencing hearing, Ligon testified that he did not have Petitioner evaluated by a psychiatrist or psychologist; have any psychological or IQ tests administered to Petitioner; investigate any head injuries Petitioner may have suffered; or investigate any physical or psychological trauma Petitioner may have experienced in his youth. (Doc. No. 229, at 153.) He testified that he may have seen Petitioner's Job Corps records just from knowing and having access to Petitioner's family, but that he never requested Job Corps records, Petitioner's birth records, school records or medical records during his investigation. (*Id.* at 154–55.)

Ligon testified that his license to practice law had been suspended three times and that at the time of his 2012 testimony it had been suspended since May 2006. (Doc. No. 229, at 165–66.) His explanation for his suspensions was not particularly lucid, but it appeared to involve at least one finding of contempt and failure "to follow through on what I was supposed to follow through." (*Id.* at 166.) He suggested that it was his habit simply to abandon his practice upon receipt of a complaint from the Board of Professional Responsibility:

> If you run a solo practice by yourself, you will not survive an inquisition on the Board of Professional Responsibility and do your clients any good. You get a complaint, and it comes to the point you are going to have to stop doing what you are doing and defend yourself, it's best to shut the doors. I have done that on three occasions.

(*Id.* at 166.) Specifically, he indicated that other complaints led to his abandoning Petitioner's appeal:

> Q.    I know after the trial in this matter, there were some problems with the filing of the appellate brief in this case. As I understand the record, you were to file the appellate brief for Mr. Duncan, but you actually didn't do that; is that correct?
>
> A.    Yes, sir.

Q.    Can you explain the circumstances behind that?

A.    I was hit with five complaints when I moved my practice from Gallatin to Nashville in early '84. I was hit with five complaints through my former partners. As I stated previously, self-preservation. I am trying to stay in business and trying to make sure I don't run into 50 complaints. I just was not able to do it. So they appointed someone else to handle this appeal.

Q.    So even though you were – you were under an obligation to file the appeal, you ultimately didn't and someone else had to file the appeal for Mr. Duncan?

A.    Yes, exactly.

(*Id.* at 167.)

On cross-examination, Ligon testified that he knew Petitioner's family and attended school with one of his brothers, but did not personally know Petitioner because of their nine or ten year age difference, and described his background investigation:

So I had to get some kind of background on him. In doing so, I had an opportunity to talk to several people who went to school with him, family, to try to get some kind of handle on whether or not he was the type of person who could get involved in something like this.

(Doc. No. 229, at 168–69.) He stated that none of Petitioner's friends or family told him that Petitioner had suffered any brain injury or that he might have any issues with his mental health or capacity: "No one mentioned – no one broached that subject with me at all." (*Id.* at 178, 180.) The exchange concerning his decision not to seek a mental health evaluation was as follows:

Q.    You were asked about whether you had ever requested a psychological or mental health exam of the Defendant. Isn't it true that you didn't think that was something that was needed in this case, and that is why you didn't request that?

A.    It was not something I requested. We are talking about 1981 and 1982, and I will be very, very bold about it. Nobody thought anybody Black was psychologically stable at all, including myself back in 1981 and 1982. We were all considered to be a little crazy or a little off or a little this, a little that, and it's a totally different time than it is now.

Your conduct – if it did not conform to the conduct of everyone else in the county, so to speak, you would be considered to be just a tad deviant. That included me. No, I did not think about this in any particular type of psychological circumstances. When I understood what we were doing and we were going to have to deal with two murder trials, I didn't really inquire a whole heck of a lot into it.

* * *

Well, the legal aspects, we were looking at the chair, and that is pretty much the long and the short of it. Our main concern – my main concern was to try to make sure we put enough doubt in the Jurors' minds that they would not vote for the death penalty. And that is what we were trying to concentrate on most of the time. Nothing psychological. David was 19 years old. He had a pretty normal lifestyle, a pretty normal life for most 19-year-old African-American males in Sumner County at that particular time. Nothing – in fact, nothing stood out to me to think that he needs any type of psychological examination or something to that effect. But I am no psychologist. That's just a judgment call that I made at the time.

(Doc. No. 229, at 178–79.)

On re-direct, Ligon elaborated on his perspective about Petitioner's sentencing hearing:

I was mostly trying to focus on – basically, what David and I discussed, I told him when I came back across and we were found guilty, I said, "I think they are going to give you – I think they're going to electrocute you. I think you are going to get the chair." I told him this earlier because once – based on the little evidence we had in the six or seven days we were in the trial, pretty much these people were going to be predisposed to – if they convicted him – if they were bold enough to convict him based on that evidence, I think they were going to be bold enough to execute him. So I told him this. When we went back to trial, my main concern was to seek some kind of leniency from the Jury and see if we could get somebody to go back in there and try to see if we can save his life. And that was my particular focus at that time.

(Doc. No. 229, at 192–93.) He also acknowledged that he had never inquired about Petitioner's

background concerning his education, IQ or head injury:

Q.    You had not independently investigated, so you did not know that David Duncan failed second grade twice?

A.    I graduated with his brother, and he probably failed second grade twice.

50

Q.     But you never reviewed David Duncan's school records to know what his academic record was?

A.     No. But that wasn't unusual in Gallatin, Tennessee for African-American males.

Q.     But you still did not know that information?

A.     No, sir.

Q.     That is my question. And you did not know he received test scores of IQ tests in the 70s – were you aware of that?

A.     No, sir.

Q.     And you didn't know that he had had a head injury as a child either, did you?

A.     No, sir.

Q.     You had not independently investigated or asked any questions about that of any witness?

A.     No, sir.

(Doc. No. 229, at 194–95.)

> e.  Petitioner's Sister Alice

Petitioner's sister Alice testified about the family conditions during Petitioner's childhood. Her description of the family home was consistent with the testimony above. The family's only source of water was a hydrant outside the house, and Petitioner shared the home's only bedroom with his parents and two other siblings. (Doc. No. 229, at 206–07.) She described their father as "a menace to society" and "a crazy drunk," who would drink every weekend to the point of drunkenness and kept a pot by his bed for vomit. (*Id.* at 208–211.) When he was drunk, Petitioner's father would "want to jump on [his mother] for no reason," including a time he grabbed her neck and shoved her into a door. (*Id.* at 211–12.) Other than that one physical

attack, though, Alice testified that their father's abuse was verbal and happened once or twice per weekend. (*Id.* at 214–15.) He would call Alice and their mother names and curse at them and "rant and rave." (*Id.* at 214–15.) Alice testified that she was too preoccupied with trying to defend her mother to notice whether her siblings were aware of their father's abusive behavior, but the house was so small that anyone in the house at the time would have heard it. (*Id.* at 216.)

Alice testified that she did not have any contact with Petitioner's attorney William Ligon before his trial, but that she would "of course" have talked to him if he had contacted her. (*Id.* at 219.)

### f. Petitioner's Former Sister-in-Law

Petitioner's former sister-in-law testified that she became part of the Duncan family at age 16 when she married Petitioner's brother, and that she knew Petitioner's father to drink a lot. (Doc. No. 229, at 223–24.) She said that sometimes when he drank he would be in a bad mood, and "[i]t was terrible," with Petitioner's father "cursing and calling people names and saying ugly stuff" to people. (*Id.* at 225.) She confirmed that "[i]t happened a lot," including when Petitioner was present, and that the father's ugly language would be directed toward whoever was there. (*Id.* at 226.) His verbal attacks were frequently directed at Petitioner's mother, whom he would call "bitch" and "whore" and accuse of infidelity. (*Id.* at 227.) He once appeared nude in front of the family in the living area of the house after drinking heavily. (*Id.* at 229.) The sister-in-law testified, however, that she never saw Petitioner's father be physically abusive with anyone, and that the family always had plenty of food, clean clothes and a clean home. (*Id.* at 228, 232.) She was not present when Petitioner fell off the porch as a child, but she had heard family members discuss it. (*Id.* at 232–33.) At the time of Petitioner's trial, she was living in Fort Campbell. She was not contacted by Petitioner's attorney but would have come to the trial

if asked. (*Id.* at 233.) She was also not contacted by Petitioner's counsel during his state post-conviction proceedings, and would have attended then as well if requested. (*Id.* at 234.)

    4.  Analysis and Conclusion

        a.  *Cronic* or *Strickland*

The Supreme Court has identified three circumstances under which a petitioner might prove a *per se* violation of the right to effective assistance of counsel: (1) complete denial of counsel at a critical stage of the case; (2) where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; and (3) where circumstances are such that competent counsel "very likely could not" render assistance. *Bell v. Cone*, 535 U.S. 685, 695–96 (2002) (citing *United States v. Cronic*, 466 U.S. 648, 659–62 (1984)). Under any of those circumstances, prejudice is presumed and a petitioner is relieved of the burden to demonstrate any impact arising from the lack of effective assistance of counsel. *Cone*, 535 U.S. at 695–96. All other claims of ineffective assistance of counsel are subject to the highly deferential two-prong standard of *Strickland v. Washington*, 466 U.S. 668 (1984). *Cone*, 535 U.S. at 696–98.

In *Bell v. Cone*, the Supreme Court held that *Strickland* provided the proper standard for review of the performance of counsel who offered no evidence and delivered a single argument, waiving final argument, at a capital sentencing hearing. *Cone*, 535 U.S. at 696–97. It insisted that in order for the less demanding standard of *Cronic* to apply, "the attorney's failure must be complete," and found that not to be the case where counsel had been able to introduce a great deal of mitigating mental health and addiction evidence during the guilt phase, had highlighted that evidence in his argument at sentencing, and had established in cross-examination of one of the state's sentencing hearing witnesses that the defendant had been awarded the Bronze Star for military service in Viet Nam. *Cone*, 535 U.S. at 691, 696–98.

In this case, by comparison, ***none*** of the mitigating evidence detailed above was presented to the jury in either phase of Petitioner's trial. Counsel's single argument, recited verbatim above, was incoherent and did not draw attention to anything particular to the Petitioner or his life that would make him appear worthy of a life sentence. Instead, counsel vaguely alluded to some message of forgiveness conveyed to him in conversation with a man (apparently the victim's son) he met mere hours before the argument. His argument evidences a total lack of preparation or focus on the critical task of convincing a jury to spare his client's life.

The conclusion that counsel had failed to prepare for Petitioner's sentencing hearing is in keeping with his testimony – during three separate hearings – to the effect that he viewed the matter of sentencing as hopeless. All indications are that once the Petitioner was convicted, counsel simply gave up. He remained physically present and even delivered a brief, hollow argument, but he effectively abdicated his role as a zealous advocate for a client he considered doomed. "[J]ustice requires that counsel must do more than appear in court or argue to the jury." *Carter v. Bell*, 218 F.3d 581, 596 (6th Cir. 2000) (ordering conditional writ of habeas corpus based on ineffective assistance at sentencing where counsel failed to investigate and present mitigating evidence including low IQ and underprivileged childhood). If this is not the "complete" failure required by *Cronic* and *Cone*, it comes as close to the line as any case could without crossing over it. Nevertheless, because *Cone* suggests that any effort by counsel at sentencing separates counsel's performance from the *Cronic* standard by kind rather than degree, the Court will proceed with a *Strickland* analysis of Petitioner's claim.

   b.  Counsel's Performance Under *Strickland*

While strategic choices made after thorough investigation are generally considered within the range of competent assistance, "counsel has a duty to make reasonable investigations or to

make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691; *see also Martin v. Rose*, 717 F.2d 295 (6th Cir. 1983) (counsel ineffective where he failed to interview alibi witnesses and was unaware of investigative file prepared by public defender); *United States v. Goodwin*, 531 F.2d 347 (6th Cir.1976) (counsel ineffective where he misunderstood elements of the offense and examined client at preliminary hearing in such a manner that client inadvertently confessed).

The Court has no difficulty concluding that Petitioner's trial counsel was deficient at sentencing under this standard. "It is clearly established that an attorney's failure to reasonably investigate the defendant's background and present mitigating evidence at sentencing can constitute ineffective assistance of counsel." *Fitzpatrick v. Robinson*, 723 F.3d 624, 637 (6th Cir. 2013) (citing *Wiggins v. Smith*, 539 U.S. 510, 521–22 (2003)); *see also Austin v. Bell*, 126 F.3d 843, 848 (6th Cir. 1997) (noting that the Constitution "requires defense counsel to reasonably investigate a defendant's background and present it to the jury" at sentencing, and finding counsel ineffective at sentencing). As the Sixth Circuit has repeatedly instructed, "[t]he 'prospect of being put to death unless counsel obtains and presents *something* in mitigation' magnifies counsel's responsibility to investigate." *Harries v. Bell*, 417 F.3d 631, 637 (6th Cir. 2005) (quoting *Mapes v. Coyle*, 171 F.3d 408, 426 (6th Cir. 1999)).

In this case, counsel unreasonably failed to conduct any real investigation into the available mitigation evidence. He was irresponsibly content to rely on his general familiarity with Petitioner's family, acquired primarily by attending school with Petitioner's older brother. His only background investigation was to speak to a few unspecified family members and other people for the purpose of determining whether they thought Petitioner's character was such that he would have committed the crime, which is a wholly different inquiry than one aimed at

55

uncovering mitigating evidence. Counsel testified that nobody volunteered to him any facts suggesting that Petitioner had any impairments, but he acknowledges that he failed to *ask* anyone about Petitioner's background in terms of his intelligence, academic history, mental health or childhood head injury, and failed to seek or review any records related to those topics. He did not even interview Petitioner's entire immediate family, much less his childhood neighbors or in-laws.

In the 1981 Tennessee capital murder trial that gave rise to *Harries v. Bell*, 417 F.3d 631 (2005), defense counsel's mitigation investigation included interviews with two of his client's family members and three other witnesses, seeking institutional records and requesting two competency evaluations. *Id.* at 638. The Sixth Circuit held that under the "prevailing professional norms," the court "cannot escape the conclusion that Harries's counsel failed to conduct a constitutionally adequate investigation." *Id.* (thorough investigation would have discovered childhood abuse, mental illness and brain impairment). Similarly, even where defense counsel conducted a mitigation investigation that led him to present the testimony of the defendant and of a prison teacher for whom the defendant worked as an aide, the Sixth Circuit has held that failure to interview the defendant's step-siblings constituted deficient performance. *Cauthern v. Colson*, 736 F.3d 465, 470, 484–86 (6th Cir. 2013) (at least one step-sibling would have been willing to testify to childhood abuse).

Particularly in light of the obvious red flags readily available to Petitioner's counsel, including Petitioner's dropping out of school at a young age and his father's reputation for drinking, counsel's almost non-existent mitigation investigation was unreasonable. *See Wiggins*, 539 U.S. at 525 (known facts including parent's chronic alcoholism and defendant's childhood absences from school would have led "any reasonably competent attorney" to pursue additional

56

investigation); *Jalowiec v. Bradshaw*, 657 F.3d 293, 319 (6th Cir. 2011) (noting that where known facts would lead a reasonable attorney to investigate further, counsel may not rely solely on information provided by defendant and his family in determining the proper extent of mitigation investigation). "The sole source of mitigating factors cannot properly be that information which [a] defendant may volunteer; counsel must make some effort at independent investigation in order to make a reasoned, informed decision as to their utility." *Mason v. Mitchell*, 320 F.3d 604, 620 (6th Cir. 2003) (quoting *Carter v. Bell*, 218 F.3d 581, 596 (6th Cir. 2000)).

Counsel's failures in this case were not the result of competently informed strategy, but were instead consistent with his fundamentally flawed understanding of mitigation and of his duties to his client at a capital sentencing hearing. Counsel's testimony establishes that he believed that the only avenues for mitigation related to remorse or character, and erroneously viewed Petitioner's disadvantaged and turbulent childhood as irrelevant. He also erroneously believed that there was no value to Petitioner in any evidence of mental disorders or intellectual deficits unless they were connected to his guilt-phase defense, for example through a theory of innocence by reason of insanity. Competent counsel facing a capital sentencing hearing would know that such evidence could be inherently mitigating, regardless of whether a defendant has connected the evidence to the commission or the crime or even admitted his involvement in the crime for which he is being sentenced. *See Tennard v. Dretke*, 542 U.S. 274, 287 (2004) ("impaired intellectual function is inherently mitigating" regardless of whether defendant establishes a "nexus to the crime"); *Wiggins*, 539 U.S. at 535 (IQ score of 79 is relevant mitigation evidence); *Hodge v. Kentucky*, 133 S. Ct. 506 (2012) (Sotomayor, J., dissenting from denial of certiorari) ("Mitigation evidence need not, and rarely could, 'explai[n]' a heinous

crime; rather, mitigation evidence allows a jury to make a reasoned moral decision whether the individual defendant deserves to be executed, or to be shown mercy instead."). In fact, the Tennessee statute in effect at the time of Petitioner's offense expressly listed, as a potential mitigating factor, a substantially impaired capacity to conform to the requirements of the law "which was *insufficient to establish a defense to the crime* but which substantially affected his judgment." Tenn. Code Ann. § 39-2404(j)(8) (1977) (emphasis added).

Where counsel has performed a proper mitigation investigation, he or she might determine, as a matter of professional strategy, that presenting available evidence would do the client's case more harm than good. *Burger v. Kemp*, 483 U.S. 776, 789–95 (1987) (finding counsel not ineffective for not presenting witness testimony that could have included defendant's propensity for violence and possibility of his bragging about the crime). In this case, Petitioner's counsel testified to the effect that he chose not to offer certain evidence about Petitioner's character, for example that he was polite to neighbors or close to his mother, for fear that it would open the door to admission of evidence that he had been charged (but not convicted) in another rape case,[10] or that he had been married to a white woman, which he believed would offend the white jury. And it is true that informed counsel might have found *some* of the additional evidence in this record to be double-edged – evidence of Petitioner's own personality disorders and severe substance abuse, for example – and elected not to present it. But Respondent cannot rest on a tactical decision to omit evidence that trial counsel did not even bother to discover and evaluate. *See Wiggins*, 539 U.S. at 527–28 (holding that counsel cannot craft an informed sentencing strategy where mitigation investigation is unreasonably

---

[10] It is unnecessary for the Court to address this issue in order to resolve this case, but Sixth Circuit precedent indicates that the concern about admission of additional adverse evidence may be unfounded. *See Harries*, 417 F.3d at 640–41 (stating that Tennessee law would bar the admission of such evidence at sentencing).

abandoned). Further, mitigation is not an all-or-nothing proposition. Informed counsel might have chosen to limit his mitigation theory to certain categories of evidence, or to have one witness rather than another testify to certain facts in order to minimize the risk of harm.[11] But there is no justification in this case for Ligon's abandonment of *all* available avenues of mitigation.

Moreover, it is difficult to imagine any strategic reason to omit evidence with *any chance* of eliciting a jury's compassion when counsel has determined – as in this case – that a death sentence is otherwise a "foregone conclusion." Believing that the jury was inclined – or even certain – to impose the death penalty, Petitioner's counsel failed to provide them with *any* evidence that might alter that inclination. Surrender is not a strategic decision. To the contrary, the Sixth Circuit has found counsel's failure to present any of the available mitigating evidence simply "because he did not think that it would do any good" to constitute "an abdication of advocacy." *Austin v. Bell*, 126 F.3d at 849.

Even if the Court were to attribute the omission of character evidence to sound tactical judgment, it does not explain counsel's failure to investigate or present any of the mitigating evidence that did not implicate Petitioner's character, including his cramped and impoverished childhood, his father's alcoholism and abusive behavior, his cognitive impairments and borderline IQ, his lack of education and relatively low academic functioning. In a case involving the failure to present evidence of a brain impairment similar to Petitioner's, the Sixth Circuit has said that it "can conceive of no rational trial strategy that would justify the failure of [petitioner's] counsel to investigate and present evidence of his brain impairment, and to instead

---

[11] For example, assuming Ligon's concerns about potential damage that Dr. Malone might have done to Petitioner's case at sentencing were well founded, he could have called another witness to testify about Petitioner's head injury or simply included that injury as a basis for expert testimony.

rely exclusively on the hope that the jury would spare his life due to any 'residual doubt' about his guilt." *Frazier v. Huffman*, 343 F.3d 780, 794 (6th Cir. 2003).

The attempt by Petitioner's counsel to explain why he did not investigate any of these latter categories of potential mitigation is frankly disturbing. He explained that he did not bother to investigate Petitioner's academic history because academic failure "wasn't unusual in Gallatin, Tennessee for African-American males" (Doc. No. 229, at 194:23–24); that he "didn't really inquire a whole heck of a lot into" Petitioner's psychological or mental function or seek any evaluation because "[n]obody thought anybody Black was psychologically stable" at that time, and that all African-Americans were "considered to be a little crazy or a little off" (*id.* at 178–79); and that Petitioner's disadvantaged childhood did not capture his attention because he did not see Petitioner's circumstances as any different than anyone else's in their community. (Doc. No. 40, Add. 26 vol. 1, Tr. at 110–11.) Counsel essentially concluded that facts that would be mitigating evidence in favor of a white defendant were not worthy of presenting or even investigating on behalf of a black defendant. That is not a "reasonable professional judgment" that would justify counsel's meager effort in this case. *See Strickland*, 466 U.S. at 690–91 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."). In failing to prepare or present any mitigation case for that reason, counsel's representation of Petitioner at sentencing fell far below the range of professionally competent assistance.

c. Prejudice Under *Strickland*

Upon finding that counsel's performance at sentencing was constitutionally deficient, the *Strickland* standard requires the Court to weigh all of the available mitigation evidence against the aggravating evidence to determine whether there is a reasonable probability that Petitioner

would have received a different sentence after a constitutionally sufficient mitigation effort by his trial counsel. *See Sears v. Upton*, 561 U.S. 945, 955–56 (2010) (citing *Strickland*, 466 U.S. at 694). The "reasonable probability" standard is "somewhat lower" than a preponderance standard and does not require that a petitioner establish that a different outcome is more likely than not. *Strickland*, 466 U.S. at 694.

The jury found both aggravating circumstances asserted by the prosecution in Petitioner's case: (1) that the murder was especially heinous, atrocious and cruel in that it involved torture or depravity of mind; and (2) that the murder was committed while the defendant was engaged in committing rape and robbery. (Doc. No. 10, Add. 1 vol. 8, Tr. at 654, 662.) The state courts have held the second factor to be legally inapplicable to Petitioner's case, [12] but they rightly found that the evidence supported a conclusion that the nature of the crime was especially heinous. *See id.* at *7; *State v. Duncan*, 698 S.W.2d 63, 71 (Tenn. 1985) ("The proof here, that the killer with great force sliced three times deeply into the victim's neck and left her to bleed to death, does support the aggravating circumstance . . . ."). The brutal nature of Ms. Burgess's murder is beyond debate.

The potential mitigating impact of much of the evidence detailed above, however, is also beyond debate. Petitioner's poverty, cognitive impairments, borderline IQ and 4th grade academic functioning level at the time of crime are all inherently mitigating. Although different terminology might have been used by experts at the time of Petitioner's trial, and in fact different experts might have necessarily have been called at that time, the substance and effect of the

---

[12] The state court held that reliance on the second aggravating factor was error as a matter of state law, but that it was not prejudicial because the jury would have reached the same result based solely on the other factor. *Duncan v. State*, Nos. 01C01-9311-CR-000412, 01C01-9510-CR-00347, 1997 WL 700043, at *4 (Tenn. Ct. Crim. App. Nov. 10, 1997).

testimony would have been the same. Petitioner's jury did not hear *any* of this evidence because, having failed to reasonably investigate and prepare any case at sentencing, his counsel was "at a loss for words" at his penalty hearing. Confidence in a sentence reached without consideration of any of those facts is gravely undermined and renders Petitioner's sentencing fundamentally unfair. Had the jury heard about Petitioner's disadvantaged background and significant impairments – including impaired ability to control his impulses or alter his behavior in stressful circumstances – and his good adjustment to structured prison life, there is a reasonable probability that at least one juror would have found that the totality of the mitigating facts outweighed the HAC factor, which was the sole aggravating factor properly applied under state law.

This decision is solidly in line with Sixth Circuit precedent finding the failure to develop and present evidence of brain impairments similar to Petitioner's to be prejudicial. *See Harries v. Bell*, 417 F.3d 631, 639–42 (6th Cir. 2005) (holding at least one juror might have been persuaded by evidence of defendant's "[f]rontal-lobe damage [that] . . . can interfere with a person's judgment and decrease a person's ability to control impulses"); *Frazier v. Huffman*, 343 F.3d 780, 798–99 (6th Cir. 2003) (holding at least one juror might have been persuaded by evidence of defendant's brain damage that "could have impaired his ability to deal with stressful or emotional situations, even ones of his own making").

On the record before this Court, Petitioner has established that he was prejudiced by his trial counsel's ineffective assistance at the sentencing phase of his trial, and that his sentence accordingly violates the Sixth Amendment to the United States Constitution. He is therefore entitled to relief on this claim under 28 U.S.C. § 2254.

*B. Paragraphs 13(a)(3) and (a)(17): Ineffectiveness Concerning Pathology Evidence*

The testimony of medical examiner Dr. Saliba at trial has been a matter of controversy since Petitioner's direct appeal from his conviction. At that time, the Tennessee Supreme Court held that Dr. Saliba's description of the circumstances of the crime ("*e.g.* he deduced from the disarray of store merchandise that the victim had been dragged backwards, her arms flailing, with her attacker's arm choking her about the neck") was "outside the area of his medical expertise," but that admission of that testimony was harmless error in light of the trial court's instruction on expert evidence and the undisputed fact that the victim was murdered. *State v. Duncan*, 698 S.W.2d 63, 68–69 (Tenn. 1985).

In sub-paragraphs 13(a)(3) and (a)(17) of the Amended Petition in this case, Petitioner alleges that counsel failed to investigate (with the assistance of experts) the pathology evidence in the case in order to develop evidence inconsistent with the prosecution's theory, and that he failed to "adequately object" to the medical examiner Dr. Saliba's testimony about circumstances of the crime. (Doc. No. 64, at 17, 18.) In his brief, Petitioner asserts that a forensic expert could have provided evidence that, contrary to the medical examiner's testimony, the victim likely died of blood loss rather than an air embolism; that she could have been standing rather than in a prone position when her throat was cut; and that the cuts could have been made with a broken bottle rather than a hook-billed knife. (Doc. No. 242, at 29–30.) He argues that leaving the medical examiner's testimony unchecked allowed the jury to be "left with a grave misimpression about how the victim died," which, in combination with other alleged errors by counsel, "made the circumstances of the offense appear worse than they actually were" and ultimately impacted the sentence by reducing the jurors' residual doubt and increasing the likelihood that the crime would be found to be heinous, atrocious or cruel. (*Id.* at 30–32.)

1. Exhaustion

The parties disagree about whether these claims are exhausted. Petitioner asserts that they "were presented and exhausted during the second post-conviction proceeding." (Doc. No. 242, at 2–3.) Respondent acknowledges that previous iterations of these claims were raised in Petitioner's second post-conviction proceeding, but that they were not raised on appeal from the denial of that petition and are therefore procedurally defaulted. (Doc. No. 248, at 6–9, 12–13.)

In a *pro se* Petition for Post-Conviction Relief filed during his second post-conviction action, Petitioner asserted in claim 7(a) that his trial counsel was ineffective for "fail[ing] to request supportive services of investigative and expert witnesses (i.e., investigators, psychological experts, forensic experts, *et cetera*) to aid in his defense." (Doc. No. 40, Add. 26 vol. 1, T.R. at 8.) He went on to assert in claim 7(e) that counsel was ineffective for failing "to request an appointed forensic expert or investigator to aid in developing the petitioner's defense or in the alternative funds to provide for such." (*Id.*) In support of this claim at his second post-conviction hearing, Petitioner relied on the affidavit of forensic pathologist Dr. Kris Sperry. (Doc. No. 40, Add. 26 vol. 2, Exhibit 6.) Dr. Sperry testified that Dr. Saliba's conclusions were not supported by the evidence, and that it was more likely that the victim died of blood loss, that it was "entirely possible" that she was standing "or in another position" when her throat was cut, and that it was impossible to determine from the evidence in the case what kind of weapon had been used. (*Id.* at ¶¶ 7–9.)

The trial court did not address this claim in its final order, but had earlier held a hearing to determine whether, based on Dr. Sperry's testimony, Petitioner should receive funding to retain a forensic expert for the post-conviction proceeding. The judge denied that request and explained at the hearing in relevant part that:

The injuries in this case would be that it would hardly take a medical expert to testify as to the extent of the injuries; that is, the throat was cut. It was cut in a vicious manner. There was, of course, naturally, blood everywhere. It was very heinous type of killing.

Now, it was also stated that Saliba went beyond his expertise in describing how the crime occurred; that is, he was not a reconstructionist, but the facts showed that there was a disarray in this market of merchandise and certainly evidence from the disarray of the merchandise and certain blood that the person had been drug back to an area where the fatality of the crime occurred.

Now, I want to cover the point that you made about Dr. Saliba one more time. The Supreme Court reviewed his findings and his testimony and made the comment it did, but it was the Supreme Court's opinion that did not and would not have changed the verdict; that while it may not have been the strongest, it was nothing lacking in the testimony that would cause the evidence to indicate that the Defendant was not guilty as charged and that he did not deserve the death penalty.

(Doc. No. 40, Add. 26 vol. 1, T.R. at 76:24–77:19.)  In its written ruling, the trial court found that "Petitioner has not shown that the outcome of the trial would have been different had he been furnished the assistance of the forensic expert at trial." (*Id.* at 74.)

Following the trial court's dismissal of that post-conviction action, one of Petitioner's issues raised on appeal was that "Trial counsel's failure to request approval from the trial court of assistance from and/or funding for qualified forensic experts deprived the Petitioner of the effective assistance of counsel." (Doc. No. 40, Add. 27, Brief of the Petitioner-Appellant at iii.) The Tennessee Court of Criminal Appeals affirmed the trial court in relevant part as follows:

Dr. Sperry also questioned the Sumner County medical examiner's findings that the victim died from an air embolism, that she was in a prone position when her throat was cut, and that her throat was cut with a hawk bill knife. Be all that as it may, the proof showed that the victim's throat was cut and she died from that cutting and Dr. Sperry agrees that was the cause of her death. Thus, any such evidence from Dr. Sperry would not have changed the outcome of the trial in any way whatsoever.

* * *

While it can hardly be doubted that such an expert would have been helpful to the defense in those tasks, it does not follow that the failure to request such assistance – at a time when under *Goodman*, 683 S.W.2d at 379, it was

necessary to show that it was a denial of due process not to have such assistance –
undermined the verdict of guilt and the sentence of death.

*Duncan v. State*, No. 01C01-9311-CR-00412, 1997 WL 700043, at *9 (Tenn. Ct. Crim. App.
Nov. 10, 1997).

The record thus establishes that the Petitioner did exhaust his claims about his attorney's
ineffectiveness in failing to seek and use expert assistance to test or rebut Dr. Saliba's pathology
testimony, and disproves Respondent's claim that the issue was abandoned during post-
conviction appeal. This matter is thus properly presented for habeas corpus review.

2. Merits

Counsel's effectiveness must be judged by the standard of *Strickland v. Washington*, 466
U.S. 668 (1984), which is set forth above. In this case the Court need not address counsel's
performance, because it agrees with the state court that no prejudice arose from the absence at
trial of the type of evidence or assistance offered by Dr. Sperry. *See Strickland*, 466 U.S. at 697
("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient
prejudice, which we expect will often be so, that course should be followed.").

Dr. Sperry's testimony does not disprove Dr. Saliba's conclusions about the cause or
circumstances of the victim's death; it merely establishes that those conclusions are not dictated
by the evidence and that there is room for other possibilities. More importantly, none of the
disputes of fact between Dr. Saliba and Dr. Sperry go to the ultimate question of Petitioner's
guilt or innocence of the crime, and they therefore could not have had any impact on the outcome
of the guilt phase of his trial or provided any basis for residual doubt about guilt at sentencing.

Petitioner argues that the forensic evidence may have had an impact on the jury's finding
that the crime was heinous, atrocious or cruel at sentencing. But the victim's body was found in

66

a pool of blood, at the end of a trail of blood leading from the back of the convenience store, with her pants and undergarments pulled down and mobile sperm in her vagina, and "three cuts to her neck of such force that they cut through her neck muscles, jugular vein, trachea, larynx and esophagus, and nicked the carotid artery." *State v. Duncan*, 698 S.W.2d 63, 66 (1985). As the state court found, "[t]he proof here, that the killer with great force sliced three times deeply into the victim's neck and left her to bleed to death, does support the aggravating circumstance" under applicable state law. *Id.* at 71. The Court cannot find a substantial likelihood that a jury would be swayed from that conclusion by any doubt over whether the ultimate cause of death was blood loss or embolism or what position the victim was in when the fatal wounds were inflicted.

Petitioner is not entitled to relief on this claim.

## III. DEFAULTED CLAIMS

Petitioner acknowledges that several of his ineffective assistance of counsel claims were not presented in state court and are therefore procedurally defaulted. As explained above, such default is ordinarily a bar to federal habeas corpus review, which a petitioner may overcome by demonstrating cause and prejudice. Until recently, a prisoner could not demonstrate cause for default by claiming that he received ineffective assistance of counsel during state post-conviction proceedings. *See Coleman v. Thompson*, 501 U.S. 722, 752–53 (1992) (holding that attorney error is not cause to excuse a default). That barrier was based on the premise that an individual does not have a constitutional right to counsel in post-conviction proceedings, so the prisoner "must bear the risk of attorney error that results in a procedural default." *Id.* (internal quotations omitted).

67

Recent changes in the law, however, have enabled petitioners in Tennessee to establish "cause" to excuse the procedural default of a substantial claim of ineffective assistance by demonstrating the ineffective assistance of post-conviction counsel in failing to raise the claim. *Martinez v. Ryan*, 566 U.S. –, 132 S. Ct. 1309 (2012) (creating exception to *Coleman* where state law prohibits ineffective-assistance claims on direct appeal); *Trevino v. Thaler*, 569 U.S. –, 133 S. Ct. 1911 (2013) (extending *Martinez* to states with procedural frameworks that make meaningful opportunity to raise ineffective-assistance claim on direct appeal unlikely); *Sutton v. Carpenter*, 745 F.3d 787, 792 (6th Cir. 2014) (holding *Martinez* and *Trevino* apply in Tennessee).

The Supreme Court's creation in *Martinez* of a narrow exception to the procedural-default bar stemmed from its recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." *Martinez*, 132 S. Ct. at 1318. In other words, *Martinez* requires that the ineffective assistance of post-conviction counsel occur during the "initial-review collateral proceeding,"[13] and that "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *See id.* at 1318–19, 1320. Importantly, *Martinez* did not dispense with the "actual prejudice" prong of the standard for overcoming procedural default first articulated by the Supreme Court in *Coleman*, 501 U.S. at 750.

---

[13] "The rule of *Coleman* governs in all but the limited circumstances recognized here. The holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts." *Martinez*, 132 S. Ct. at 1320.

As this Court understands it, review of an ineffective-assistance claim under *Martinez* potentially involves two complex layers of analysis: *Coleman* cause and prejudice analysis (including *Strickland* analysis of post-conviction counsel's effectiveness) and *Strickland* analysis of trial counsel's effectiveness. Guidance to district courts about how to implement the rulings in *Martinez* and *Trevino* is sparse. In one of the first circuit court opinions to address the issue directly, the Ninth Circuit held that, to establish *Coleman* cause under *Martinez*, a habeas petitioner must first "show that his post-conviction relief counsel was ineffective under *Strickland v. Washington*." *Clabourne v. Ryan*, 745 F.3d 362, 376 (9th Cir. 2014). That is, the petitioner must show both that his post-conviction counsel's performance was constitutionally deficient and that there is a "reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different." *Id.* at 376–77.

Next, according to the Ninth Circuit, the *Coleman* prejudice prong in the *Martinez* context requires a showing that "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the claim has some merit." *Clabourne*, 745 F.3d at 377 (quoting *Martinez*, 132 S. Ct. at 1318). For a claim to be found substantial for *Martinez* purposes, "a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell*, 537 U.S. 322, 336 (2003), *cited in Martinez*, 132 S. Ct. at 1318–19. Conversely, a claim is "insubstantial" if "it does not have any merit or . . . is wholly without factual support." *Martinez*, 132 S. Ct. at 1319.

This *Coleman/Martinez* analysis is technically required to determine whether a petitioner has established cause and prejudice sufficient to overcome his default and have his underlying

ineffective-assistance claim reviewed on the merits. But as the Ninth Circuit has noted, there are layers of redundancy built into these evaluations, which effectively necessitate an early look at the underlying merits:

> There is, to be sure, overlap between the two requirements. Within the "cause" prong there is an element of "prejudice" that must be established: to show ineffective assistance of post-conviction relief counsel, a petitioner must establish a reasonable probability that the result of the postconviction proceeding would have been different. The reasonable probability that the result of the post-conviction proceedings would have been different, absent deficient performance by post-conviction counsel, is necessarily connected to the strength of the argument that trial counsel's assistance was ineffective. The prejudice at issue is prejudice at the post-conviction relief level, but if the claim of ineffective assistance of trial counsel is implausible, then there could not be a reasonable probability that the result of post-conviction proceedings would have been different.
> . . . [T]he third conclusion—"prejudice" for purposes of the "cause and prejudice" analysis requires only a showing that the trial-level ineffective assistance of counsel claim was "substantial"—does not diminish the requirement of the second conclusion that petitioner satisfy the "prejudice" prong under *Strickland* in establishing ineffective assistance by post-conviction counsel. To demonstrate that there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different, it will generally be necessary to look through to what happened at the trial stage.

*Clabourne*, 745 F.3d at 377–78.

As a practical matter, then, in many habeas cases where a petitioner seeks to overcome procedural default under *Martinez*, it will be more efficient for the reviewing court to consider in the first instance whether the alleged underlying ineffective assistance of counsel was "substantial" enough to satisfy the "actual prejudice" prong of *Coleman*. If not, the court would have no need to consider whether the petitioner has established deficient performance by post-conviction counsel. The Sixth Circuit appears to have adopted this approach in one of its few post-*Sutton* applications of *Martinez*. *See Morrow v. Tennessee*, 588 F. App'x 415, 422–23 (6th

Cir. 2014) (reviewing trial level performance and prejudice to conclude claim was not sufficiently substantial to excuse default under *Martinez*).

With this framework in mind, the Court turns to Petitioner's defaulted claims of ineffective assistance of counsel.

A. *Paragraph 13(a)(1): Ineffectiveness Concerning Serology Evidence*

Sub-paragraph 13(a)(1) asserts that:

> Counsel failed to fully investigate the relevant serology evidence, including bodily fluids found in the victim, and blood found in the store and on a box in the cooler, to demonstrate that this evidence was not consistent with David Duncan's guilt; counsel failed to properly and fully cross-examine the prosecution's witnesses with all such serology evidence inconsistent with the prosecution's theory, including evidence revealed through investigation by the Tennessee Bureau of Investigation (T.B.I.) Laboratory; and counsel failed to employ expert assistance to assist in the investigation of the serology evidence and the cross-examination of the prosecution's experts.

(Doc. No. 64, at 16–17.)

The root of this claim is two pages of notes about serology testing conducted by the T.B.I. lab on blood samples recovered from an assortment of paper towels and toilet paper found (along with part of a cigarette wrapper and a disposable razor) at the market where the victim was killed. (*See* Doc. No. 188-14.) According to Petitioner, these cryptic and technical notes are "exculpatory" in that they "unquestionably" mean that someone other than Petitioner and the victim left blood at the scene, which means in turn that someone else committed the crime. (Doc. No. 242, at 13.) He insists that trial counsel was ineffective for failing to present this evidence through cross-examination of the prosecution's serology expert.

With regard to the allegedly deficient performance of his post-conviction counsel in failing to raise this claim, Petitioner has offered nothing more than his conclusory statement that "[t]here was 'no strategy'" in his first post-conviction counsel's failure. (Doc. No. 242, at 12.)

71

The Court need not address whether Petitioner has sufficiently established deficient performance under the first prong of *Martinez*, however, because he has failed to establish any prejudice arising from the underlying claim.

At trial, counsel elicited an acknowledgment from the prosecution's serology expert that none of the blood samples recovered from the murder scene could have come from Petitioner. (Doc. No. 10, Add. 1 vol. 7, at 528:22–529:12.) The Court has only Petitioner's assumption about what the witness's testimony would have been regarding the source of the blood stains on the paper towels and toilet paper, because he chose not to present any proof on that point at the evidentiary hearing in this matter – no examination of the original witness, no testimony from another expert, no expert affidavits. A habeas corpus petitioner cannot show prejudice arising from a failure to present testimony without making some showing of what the testimony would have been. *See Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002).

Moreover, even if, as Petitioner assumes, the necessary expert interpretation of the T.B.I. lab notes were to establish a third party as the source of the blood stains in question, that alone would not be as exculpatory as Petitioner's claim assumes. Evidence of a third party's blood in a location open to the public does not strongly suggest that a third party committed the murder, in the absence of evidence establishing exactly where the blood stains were found, how old they were, how much blood was spilled and whether there is anything else connecting it to the crime, as opposed to – for example – an accident with the razor with which they were found.

Petitioner is not entitled to relief on this claim.

*B. Paragraph 13(a)(2): Ineffectiveness Concerning Fingerprint Evidence*

The Amended Complaint sets forth this claim as follows:

> Counsel failed to fully investigate relevant fingerprint evidence, including a fingerprint allegedly found on a juice bottle in the store, to demonstrate that the physical evidence was not consistent with David Duncan's guilt, and counsel failed to properly and fully cross-examine the prosecution's witnesses with such evidence inconsistent with the prosecution's theory (including establishing the inaccuracy and subjectivity of the prosecution's fingerprint analysis), including evidence revealed through investigation by the Tennessee Bureau of Investigation (T.B.I.) Laboratory; and counsel failed to employ expert assistance to assist in the investigation of the serology evidence and the cross-examination of the prosecution's experts.

(Doc. No. 64, at 17.) Petitioner never raised a claim about fingerprint evidence in his state court proceedings.

Larry Hall, senior latent print examiner and supervisor of the fingerprint examination section of the Tennessee Bureau of Investigation crime lab, testified as an expert at trial about the fingerprints found on a juice bottle at the crime scene that circumstances suggested was the last item sold before the murder. (Doc. No. 10, Add. 1 vol. 7, at 538, 540–41.) At the time of his testimony, Hall had been working with fingerprints for thirteen years, including two years with the Federal Bureau of Investigation, and had testified as a fingerprint expert in forty or more trials. (*Id.* at 537.) He testified that he personally lifted six partial latent prints from the juice bottle, five of which were sufficient to be considered identifiable. (*Id.* at 544–45.) Comparing those latent prints to the Petitioner's fingerprints, Hall positively identified two of the latent prints as Petitioner's left index finger, one as his left ring finger, and one as his left thumb. (*Id.* at 546.) He used a chart to demonstrate to the jury ten different points of identification between one of the latent prints and Petitioner's ink fingerprint, and testified that while he considered the print a match at ten points, he actually found twenty-nine matching characteristics in that

particular print. (*Id.* at 547–52.) He acknowledged that there was no set minimum number of points of identification to justify finding a match, and that he had seen identifications made on the basis of six points with good quality prints. (*Id.* at 551–52.) Hall testified that the only purpose for his counting points in that print was for his demonstration for the jury and that he had not reported any certain number of matching points in the other prints, but that "there was no question" as to the identification of the three other prints he had matched to Petitioner. (*Id.* at 543–54.)

On cross-examination, Petitioner's counsel forced Hall to admit that he could not positively identify a fifth partial latent print on the bottle as Petitioner's, because Petitioner's ink print did not include the same area of the finger that the latent print exposed. (Doc. No. 10, Add. 1 vol. 7, at 557.) Counsel also highlighted the possibility that the sixth print was left by someone other than Petitioner:

> Q.    All right. And, so, the latent was not sufficient to identify, so the latent could have come from another source?
>
> A.    It possibly could have.
>
> Q.    All right, now, that means in your expert opinion, that latent could have been made by another party?
>
> A.    It may have, I couldn't identify it.

(*Id.* at 564; *see also id.* at 572:23–25 ("[C]ould possibly have come from another source?" "It possibly could have, yes, sir.").) Cross-examination further revealed that it is possible that someone else could have handled the bottle without leaving any prints. (*Id.* at 567–68, 575.)

Asked on redirect whether it was likely that the sixth print came from anyone other than Petitioner, Hall responded that he "wouldn't think so." (Doc. No. 10, Add. 1 vol. 8, at 573:11–

13.) He further testified that to his knowledge there was no way for Petitioner's fingerprints to be on the juice bottle without his touching or holding it. (*Id.* at 574.)

Petitioner argues to this Court that counsel should have attacked Hall's conclusions as unscientific or unreliable on the basis of his "dramatic admission" that the number of points of similarity required to identify a fingerprint as a match is subjective. (Doc. No. 242, at 14; Doc. No. 188, at 24–25.) This position fails in the abstract because courts have widely accepted fingerprint comparison evidence as sufficiently reliable to be admissible in criminal trials. *United States v. Hatcher*, 513 F. App'x 581, 584 (6th Cir. 2013); *United States v. Baines*, 573 F.3d 979, 992 (10th Cir. 2009). More importantly, it fails in the specific context of this case because Hall testified that he found twenty-nine points of similarity between Petitioner's print and one of the latent prints on the juice bottle (print #1), and walked the jury through ten of them in his chart. Petitioner does not cite any case law indicating that an identification on that basis is unreliable, much less that an attorney would be ineffective for failing to make such an argument.

Petitioner's arguments pertaining to Hall's identification of latent prints #2, #3 and #4 as Petitioner's prints all fail for lack of prejudice. Because Petitioner could only have left print #1 on the bottle by touching or holding it, that print alone places Petitioner at the scene. It makes no practical difference whether Petitioner left one print or twenty on the bottle, and no prejudice arises from any perceived failures by counsel with regard to the other matches. Further, even with the benefit of hindsight and a full federal evidentiary hearing, we do not know what additional cross-examination or expert testimony about those fingerprint matches would have established. The weakness of Hall's lack of detailed testimony about prints #2–#4 was as apparent at trial as it is today. Giving Hall an opportunity to elaborate on the points of similarity he found between the prints might only have increased his credibility in the minds of the jurors.

Petitioner also argues that trial counsel should have objected to Hall's testimony that he "wouldn't think" the two latent prints he was not able to match – prints #5 and #6 – would have come from anyone other than Petitioner. Even accepting Petitioner's position that neither Hall's expertise nor common sense supports that supposition, it is immaterial for the same reason explained above: it only takes a single print – print #1 – to establish that Petitioner touched the bottle and was therefore at the scene of the murder. Counsel effectively cross-examined Hall about those prints, forcing Hall to acknowledge that print #6 might have been left by another party and to admit repeatedly that any number of other people might have also touched the bottle. Contrary to Petitioner's current argument, the record with regard to those prints did not leave the jury with any prejudicial misimpression, despite the lack of objection.

Finally, Petitioner faults trial counsel for failing to ask Hall about any points of *dissimilarity* between Petitioner's prints and the latents found on the bottle, which he says "very well may" require a conclusion that the latent print was not Petitioner's. (Doc. No. 188, at 28.) But if there is any evidence that any of the latent prints on the bottle are definitively not Petitioner's, Petitioner has not offered it to this Court despite having ample opportunity to do so. He has therefore failed to demonstrate any prejudice arising from the alleged ineffectiveness of his trial counsel on this claim. *See Goldsby v. United States*, 152 F. App'x 431, 436 (6th Cir. 2005) (holding that habeas relief is properly denied where petitioner did not offer habeas court the evidence he claimed trial counsel should have offered).

Because his underlying claim of ineffective assistance with regard to fingerprint evidence is without merit, Petitioner is not entitled to relief on this claim regardless of whether its default would be excused under *Martinez*.

*C. Paragraphs 13(a)(5) and (a)(6): Ineffectiveness Concerning Evidence About Other Suspects*

In the referenced sub-paragraphs of his Amended Petition, Petitioner alleges that his trial counsel was ineffective for failing to investigate and present evidence that the crime was actually committed by David Key and/or Glenn David Randolph, and for failing to investigate information about the crime known to Pat Freeman. (Doc. No. 64, at 17.) The Court has already dismissed Petitioner's related claims that the prosecution's failure to produce evidence related to those individuals violated *Brady v. Maryland*, 373 U.S. 83 (1963), primarily on the basis that Petitioner has never produced any evidence connecting any of them to the crime. *Duncan v. Carpenter*, No. 3:88-00992, 2014 WL 3905440, at *29–32, 34 (M.D. Tenn. Aug. 11, 2014). For the reasons set forth in its previous memorandum, the Court finds Petitioner's ineffective-assistance claims based on the same underlying "facts" not to be substantial as required to overcome default under *Martinez*.

*D. Paragraph 13(e): Ineffectiveness on Direct Appeal*

Petitioner alleges in subaragraph 13(e) of the Amended Petition that "Counsel was ineffective on direct appeal for failing to raise any and all meritorious claims of constitutional deprivation, including any and all claims contained in this petition for writ of habeas corpus." (Doc. No. 64, at 21.) Petitioner acknowledges that this claim of ineffective assistance of appellate counsel is defaulted because it was never raised in state court, but asserts that the Court should find cause for that default in accordance with *Martinez*. (Doc. No. 242, at 6, 60.) Petitioner's argument is rooted in the fact that there is no rational distinction between post-conviction counsel's ineffectiveness in failing to raise claims of previous counsel's errors at trial and his failing to raise claims of previous counsel's errors on appeal, where there is no

opportunity to raise either claim prior to post-conviction proceedings. Regardless of the logical soundness of that argument, this Court is bound by the clear instruction of the Sixth Circuit that even under *Martinez*, "ineffective assistance of post-conviction counsel cannot supply cause for procedural default of a claim of ineffective assistance of appellate counsel." *Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013.) This claim is procedurally defaulted and not subject to habeas review.

Moreover, even if the Court were to reach the merits of subparagraph 13(e), this vague attempt at a catch-all ineffective-assistance claim does not state a claim for relief as required by Rule 2 of the Rules Gov'g Habeas Corpus Cases Under Section 2254, and would be dismissed on that basis.[14] *See Phillips v. Bradshaw*, 5:03 CV 875, 2006 WL 2855077, at *40 (N.D. Ohio Sept. 29, 2006) (holding that "catch-all ineffective assistance of counsel claim" for failure to preserve any issue raised on habeas corpus was "not well-taken"), *aff'd*, 607 F.3d 199 (6th Cir. 2010); *Clemons v. Luebbers*, 212 F. Supp. 2d 1105, 1135 (E.D. Mo. 2002) (holding that "Ground 15 is a catch-all claim that any failure to preserve claims or exhaust remedies was caused by ineffective assistance of counsel. This claim presents no grounds for habeas relief, and none will be granted."), *rev'd in part on other grounds*, 381 F.3d 744 (8th Cir. 2004); *Griffey v. Hubbard*, C 01-3483 FMS, 2004 WL 941234 (N.D. Cal. Apr. 29, 2004) (rejecting as "conclusory catchall" petitioner's claim that "[t]o the extent defense counsel failed to further develop the factual basis

---

[14] Petitioner has attempted to avoid this result by using his supplemental brief to narrow the contours of his original catch-all claim to focus on appellate counsel's failure to challenge the reasonable doubt jury instructions delivered at trial. (*See* Doc. No. 242, at 60–61.) Even that narrowed claim would fail, however, because the instructions at issue have previously been found constitutional by this Court, *Morris v. Bell*, No. 07-1084-JDB, 2011 WL 7758570, at *36 (W.D. Tenn. Sept. 29, 2011), and are materially similar to instructions approved by the Sixth Circuit in *Austin v. Bell*, 126 F.3d 843, 847 (6th Cir. 1997).

and to preserve the record with regard to the foregoing errors, petitioner was deprived of effective assistance of counsel as guaranteed by the Sixth Amendment.").

E. *Paragraphs 10(b) and 10(c): Presence of the Ku Klux Klan at Trial*

The referenced paragraphs of the Amended Petition assert that the visible presence of members of the KKK in the courtroom during Petitioner's trial, where the victim and jury were all white, violated his Sixth, Eighth and Fourteenth Amendment rights to a fair trial and sentencing hearing. In its previous decision, the Court found this claim to be procedurally defaulted, having never been raised in state court. *Duncan v. Carpenter*, No. 3:88-00992, 2014 WL 3905440, at *8 (M.D. Tenn. Aug. 11, 2014). Petitioner now argues that *Martinez v. Ryan*, 566 U.S. –, 132 S. Ct. 1309 (2012) should apply to excuse that default. (Doc. No. 242, at 20–26.) This argument lacks any basis in *Martinez* or its progeny and must fail.

As explained above, *Martinez*'s exception to the *Coleman* procedural default bar is limited to claims of ineffective assistance of trial counsel: "*Coleman* held that an attorney's negligence in a postconviction proceeding does not establish cause, and this remains true except as to initial-review collateral proceedings for claims of ***ineffective assistance of counsel at trial***." *Martinez*, 132 S. Ct. at 1319 (emphasis added). The Sixth Circuit has enforced the strict limitation on the scope of *Martinez*, explaining that "[w]e will assume that the Supreme Court meant exactly what it wrote." *See Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013) (holding that ineffective assistance of post-conviction counsel did not excuse default of substantive mental-competence claim or of ineffective-assistance-of-appellate-counsel claim); *accord Hunton v. Sinclair*, 732 F.3d 1124 (9th Cir. 2013) (rejecting argument for application of *Martinez* to *Brady* claims and explaining "[i]f *Coleman*'s revetment is to be torn down, it is not for us to do it. Rather, we must follow the case which directly controls, leaving to the Court the

prerogative of overruling its own decisions"). Accordingly, *Martinez* cannot save Petitioner's "substantive KKK/improper-racist-influence claim." (*See* Doc. No. 242, at 24.)

Petitioner now attempts to avoid this result by shoe-horning his substantive claim into a claim that "trial counsel was ineffective for failing to object to the KKK's influence upon the trial and especially the death sentence." (*Id.*) But that ineffective-assistance claim does not appear in the Amended Petition. Petitioner makes a lengthy, convoluted argument that the Court should excuse default of his substantive claim as the result of a "two-layered showing of 'cause,'" that invokes *Martinez* (Doc. No. 242, at 23), which sounds very similar to an effort that at least one other federal court has already rejected as "labyrinthine":

> Olmos attempts to derive support for the viability of this labyrinthine causal chain from *Martinez v. Ryan*, but that reliance is misplaced. The standard rule is that a petitioner has no constitutional right to counsel at collateral proceedings, and therefore cannot claim ineffective assistance at that stage. *See Coleman*, 501 U.S. at 753. The Supreme Court carved out a very narrow exception in *Martinez*: inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's default of a claim of ineffective assistance at trial. 132 S. Ct. at 1321. But that is not Olmos's argument. . . . Olmos's claim is not ineffective assistance as cause to excuse default of a claim of ineffective assistance—it is that ineffective assistance serves as cause to excuse default of a claim of ineffective assistance as cause to excuse default of a constitutional claim. Olmos therefore seeks to extend *Martinez* to situations where the ineffective assistance claim is merely the excuse for a procedural default—not the base claim itself.

*Olmos v. Ryan*, No. CV-11-00344-PHX-GMS, 2013 WL 3199831, at *10 (D. Ariz. June 24, 2013). Similarly, Petitioner's Claim 10 is not a claim of ineffective assistance of trial counsel, but a substantive constitutional claim to which *Martinez* is as inapplicable as it is to any other defaulted substantive claim.

Nothing about Petitioner's latest argument alters the Court's previous conclusion that this claim is procedurally defaulted.

## IV.  CONCLUSION

As detailed above, Petitioner is entitled to federal habeas relief from his sentence of death, based on the prejudicial ineffective assistance of his trial counsel at sentencing.  His death sentence will therefore be vacated, subject to the State's right to commence new sentencing proceedings consistent with this ruling.  In all other respects, the petition will be denied.

An appropriate Order is entered herewith.

_____
JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT